**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA**

| | |
|---|---|
| Target Corporation, a Minnesota corporation, | |
| Plaintiff, | **Case No. 0:19-cv-02916 (WMW/DTS)** |
| v. | |
| ACE American Insurance Company, a Pennsylvania corporation, and ACE Property & Casualty Insurance Co., a Pennsylvania corporation, | |
| Defendants. | |

**TARGET CORPORATION'S MEMORANDUM IN SUPPORT OF ITS
<u>MOTION FOR PARTIAL SUMMARY JUDGMENT</u>**

## **TABLE OF CONTENTS**

Page

I.    INTRODUCTION AND SUMMARY OF ARGUMENT...................................1

II.    FACTUAL BACKGROUND ..........................................................................3

    A.    The ACE Policies ...........................................................................3

    B.    The Data Breach and Financial Institutions Litigation .................6

III.    THE LEGAL STANDARDS GOVERNING THIS MOTION ..............................8

    A.    Summary Judgment Standard........................................................8

    B.    Minnesota's Rules Of Insurance Policy Interpretation .................9

IV.    ARGUMENT ...........................................................................................10

    A.    The Data Breach Settlement Includes Losses Covered by the ACE
       Policies ........................................................................................11

        1.    The Data Breach Was an "Occurrence"...........................11

        2.    Payments Cards are "Tangible Property That is Not
           Physically Injured".........................................................16

        3.    The Data Breach Resulted in the "Loss of Use" of the
           Payment Cards...............................................................17

    B.    No Exclusions in the ACE Policy Preclude Coverage, and ACE's
       Purported "Functional Analysis" is Not a Substitute for Policy
       Language .....................................................................................26

        1.    ACE Cannot Avoid Its Coverage Obligations Merely Because
           Target Had In Place Different Insurance Policies Covering
           Different Risks ...............................................................26

        2.    ACE's "Functional Analysis" Cannot Revive the "Electronic
           Information" Exclusion Deleted from the ACE Policies ................27

        3.    Other Exclusions Do Not Apply. ....................................30

V.    CONCLUSION ........................................................................................32

## <u>TABLE OF AUTHORITIES</u>

CASES                                                                    Page(s)

*Am. Emp'rs Ins. Co. v. Doe*,
   165 F.3d 1209 (8th Cir. 1999) .................................................................. 13

*Am. Family Ins. Co. v. Walser*,
   628 N.W.2d 605 (Minn. 2001)................................................................... 12

*Auto-Owners Ins. Co. v. NewMech Cos., Inc.*,
   678 N.W.2d 477 (Minn. Ct. App. 2004)..................................................... 31

*Batts v. Tow-Motor Forklift Co.*,
   66 F.3d 743 (5th Cir. 1995) ....................................................................... 18

*Block Fin. Corp. v. Lendingtree, Inc.*,
   No. 01–1007–CV–W–ODS, 2007 WL 2885158 (W.D. Mo. Sept. 27,
   2007) ......................................................................................................... 17

*C.S. McCrossan Inc. v. Fed. Ins. Co.*,
   932 F.3d 1142 (8th Cir. 2019) .................................................................. 29

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986).................................................................................... 8

*Dougherty v. State Farm Mut. Ins. Co.*,
   699 N.W.2d 741 (Minn. 2005)................................................................... 14

*Eng'g & Constr. Innovations, Inc. v. L.H. Bolduc Co.*,
   825 N.W.2d 695 (Minn. 2013).......................................................... 9, 10, 30

*Eyeblaster Inc. v. Fed. Ins. Co.*,
   613 F.3d 797 (8th Cir. 2010) ............................................................ *passim*

*Gen. Cas. Co. of Wis. v. Wozniak Travel, Inc.*,
   762 N.W.2d 572 (Minn. 2009)............................................................. 23, 25

*Goodyear Tire & Rubber Co. v. Dynamic Air, Inc.*,
   No. 02–1218 (DWF/JSM), 2004 WL 2501196 (D. Minn. Nov. 4, 2004) .................. 30

*Hartzell Indus., Inc. v. Fed. Ins. Co.*,
   168 F. Supp. 2d 789 (S.D. Ohio 2001) ..................................................... 23

*Hauenstein v. Saint Paul-Mercury Indem. Co.*,
   65 N.W.2d 122 (Minn. 1954).................................................................... 14

*J. C. Penney Nat'l Bank v. Johnson,*
    19 S.W.3d 831 (Tenn. Ct. App. 1999) ....................................................... 17

*Jefferson Ins. Co. of N.Y. v. Travelers Indem. Co.,*
    92 N.Y.2d 363 (N.Y. 1998) ...................................................................... 28

*Kokins v. Teleflex, Inc.,*
    621 F.3d 1290 (10th Cir. 2010) ................................................................ 18

*Liberty Mut. Ins. Co. v. Wheelwright Trucking Co., Inc.,*
    851 So. 2d 466 (Ala. 2002) ...................................................................... 22

*McIntosh v. State Farm Mut. Auto. Ins. Co.,*
    488 N.W.2d 476 (Minn. 1992) ................................................................. 11

*Metro. Prop. & Cas. Ins. Co. v. Adamez ex rel. Adamez,*
    102 F. Supp. 3d 1080 (D. Minn. 2015) ..................................................... 14

*Midwest Family Mut. Ins. Co. v. Wolters,*
    831 N.W.2d 628 (Minn. 2013) .................................................... 11, 27, 29

*Milbank Ins. Co. v. B.L.G.,*
    484 N.W.2d 52 (Minn. Ct. App. 1992) ..................................................... 12

*Mork Clinic v. Fireman's Fund Ins. Co.,*
    575 N.W.2d 598 (Minn. Ct. App. 1998) .................................................... 13

*Neidenbach v. Amica Mut. Ins. Co.,*
    842 F.3d 560 (8th Cir. 2016) ..................................................................... 18

*Nerud v. Nat'l Family Ins. Corp.,*
    No. CX-94-1702, 1994 WL 695040 (Minn. Ct. App. Dec. 13, 1994)............ 23, 26, 29

*Netherlands Ins. Co. v. Main Street Ingredients, LLC,*
    745 F.3d 909 (8th Cir. 2014) ..................................................................... 14

*Otten v. Stonewall Ins. Co.,*
    511 F.2d 143 (8th Cir. 1975) ....................................................................... 9

*Owners Ins. Co. v. European Auto Works, Inc.,*
    695 F.3d 814 (8th Cir. 2012) ..................................................................... 10

*Pa. State Empls. Credit Union v. Fifth Third Bank,*
    No. 1:CV-04-1554, 2005 U.S. Dist. LEXIS 42334 (M.D. Pa. May 3,
    2005) ......................................................................................................... 17

*In re Payment Card Interchange Fee and Merch. Disc. Antitrust Litig.*, 986
    F. Supp. 2d 207 (E.D.N.Y. 2013), *rev'd*, 827 F.3d 223 (2d Cir. 2016) ...................... 20

*Piper Jaffray Cos., Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*,
    967 F. Supp. 1148 (D. Minn. 1997) .............................................................. 23

*Prahm v. Rupp Constr. Co.*,
    277 N.W.2d 389 (Minn. 1979) ..................................................................... 19

*RAM Mut. Ins. Co. v. Meyer*,
    768 N.W.2d 399 (Minn. Ct. App. 2009) ....................................................... 13

*Saint Paul Fire & Marine Ins. Co. v. Lippincott*,
    287 F.3d 703 (8th Cir. 2002) ......................................................................... 8

*Star Windshield Repair, Inc. v. W. Nat'l Ins. Co.*,
    768 N.W.2d 346 (Minn. 2009) ....................................................................... 8

*Thee Sombrero, Inc. v. Scottsdale Ins. Co.*,
    28 Cal. App. 5th 729 (2018) ......................................................................... 22

*Travelers Indem. Co. v. Bloomington Steel & Supply Co.*,
    718 N.W.2d 888 (Minn. 2006) ..................................................................... 13

*Travertine Corp. v. Lexington-Silverwood*,
    683 N.W.2d 267 (Minn. 2004) ..................................................................... 23

*Turner v. Alpha Phi Sorority House*,
    276 N.W.2d 63 (Minn. 1979) ......................................................................... 9

*W. Nat'l Mut. Ins. Co. v. Frost Paint & Oil Corp.*,
    No. C3-97-1118, 1998 WL 27247 (Minn. Ct. App. Jan. 27, 1998) ............................ 12

*Westfield Ins. Co. v. Robinson Outdoors, Inc.*,
    700 F.3d 1172 (8th Cir. 2012) ..................................................................... 10

*Woida v. N. Star Mut. Ins. Co.*,
    306 N.W.2d 570 (Minn. 1981) ..................................................................... 19

## OTHER AUTHORITIES

Fed. R. Civ. P. 26(f) ......................................................................... 13, 22, 25

Fed. R. Civ. P. 56(a) ................................................................................ 8

Fed. R. Civ. P. 57 ...................................................................................... 8

## I.   INTRODUCTION AND SUMMARY OF ARGUMENT

In December 2013, Target Corporation learned that it had been the victim of a massive data breach that occurred after a hacker installed malware on its computer network and stole payment card data and personal contact information for millions of Target's customers.  Once alerted to the data breach, Target promptly contained the attack and notified its customers.  But it cost Target approximately $292 million to investigate the incident, remediate the breach, and compensate its customers, vendors, and payment card issuers for their losses.  One of the most significant losses for which Target was responsible was the replacement of tens of millions of credit and debit cards that could no longer be used because of the data breach.

Fortunately, like many large businesses, Target had already paid millions of dollars in premiums to secure insurance coverage to protect it against some of the losses that it, and its customers and vendors, incurred as a result of the data breach.  Also fortunately, Target's cyber insurers and director and officer insurers paid for losses covered under their respective insurance programs.  Some of Target's commercial general liability ("CGL") also informally resolved Target's claim for a portion of the losses covered under the CGL policies.  But there was one holdout among the CGL insurers:  ACE American Insurance Company and its sister company ACE Property & Casualty Insurance Company (collectively, "ACE"), which declined coverage and refused to pay.  Target therefore filed this insurance coverage action–the only legal action it has had to file to obtain insurance coverage for data breach losses.

By this motion, Target seeks a declaration that the ACE policies provide coverage for certain sums that Target was legally obligated to pay to settle claims for damages because of "property damage," specifically, the cost of replacing the physical payment cards rendered useless by the data breach, with the precise amount of coverage to be determined at trial. These costs fall squarely within the ACE Policies' coverage for property damage losses, which are defined to include damages resulting from the *"loss of use of tangible property that is not physically injured."* (Emphasis added.) Put simply, Target seeks a determination by the Court that the insurance policy language covers Target's losses as a matter of law. The amount of those losses will be an issue for trial.

The coverage claim is straightforward: When cyber criminals obtain cardholders' private financial account and PIN information, the physical payment cards associated with those accounts can no longer perform their intended function, *i.e.,* provide the cardholder (and only the cardholder) *safe and secure* access to financial accounts. That the card could, in theory, still be used does not mean that it can function as a valid payment card. A front-door lock whose key has been copied and distributed among the town's criminals, for example, can still be "locked" with the key, but the lock has "lost its use" as an object that protects the home from intruders and must be replaced. Likewise, continuing to use hacked payment cards after a data breach would subject cardholders to great risk of fraud and theft and so can no longer serve their intended purpose. The cards have lost their use. Thus, when a data breach occurs, banks that issue payment cards needed to change account information and incur significant costs to create and distribute new payment cards. The issuing banks asserted claims against Target for those costs, and

Target, in turn, tendered those claims to ACE for coverage as damages resulting from the "loss of use" of tangible property that is not physically injured.

ACE's refusal to provide coverage for these claims has no valid basis in the insurance policy language or Minnesota law. As is described below, each of ACE's arguments against coverage—*e.g*., that coverage is only available for a complete "loss of use" and that the "loss of use" did not arise form an "Occurrence"—all boil down to an effort to rewrite the policies that ACE drafted and sold to Target, to insert restrictions on coverage for which ACE never bargained and to which Target never agreed. But Minnesota law does not permit ACE to rewrite its contracts of insurance now that a claim has arisen. Rather, Target's rights and ACE's obligations are governed instead by the language actually contained in the insurance policies, not the language that ACE now wishes they had contained (let alone ACE's impression of what its policies *should* cover).

For these reasons, as is discussed further below, the Court should grant this motion for partial summary judgment and should declare that the ACE Policies cover Target's insurance claim, subject to proof at trial of the amount of the covered loss.

## II.     FACTUAL BACKGROUND

### A.     The ACE Policies

Like many large businesses, Target purchases a tower of CGL insurance policies each year to protect itself against third party lawsuits and claims, like the claims and lawsuits arising out of the December 2013 data breach. For the year beginning on February 1, 2013, four of the policies in Target's CGL tower were triggered by claims made by financial institutions for the costs associated with replacing payment cards that

were compromised during the data breach.  Only two of the CGL policies in that tower are at issue in this case, both issued by ACE:  a primary policy bearing policy number G27017381 ("the Primary Policy"), and a third layer excess policy ("the Excess Policy") bearing policy number G27048985.  *See* Declaration of Amanda Lagatta ("Lagatta Decl.") Exs. A & B (collectively, the "ACE Policies").

As the chart below reflects, the ACE Primary Policy is the foundation of the tower.  It provides $4.5 million in coverage for each occurrence (less a $2.5 million deductible), in excess of a $500,000 self-insured retention.  The ACE Excess Policy provides $25 million in coverage (with no deductible) in excess of $55 million:



As noted, Target has resolved this claim with the first and second excess layer CGL insurers (National Union Fire Insurance Company and XL Insurance America Inc.); it is only the ACE Policies that are at issue in this motion. Lagatta Decl. ¶ 20.

The Primary Policy's insuring agreement requires ACE to pay "for the 'ultimate net loss' ... because of ... 'property damage' to which this insurance applies." Lagatta Decl. Ex. A at 12 of 230. "Ultimate net loss" is defined to include settlement payments and defense costs. *Id*. at 30 of 230.[1] Similarly, the Excess Policy requires ACE to pay for "'loss' arising out of an 'occurrence'" once "all 'underlying insurance' has been exhausted by the payment of the limits of such insurance for covered injury or damage that takes place during our [i.e., ACE's] policy period." Lagatta Decl. Ex. B at 5 of 21. Again, "loss" is defined to include settlement payments and defense costs. Both ACE Policies have the standard definition of "Occurrence," that is, an "accident, including continuous or repeated exposure to substantially the same general harmful conditions." Lagatta Decl. Ex. A at 29 of 230; Ex. B. at 7 of 21(incorporating the substantively identical definition of the National Union excess policy, *id*. Ex. C at 9 of 113).

Both ACE Policies contain the same definition of "property damage," and it is that definition which is at the heart of this dispute. ACE defines "property damage" in pertinent part as:

---

[1]     In contrast to many primary CGL policies, defense costs erode the limits of liability of the Primary Policy. For that reason, and because the self-insured retention is substantial, the Primary Policy is sometimes described as providing "umbrella" coverage.

b.  Loss of use of tangible property that is not physically
injured.  All such loss of use shall be deemed to occur at the
time of the "occurrence" that caused it.

Lagatta Decl. Ex. A at 30 of 230; Ex. B at 7 of 21 (incorporating the substantively

identical definition of the National Union excess policy, Ex. C at 10 of 113).

In short, the first, and key, issue in this motion is whether Target's liability for

replacing credit and debit cards affected by the data breach—as described in the section

below—constitutes "loss of use of tangible property that is not physically injured."

Target submits that its losses fall within this definition as a matter of law, and as a result,

that they are covered under the ACE Policies.  *See* Section IV.A below.

**B.      The Data Breach and Financial Institutions Litigation**

The facts material to this motion are not in dispute.  In December 2013, Target

discovered that hackers had gained access to its networks and had stolen information

associated with tens of millions of payment cards.  Target took immediate steps to stop

the breach and remediate its networks.  Lagatta Decl. ¶ 5.

As a result of the data breach, Target faced multiple lawsuits, including lawsuits

from banks that issued payment cards (the "Issuing Banks").  These lawsuits were

consolidated before Judge Paul Magnuson as MDL No. 14-2522 (D. Minn.).  The Issuing

Banks claimed that, as a result of the data breach, the physical payment cards associated

with compromised accounts could no longer be used without a significant threat of

unauthorized use and fraud.  *See* Lagatta Decl. Ex. E ¶ 85.  The Issuing Banks further

claimed that they had been forced to dedicate "significant capital and human resources"

to cancelling and reissuing these physical payment cards.  *See id.* ¶¶ 85-86.  The Issuing

Banks sought substantial damages from Target.  Target provided prompt notice of these claims to ACE, which denied coverage.  Lagatta Decl. ¶¶ 6-7.

In May 2016, Target reached a settlement in the class action lawsuit brought on behalf of a class of Issuing Banks for approximately $58 million, which the district court approved.  *See* Lagatta Decl. Ex. H.   Target also reached confidential settlements with the major card issuers, Visa, MasterCard, American Express, and Discover (the "Card Brands") on behalf of most of their affiliated Issuing Banks, for the payment card claims for a total of roughly $80 million.  *See* Lagatta Decl. ¶¶ 14-15.  In total, Target settled these claims for approximately $138 million.  *Id*. ¶ 15.

This $138 million in settlements resolved all of the financial institutions' claims against Target.  The value of the settlements was calculated based on two types of losses: the cost of replacing physical payment cards, and the costs associated with alleged fraud committed with compromised payment cards.  In seeking coverage from ACE, Target is exclusively seeking indemnification for the losses associated with the former item: payment card replacement costs.  Target is not seeking to recover damages related to credit card fraud.

The precise allocation of damages between card replacement and fraud is not at issue on this motion for partial summary judgment.[2]  Instead, the sole question in this motion concerns the interpretation of the language of the ACE Policies:  whether that

---

[2]     Target alleges, and has provided documents to ACE demonstrating, that the total amount properly allocated to the costs of payment card replacement falls within ACE's aggregate coverage layer.  But the precise quantum of loss and allocation of damages are not presented by this motion.

language encompasses the amounts that Target paid to resolve third party claims for

payment card replacement costs.  That contract interpretation issue presents a question of

law that both ACE and Target agree is appropriate for resolution on summary judgment.

*See* Dkt. No. 20 at 7 ("The parties agree that a central issue in this case—whether

Defendants' insurance policies provide coverage for Target's insurance claims—is a

question of law that should be amenable to summary judgment immediately following the

parties' initial disclosures."); *see also* Fed. R. Civ. P. 57 ("The court may order a speedy

hearing of a declaratory-judgment action.").  To the extent that the Court finds coverage

is available for these payment card replacement costs, "the only remaining issue to be

decided would be the amount of damages."  Dkt. No. 20 at 7

## III.    THE LEGAL STANDARDS GOVERNING THIS MOTION

### A.    Summary Judgment Standard

A court must grant summary judgment when "there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Disputes over the meaning of

language in an insurance policy, like the one presented by this motion, are especially

appropriate for summary judgment because "[t]he interpretation of an insurance policy is

a question of law as applied to the facts presented."  *Star Windshield Repair, Inc. v. W.*

*Nat'l Ins. Co.*, 768 N.W.2d 346, 348 (Minn. 2009); *see also Saint Paul Fire & Marine*

*Ins. Co. v. Lippincott*, 287 F.3d 703, 705 (8th Cir. 2002).  The only circumstance in

which a court submits the interpretation of an insurance policy to a jury is when the Court

has determined both that (1) the relevant policy language is ambiguous; and (2)

controverted extrinsic evidence bears on that ambiguity.  *See Turner v. Alpha Phi Sorority House*, 276 N.W.2d 63, 66 (Minn. 1979).

Thus, as the Eighth Circuit put it, "even if there were an ambiguity in the contract of insurance, it is for the court to construe the contract unless its interpretation is dependent upon the resolution of controverted extrinsic evidence."  *Otten v. Stonewall Ins. Co*., 511 F.2d 143, 147 (8th Cir. 1975) (Minnesota law); *see also id.* (reversing judgment because the judge permitted "the jury rather than the judge to construe the alleged ambiguity" when there was no controverted extrinsic evidence).  Neither ACE nor Target has identified any controverted extrinsic evidence bearing on the interpretation of the "loss of use" provision in the ACE Policies, the legal issue presented by this motion.  It is thus the Court's role to interpret that language as a matter of law and determine whether ACE provides coverage.

### B.    Minnesota's Rules Of Insurance Policy Interpretation

The rules that apply to the interpretation of insurance policy language under Minnesota law are well-established.  Insurance coverage depends on the words in the insurance policy itself.  *See Eng'g & Constr. Innovations, Inc. v. L.H. Bolduc Co.*, 825 N.W.2d 695, 704 (Minn. 2013).  Thus, the "objective when interpreting insurance contracts is to 'ascertain and give effect to the intentions of the parties as reflected in the terms of the insuring contract.'"  *Id*.  "[W]e read the terms of an insurance contract 'in the context of the entire contract,' and do not construe terms so strictly 'as to lead to a harsh and absurd result.' ... We will not adopt a 'construction of an insurance policy which entirely neutralizes one provision ... if the contract is susceptible of another construction

9

which gives effect to all its provisions and is consistent with the general intent.'" *Id*. at 705.

"Where the language of an insurance policy 'is clear and unambiguous,'" Minnesota courts will "effectuate the intent of the parties by interpret[ing] the policy according to plain, ordinary sense." *Id*. at 704-05 (citation and internal quotation marks omitted); *see also Owners Ins. Co. v. European Auto Works, Inc.*, 695 F.3d 814, 822 (8th Cir. 2012) ("If a 'narrow, technical definition ... was intended by the insurance companies, it was their duty to make that intention clear.'") (quoting *Minn. Mining & Mfg. Co. v. Travelers Indem. Co.*, 457 N.W.2d 175, 181 (Minn. 1990)).  "An insurance policy is ambiguous, however, 'if it is susceptible to two or more reasonable interpretations.' ... We resolve ambiguous terms against the insurer, and construe such terms in favor of providing coverage to the insured." *Eng;g & Constr. Innovations*, 825 N.W.2d at 705.  In determining whether an insurance policy covers a claim, therefore, "policy words of inclusion within an insurance contract are 'broadly construed, and words of exclusion are narrowly considered.'" *Westfield Ins. Co. v. Robinson Outdoors, Inc.*, 700 F.3d 1172, 1174 (8th Cir. 2012) (Minnesota law) (citation omitted).

## IV.   ARGUMENT

The insuring agreements in the ACE Polices set forth three relevant requirements for coverage: the losses must (1) arise out of an "Occurrence" (2) resulting in the "loss of use" (3) of "tangible property that is not physically injured."  Lagatta Decl. Ex. A at 12, 30 of 230; Ex. B at 5 of 21; Ex. C at 10 of 113.  Once Target demonstrates that the settlement it paid to the Issuing Banks and Card Brands meets these threshold

requirements, the burden then shifts to ACE to show that an exclusion limits or eliminates coverage.  *See Midwest Family Mut. Ins. Co. v. Wolters,* 831 N.W.2d 628, 636 (Minn. 2013) ("While the insured bears the initial burden of demonstrating coverage, the insurer carries the burden of establishing the applicability of exclusions.") (citation omitted).  As described in Section IV.A below, all three requirements are met, and ACE cannot show that an exclusion bars coverage, *see* Section IV.B.

A.    **The Data Breach Settlement Includes Losses Covered by the ACE Policies**

1.    **The Data Breach Was an "Occurrence"**

The first of the three requirements in the property damage insuring agreement is easily met here.  The loss for which Target seeks coverage—*i.e.*, the portion of the settlement payment associated with the costs of replacing payment cards—arises out of an "Occurrence," *i.e.*, the data breach.

As noted above, the ACE Policies use the standard CGL definition of "Occurrence," that is, an "accident, including continuous or repeated exposure to substantially the same general harmful conditions."  Lagatta Decl. Ex. A at 29 of 230; Ex. B. at 7 of 21 (incorporating the identical definition in the National Union Excess Policy, *id*. Ex. C at 9 of 113).  The Minnesota Supreme Court has interpreted this language broadly: "As any dictionary says, an accident is simply a happening that is unexpected and unintended."  *McIntosh v. State Farm Mut. Auto. Ins. Co*., 488 N.W.2d 476, 478 (Minn. 1992).  Critically, whether an accident is "unexpected and unintended" is determined from *the standpoint of the policyholder*, Target.  So long as the

11

policyholder lacked the "specific intent to injure," a third party's intent to injure does not preclude coverage. *See Am. Family Ins. Co. v. Walser*, 628 N.W.2d 605, 612 (Minn. 2001); *see also W. Nat'l Mut. Ins. Co. v. Frost Paint & Oil Corp*., No. C3-97-1118, 1998 WL 27247, at *1 (Minn. Ct. App. Jan. 27, 1998) ("[T]here is an 'occurrence' as long as the insured did not engage in conscious wrongdoing.").

There can be no serious question but that the data breach was an unexpected and unintended "happening" from Target's standpoint and, thus, an "Occurrence" under the ACE Policies. Target was the victim of a cyberattack. There is no evidence that Target had a "specific intent" to compromise the account data of millions of its customers. It would be entirely unreasonable to suggest that Target intended to engage in conduct that heaped immense liabilities on it. This is just common sense. But more important, it is also what the Issuing Banks alleged. They asserted that the data breach was a result of Target's *negligent conduct* in *failing to stop* a third party from accessing private consumer data. At the time of settlement, the operative complaint contained no allegations of intentional misconduct. *See* Lagatta Decl. Ex. E ¶¶ 100-126; *see also id*. Ex. F (order granting in part Target's motion to dismiss). Negligence is a quintessential "accident" as that term is used in CGL policies. *See Milbank Ins. Co. v. B.L.G.*, 484 N.W.2d 52, 58 (Minn. Ct. App. 1992) ("[T]he term 'accident' includes all negligently caused injury, provided such injury was not intentional.").

That Target was alleged to be responsible for losses resulting from the intentional misconduct of third parties does not change the result. Minnesota law recognizes the existence of an "Occurrence" under standard form CGL policy language when an

12

allegedly negligent policyholder is held liable for damages resulting from the intentional acts of a third party.  *See, e.g.*, *Mork Clinic v. Fireman's Fund Ins. Co.*, 575 N.W.2d 598, 600-02 (Minn. Ct. App. 1998) (negligent hiring and supervision claims against insured employer arising out of employee's alleged intentional sexual abuse constitutes a covered "Occurrence"); *Am. Emp'rs Ins. Co. v. Doe*, 165 F.3d 1209, 1211-12 (8th Cir. 1999) (same); *see also Travelers Indem. Co. v. Bloomington Steel & Supply Co.*, 718 N.W.2d 888, 894-95 (Minn. 2006) (sole shareholder's intent to cause physical injury could not be imputed to insured corporation); *RAM Mut. Ins. Co. v. Meyer*, 768 N.W.2d 399, 404 (Minn. Ct. App. 2009) ("[T]he word 'accident' is defined to include unintended consequences of an insured's actions").

ACE argues in its portion of the Rule 26(f) Report that the "loss of use" of the payment cards did not arise from an "Occurrence" because those payment cards were "intentionally" deactivated by the Issuing Banks after the data breach.  *See* Dkt. No. 20 at 3.  In ACE's view, this "intentional" act severs the connection between the "Occurrence" and the "loss of use," purportedly vitiating coverage under the ACE Policies.  *Id.*  That argument fails for three reasons.

***First***, as described in Section IV.A.3 below, the "Occurrence" caused harm at the moment of the breach, not solely when the Issuing Banks deactivated the payment cards. Payment cards are used to safely and securely permit cardholders (and only cardholders) to purchase goods and services.  The payment cards could no longer be *safely and securely* used after a breach and before the Issuing Banks deactivated them, because the cyber criminals (or purchasers of their illegally-obtained information) could use the

cardholders' account and PIN information to make such purchases for themselves.  *See* Lagatta Decl. Ex. E ¶¶ 85-86.  For example, a car's use is lost when a leaking gas tank renders it unsafe to drive.  It is not reasonable to assert that a "loss of use" has not yet occurred simply because a driver could attempt to drive the car anyway, at the risk of further damage to the car (as well as serious injury to the driver).  *See, e.g., Netherlands Ins. Co. v. Main Street Ingredients, LLC*, 745 F.3d 909, 916 (8th Cir. 2014) (accidental sale of unfit food product constituted an "Occurrence," despite subsequent voluntary recall of the unfit products) (Minnesota law).

*Second*, it makes no difference if the loss of use of the payment cards had been triggered by the Issuing Bank's formal deactivation of the cards.  Under the insurance policy language, there is coverage if the "Occurrence" *arose from* or was caused by the data breach.  Lagatta Decl. Ex. A at 12 of 230; Ex. B at 5 of 21.  Under Minnesota law, "[t]he phrase 'arising out of' is broadly construed," *Dougherty v. State Farm Mut. Ins. Co.*, 699 N.W.2d 741, 744 (Minn. 2005), and "generally connotes originating from, growing out of, or flowing from." *Metro. Prop. & Cas. Ins. Co. v. Adamez ex rel. Adamez*, 102 F. Supp. 3d 1080, 1084 (D. Minn. 2015); *see also Hauenstein v. Saint Paul-Mercury Indem. Co.*, 65 N.W.2d 122, 126 (Minn. 1954) (property damage that was "an unexpected, unforeseen, or undesigned happening or consequence from either a known or unknown cause" was "caused by accident").  It is thus not necessary, as ACE appears to assume, that there be no intentional acts in the causal chain between the "Occurrence" and the "loss of use."  The policy language does not require that the "loss of use" arise *solely* from the "Occurrence"; the loss only must "flow[] from" the unexpected

14

happening.  In this case, the replacement costs "flow[] from" the data breach, as the Issuing Banks made the reasonable (and necessary) decision to deactivate and replace the affected payment cards after the data breach rendered their use unsafe.

In fact, parties must almost always take such necessary actions to mitigate and address the risks to life and property caused by an "Occurrence."  This is precisely why plaintiffs seek damages—because as a result of someone else's negligence, they are forced to spend money to fix a problem.  Taking steps to remedy another's negligence does not eliminate the damages; rather, it defines the scope of the damages.  Thus, when a policyholder borrows a neighbor's front-door key, and the key is stolen and copied as the result of the policyholder's negligence, that policyholder may be held liable for—and CGL insurance would then cover—all of the neighbor's damages, including the cost of re-keying the door.  The "Occurrence" is not the intentional call to the locksmith, or the intentional decision to re-key the lock; it is the fact that the key was stolen as a result of the policyholder's negligence, which was accidental from the standpoint of the policyholder.  The cost of the locksmith's "intentional" re-keying is part of the resulting damage from the "Occurrence."

ACE's argument thus improperly conflates the accident with the remedy, suggesting that when the Issuing Banks fixed the problem caused by the data breach, that undid the fact that the property damage "flow[ed] from" an "Occurrence" in the first place.  The reasonable and necessary steps that the Issuing Banks took to mitigate the harm caused by the data breach by reissuing payment cards that had been rendered useless arose from (and was rendered necessary by) the data breach.

15

**Third**, ACE's position is also contrary to Eighth Circuit authority.  In *Eyeblaster Inc. v. Federal Insurance Co.*, 613 F.3d 797 (8th Cir. 2010)—discussed in greater detail in Section IV.A.3.a below—the Eighth Circuit, applying Minnesota law, found that the cost of a computer whose operations had been limited by a spyware attack was covered as the "loss of use of tangible property that is not physically injured," despite the fact that the owner of the computer necessarily made an "intentional" decision to replace it once the computer became infected.  *Id.* at 801-802.  The Eighth Circuit's reasoning is equally applicable to this case.  If ACE were right that the steps taken to fix a problem eliminates the possibility of an "Occurrence," then the decision to dispose of the infected computer would have severed the relationship between the spyware attack and the loss of use of the computer, and the Eighth Circuit could not have held that the CGL policy covered the loss.  That the Eighth Circuit did find coverage means, consistent with other Minnesota cases, that the intervening acts of a third party to mitigate damage does not sever the connection between loss of use and an "Occurrence."

*     *     *     *

For these reasons, Target's liability for the payment card replacement costs arose from an "Occurrence" as required by the ACE Policies.

### 2.    Payments Cards are "Tangible Property That is Not Physically Injured"

The second requirement does not appear to be in dispute: payment cards replaced by the Issuing Banks were "tangible property that is not physically injured."  Every court to have considered this question has concluded, consistent with common sense, that

plastic payment cards constitute "tangible property."  "[T]hey are palpable, can be touched, [are] capable of ownership, and [are] endowed with intrinsic value."  *Pa. State Empls. Credit Union v. Fifth Third Bank*, No. 1:CV-04-1554, 2005 U.S. Dist. LEXIS 42334, at *33 (M.D. Pa. May 3, 2005); *see also Block Fin. Corp. v. Lendingtree, Inc.*, No. 01–1007–CV–W–ODS, 2007 WL 2885158, at *2-3 (W.D. Mo. Sept. 27, 2007) ("financial card" such as credit or debit card is properly defined, in part, as "a tangible piece of plastic"); *J. C. Penney Nat'l Bank v. Johnson*, 19 S.W.3d 831, 840 (Tenn. Ct. App. 1999) ("a credit card is tangible in that it can be seen and touched").  Even ACE admits that these payment cards are "a piece of tangible plastic."  Dkt. No. 20 at 3.

Because there is also no dispute that the physical payment cards were "not physically injured" by the data breach, Target has satisfied the second requirement for coverage under the ACE Policies.

### 3.     The Data Breach Resulted in the "Loss of Use" of the Payment Cards

The last relevant requirement for coverage is also met here: the tens of millions of affected payment cards could no longer perform their intended function as a result of the data breach, and they thus had to be replaced at great expense to the Issuing Banks (and ultimately, to Target).  ACE disputes this obvious conclusion, but its arguments either contradict the plain language of the ACE Policies, Eighth Circuit authority, or both.  As a matter of law, the data breach resulted in the "loss of use" of the affected payment cards.

### a)     Both the Plain Meaning of the Policy Language and Eighth Circuit Authority Demonstrate that the Data

17

**Breach Resulted in the "Loss of Use" of the Payment Cards**

The Court's analysis of what constitutes the "loss of use" of tangible property that is not physically injured must be guided by, and ultimately conform to, the Eighth Circuit's interpretation of the standard CGL policy's "loss of use" provision under Minnesota law.[3]  The Eighth Circuit's *Eyeblaster* decision addressed this precise issue and confirms that Target has met the "loss of use" requirement.

In *Eyeblaster*, the underlying plaintiff alleged that his computer had been infected by spyware as a result of Eyeblaster's internet advertising, and that attempts to repair the computer only restored its most basic functions.  *Eyeblaster*, 613 F.3d at 801.  The underlying plaintiff sought from Eyeblaster the cost of replacing its computer, among other damages.  *Id*. at 802.  Eyeblaster tendered its defense to Federal Insurance Company under two policies (including its CGL policy) but Federal refused to defend. *Id*. at 799.  Eyeblaster then brought a declaratory relief action in the District of Minnesota and the district court granted Federal's motion for summary judgment.  *Id*. at 799-800.

The Eighth Circuit reversed, holding that Federal owed a duty to defend Eyeblaster under both of Eyeblaster's insurance policies, including its CGL policy's "loss of use" grant of coverage:

> He thus argues that his computer is no longer usable, as he
> claims among his losses "the cost of his existing computer"…

---

[3]     *See Neidenbach v. Amica Mut. Ins. Co*., 842 F.3d 560, 566 (8th Cir. 2016) ("'Absent an intervening opinion by a [state] court,' we are bound by a prior panel's interpretation of state law."); *see also Kokins v. Teleflex, Inc.*, 621 F.3d 1290, 1295 (10th Cir. 2010) (district courts are bound by federal circuit court's prior interpretation of state law); *Batts v. Tow-Motor Forklift Co.*, 66 F.3d 743, 747 (5th Cir. 1995) (same).

> The plain meaning of tangible property includes computers, and the Sefton complaint alleges repeatedly the "loss of use" of his computer. We conclude that the allegations are within the scope of the General Liability policy.

*Id.* at 802 (emphasis added).

That *Eyeblaster* involved the duty to defend (as opposed to the duty to indemnity) does not make a difference for present purposes.  Although the duty to defend is broader than the duty to indemnify, if there can be no duty to indemnify *as a matter of law*, there is no duty to defend.  *Woida v. N. Star Mut. Ins. Co.*, 306 N.W.2d 570, 574 (Minn. 1981).  In other words, a duty to defend exists if a plaintiff *alleges* a loss within the scope of coverage.  *Prahm v. Rupp Constr. Co.*, 277 N.W.2d 389, 390 (Minn. 1979).  If the plaintiff does not allege a loss within the scope of coverage, no duty to defend can exist.  *Id.*  Thus, the Eighth Circuit could not have reached its decision in *Eyeblaster without holding that the plaintiff in that case alleged a loss within the scope of coverage as a matter of law.*  If ACE were correct—*i.e.*, if coverage for "loss of use of tangible property that is not physically injured" could not apply in this situation as a matter of law—then *Eyeblaster* would not have found that the plaintiffs' allegations triggered a duty to defend.  That the Eighth Circuit did so confirms that coverage is available for Target's loss.

ACE may attempt to distinguish *Eyeblaster* on the ground that the underlying plaintiff also complained that he had spent thousands of dollars reconstructing tax returns stored on the computer.  That would be wrong, because the Eighth Circuit did not consider that cost in its analysis, let alone base its interpretation of the "loss of use"

provision on that fact.  *See Eyeblaster*, 613 F.3d at 802-03.  For the Eighth Circuit, it was sufficient that the computer was tangible property and that the spyware that infected the computer had rendered at least some of its functions unusable.  *Id*.  The Eighth Circuit did not require that the computer be entirely unusable for any purpose to trigger CGL coverage for loss of use; rather, the Court found coverage even though the computer apparently retained some basic functionality.

The same logic applies to Target's claim.  Both the computer in *Eyeblaster* and the payment cards at issue in this action lost their ability to function *as intended* as a result of the respective cyber-attacks.  Payment cards permit consumers to purchase goods and services because they are connected to each consumer's account at a financial institution. Lagatta Decl. Ex. E ¶ 17; *see also In re Payment Card Interchange Fee and Merch. Disc. Antitrust Litig*., 986 F. Supp. 2d 207, 214 (E.D.N.Y. 2013), *rev'd*, 827 F.3d 223 (2d Cir. 2016).  An essential function of payment cards is that each card applies exclusively to the cardholder's own debts (*i.e.*, the charges that the cardholder makes) and not to the fraudulent charges of some third person.  When the data connected to those accounts is compromised (such that someone besides the consumer could withdraw the cardholder's funds or make purchases on the cardholder's line of credit), the physical payment cards associated with those compromised accounts cannot safely be used without the risk of fraud.  *See* Lagatta Decl. Ex. E ¶ 85 (alleging that "possession of a stolen PIN number could mean unauthorized access at an ATM" and that customers whose account information was hacked "risk having [their] checking account wiped out").

Like the analogy at the beginning of this memorandum to a front door lock whose key has been copied and stolen, the payment cards associated with the hacked accounts immediately lost their ability to function as intended—*i.e.* to provide secure access only to the cardholder.  The Issuing Banks needed to change or cancel the accounts whose information was compromised, and then issue new physical payment cards associated with that new account information, to keep the assets of the cardholders safe.  *See id.* ¶ 2 (listing actions undertaken by the Issuing Banks in response to the data breach); ¶ 85 (alleging Issuing Banks "are primarily responsible for paying for card replacement"). And, of course, once the Issuing Banks took the necessary task of cancelling or changing the account information, the "old" payment cards lost any ability to access the funds or credit lines of the cardholders (safely or not).

### b)      ACE's Counterarguments Have No Merit

ACE does not appear to dispute that the payment cards could no longer safely be used *as payment cards* after the data breach.  Nevertheless, ACE has at various times raised three arguments for why it contends that there has been no "loss of use": (1) the plastic payment cards could be used for other purposes after the data breach; (2) even if there was a loss of use," it was the cardholder's use of the card was lost, not the Issuing Banks' or Card Brands' loss of use; and (3) the ACE Policies were intended only to provide coverage for the temporary "loss of use," not a permanent loss as occurred here. Each argument fails.

***First***, ACE asserts in its portion of the Rule 26(f) report that even though the data breach precluded millions of payment cards from being used as intended, the payment

cards were still "completely useful [for other purposes] as a piece of tangible plastic." Dkt. No. 20 at 3.  ACE suggests, for example, that "an enterprising Minnesotan could still use the plastic card to clear a frosted windshield where no ice scraper was available."  *Id.*

As an initial matter, the ACE Policies provide coverage for damages that Target must pay because of a "loss of use" of tangible property that is not physically injured, without further limitation or qualification.  *See* Lagatta Decl. Ex. A at 30 of 230; Ex. B at 7 of 21.  There is no requirement, for example, that the "loss of use" be total as opposed to partial, or that the tangible property be unable to be converted for a completely different purpose than the use that was lost.  Courts in multiple jurisdictions have been clear that a CGL policy that simply refers to "loss of use," without further limitations, means the loss of any significant use of the property, whether permanent or temporary, partial or total, diminished or complete.  *See, e.g.*, *Thee Sombrero, Inc. v. Scottsdale Ins. Co.*, 28 Cal. App. 5th 729, 737 (2018) ("[T]he reasonable expectations of the insured would be that 'loss of use' means the loss of *any* significant use of the premises, not the total loss of all uses.") (emphasis in original); *Liberty Mut. Ins. Co. v. Wheelwright Trucking Co., Inc.*, 851 So. 2d 466, 494-95 (Ala. 2002) ("The failure … to specify the extent of the loss of use, whether complete uselessness or diminishment in value for a particular purpose, means that, at a minimum, the provision is ambiguous and therefore due to be construed against [the insurer]."); *Hartzell Indus., Inc. v. Fed. Ins. Co.*, 168 F. Supp. 2d 789, 795 (S.D. Ohio 2001) ("The policy does not specify that the loss of use must be total as opposed to partial.").

22

Had ACE actually intended to include those additional restrictions in the ACE Policies it was required to do so expressly and in writing; Minnesota courts "will not rewrite the insurance contract to provide an exclusion that the insurer could have [included], but did not, include." *Nerud v. Nat'l Family Ins. Corp.*, No. CX-94-1702, 1994 WL 695040, at *2 (Minn. Ct. App. Dec. 13, 1994); *see also Travertine Corp. v. Lexington-Silverwood*, 683 N.W.2d 267, 271 (Minn. 2004) ("[W]hen a contractual provision is clear and unambiguous, courts should not rewrite, modify, or limit its effect by a strained construction."). Target was sued by the Issuing Banks because the payment cards lost their ability to safely and securely access the cardholders' financial accounts. That the Issuing Banks could have handed out the cards for use as ice scrapers was not a defense to Target's potential liability. That "loss of use" alone is sufficient to trigger coverage.

ACE's position also contravenes basic tenets of insurance policy interpretation. Policy words of "inclusion"—like the grant of coverage in the ACE Policies for damages caused by the "loss of use of tangible property that is not physically injured"—must be "broadly construed." *Gen. Cas. Co. of Wis. v. Wozniak Travel, Inc*., 762 N.W.2d 572, 575 (Minn. 2009). ACE's artificial narrowing of that term contradicts this rule of insurance policy interpretation. In addition, adopting ACE's interpretation would improperly render the grant of coverage for such "loss of use" a "practical nullity." *See Piper Jaffray Cos., Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 967 F. Supp. 1148, 1157 (D. Minn. 1997) (holding that an interpretation renders a policy provision a "practical nullity" is "disfavored in Minnesota, for 'liability insurance contracts should, if possible,

be construed so as not to be a delusion to the insured'") (citation omitted).  An insurer could always invent some alternative use for any item of tangible property for which "loss of use" coverage is sought.  For example, a machine that melted down in a fire could still serve as a paper weight.  However, no reasonable policyholder would expect that its insurer could deny coverage for any "loss of use" simply because the affected tangible property might still hold a stack of papers in place against the wind.

Finally, ACE's position is not consistent with *Eyeblaster*.  In that case, the Eighth Circuit found that the "loss of use" of the underlying plaintiff's spyware-infected computer was covered under identical policy language.  *See Eyeblaster*, 613 F.3d at 801-802.  The Eighth Circuit reached this conclusion even though the underlying plaintiff had alleged that, after repair, the computer retained some basic functionality while continuing to suffer from "numerous pop-up ads; a hijacked browser that communicates with websites other than those directed by the operator; random error messages; slowed computer performance that sometimes results in crashes; and ads oriented toward his past web viewing habits."  *Id*. at 800.  That the underlying plaintiff did not allege a total "loss of use" was immaterial to the Eighth Circuit's decision, as was the obvious fact that—as ACE might have suggested—the computer was not *completely* useless because it could have been repurposed as a paper weight.

**Second**, ACE asserts in the Rule 26(f) Report that, even if there was a "loss of use," the fact that *cardholders* lost the use of the payment cards (and not "the Issuing Banks or Card Brands to which Target's settlement payments were made"), eliminates coverage.  *See* Dkt. No. 20 at 3.  This position too has no support in the language of the

24

ACE Policies.  ACE's standard-form language provides coverage for damages resulting from *any* "loss of use of tangible property that is not physically injured."  Lagatta Decl. Ex. A at 30 of 230.  The ACE Policies contain no language suggesting that the "loss of use" must be experienced by the underlying plaintiff itself (as opposed to the underlying plaintiff's customers), let alone language stated in the clear and unambiguous terms required for ACE to deny coverage on this ground.  *See Wozniak Travel*, 762 N.W.2d at 575 ("words of exclusion are narrowly considered").

Instead, the Policies cover Target's liability to pay damages because of property damage.  *See* Lagatta Decl. Ex. A at 12 of 230; Ex. B at 7 of 21.  Moreover, the cardholders and the Issuing Banks share the use of the cards—while they are in the possession of cardholders, they are used by the Issuing Banks as a "key" to access credit lines held by the banks; they do not serve only the cardholders.  *See* Lagatta Decl. Ex. E ¶ 17.  So ACE's argument that the plaintiffs—the Issuing Banks—had to suffer injury would not help it even if the insurance policy had included such a limitation.

***Third***, ACE argued in its pre-litigation correspondence that no coverage is available because the "loss of use" provision was intended to cover only the *temporary* "loss of use" of tangible property not physically injured, not *permanent* "loss of use." But there is no Minnesota law to support this proposition, particularly when, as here, ACE did not actually limit the language in its policies to "temporary" loss of use.  It may not rely on a phantom exclusion or enlist the Court to improperly insert it after the fact. *See Nerud*, 1994 WL 695040, at *2.  In addition, ACE's argument cannot be reconciled with the Eighth Circuit's holding in *Eyeblaster*.  Were ACE correct, the *Eyeblaster*

decision could not have been decided as it was, as the Eighth Circuit found "loss of use" coverage available for the underlying plaintiff's allegation that he *permanently* lost the use of his computer. *See Eyeblaster*, 613 F.3d at 802.

*      *      *      *

For these reasons, Target's liability for the payment card replacement costs falls within covered damages caused by the "loss of use of tangible property that is not physically injured."

### B.   No Exclusions in the ACE Policy Preclude Coverage, and ACE's Purported "Functional Analysis" is Not a Substitute for Policy Language

The burden now shifts to ACE to establish that exclusions or other limitations in the ACE Policies allow it to avoid coverage. *See Wolters,* 831 N.W.2d at 636 ("While the insured bears the initial burden of demonstrating coverage, the insurer carries the burden of establishing the applicability of exclusions.") (citation omitted).  ACE cannot satisfy its burden of proof.

### 1.   ACE Cannot Avoid Its Coverage Obligations Merely Because Target Had In Place Different Insurance Policies Covering Different Risks

ACE argues, without citation to authority, that its policies do not cover the payment card losses because other insurance policies, covering different risks, were available to Target.  That argument fails.

While it is undisputed that Target had in place at the time of the breach cyber insurance and director and officer insurance that provided coverage for some of Target's data breach losses, that does not allow ACE to avoid its CGL coverage obligations under

26

the ACE Policies.  Target purchased a contract of insurance from ACE that explicitly

provides coverage for the types of losses that are the subject of this motion, and Target is

not seeking coverage from different towers for the same losses:  the cyber insurers paid

their limits of liability for investigation and remediation costs, and the expense of

defending against and settling consumer claims and PCI fines; and the D&O policies paid

for the cost of certain matters related to shareholder derivative litigation following the

data breach.  Lagatta Decl. ¶¶ 17-18.

Neither tower indemnified Target for the cost of resolving claims for "loss of use"

of payment cards, and the ACE Policies contain no language allowing ACE to escape its

coverage obligations for the "loss of use" claims merely because Target maintains

different insurance policies covering differing risks and different losses arising from the

data breach.  Target is not seeking a "double recovery" for the losses that other insurers

paid.

### 2.   ACE's "Functional Analysis" Cannot Revive the "Electronic Information" Exclusion Deleted from the ACE Policies

In prior communications, ACE eschewed its insurance policy language for a so-

called "functional analysis," a doctrine that is occasionally employed in New York.  In

that state, courts will sometimes consider the "common sense meaning of the terms that

describe the policy's coverage vis-à-vis other insurance" to determine the purpose of the

coverage provided relative to other insurance policies.  *See Jefferson Ins. Co. of N.Y. v.*

*Travelers Indem. Co*., 92 N.Y.2d 363, 372 (N.Y. 1998).  In other words, under this

analysis, coverage depends not on the language of the insurance policy but on the losses

that the court decisions conclude should fall under this *type* of coverage (as opposed to another type of coverage), regardless of what the insurance policy actually says. But that gets ACE nowhere for three principal reasons.

*First*, the "functional analysis" argument is a creature of New York law. *See id.* ("New York applies 'a functional analysis to separate lines of insurance, and an insurance policy should be read in light of the role it is to play'"). Target has not been able to locate a single Minnesota decision applying the concept. Accordingly, Minnesota policyholders like Target bargain for coverage with the reasonable expectation that this non-Minnesota doctrine will not apply to the policies that they purchase. ACE cannot simply import a doctrine used by another jurisdiction to restrict coverage provided by insurance policies governed by Minnesota law.

*Second*, a "functional analysis" is inconsistent with Minnesota law. It is hornbook law in Minnesota that insurance policies are interpreted based on the plain meaning of the language actually contained in the insurance policy, not the unspoken intent of one of the parties. *See, e.g.*, *Wolters*, 831 N.W.2d at 636; *C.S. McCrossan Inc. v. Fed. Ins. Co.*, 932 F.3d 1142, 1145 (8th Cir. 2019). Moreover, it is not uncommon, let alone prohibited (as ACE suggests), for different lines of insurance to provide overlapping coverage. In fact, the Eighth Circuit in *Eyeblaster* held that the underlying plaintiff's claim was covered under both Eyeblaster's CGL policy *as well as* its Information and Network Technology Errors or Omissions policy. *See* 613 F.3d at 801-802, 804-805. To the extent that ACE sought to exclude from its CGL coverage anything that might also be covered by another type of insurance policy, it was required to bargain for such an exclusion and agree with

Target to include that limiting language in the ACE Policies.  *See Nerud*, 1994 WL 695040, at *2.  It never did so.

> **Third**, the original text of the ACE Policy had an express exclusion for loss of use of electronic data.  But ACE deleted that exclusion, reflecting an express intent to include loss of use of electronic data as a covered property damage loss.  That is, the "body" of the ACE Primary Policy contains Exclusion T, an "Electronic Data" exclusion that bars coverage for:

> > Damages arising out of the loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate electronic data.

Lagatta Decl. Ex. A at 18 of 230.  However, ACE deleted this Exclusion from the as-issued ACE Policies, through Endorsement 18, which provides:

> > The following exclusions under SECTION I COVERAGES, COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY, 2. Exclusions are deleted: . . . t. Electronic Data.

*Id*. at 83 of 230.  Had ACE intended to exclude coverage for loss of use of property in the form of electronic data, such as the financial account data accompanying each payment card, ACE would have kept the exclusion in its policies.  Having expressly agreed to delete this exclusion, ACE cannot take the position that the limits on coverage that it expressly deleted are still part of the contract of insurance.  Nor can it evade its express deletion of the limiting language by invoking an out-of-state "functional analysis" argument.  Instead, its "liability is governed by the language of the insurance policy." *Eng'g. & Constr.*, 825 N.W.2d at 704.

###     3.     Other Exclusions Do Not Apply.

ACE raises the Contractual Liability Exclusion and the Impaired Property Exclusion as potential bases to deny coverage in its fifth affirmative defense. *See* Dkt. No. 15 at 9.  To the extent that ACE pursues these purported defenses, there is no reasonable interpretation of either of them that could preclude coverage here.

This is because the Contractual Liability exclusion bars coverage only for liability that Target assumed from a third party by contract.  *See* Lagatta Decl. Ex. A at 13 of 230 ("This insurance does not apply to: … '[P]roperty damage' for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement."); *see also Goodyear Tire & Rubber Co. v. Dynamic Air, Inc.*, No. 02–1218 (DWF/JSM), 2004 WL 2501196, at *5 (D. Minn. Nov. 4, 2004) (contractual liability exclusion only excludes coverage "for damages the insured must pay by reason of the assumption of liability of a third party in a contract or agreement, such as an indemnification or agreement to hold harmless").  Target did not face or settle any claims for such assumed liability arising out of the data breach.  *See* Lagatta Decl. Ex. E ¶¶ 100-126; Ex. H at 5 of 41.  In fact, no breach of contract claims whatsoever were ever pleaded against or settled by Target.  *Id.*  The Court can and should reject ACE's argument concerning the Contractual Liability Exclusion on this ground alone.

But even if Target had assumed such third party liability, the Contractual Liability Exclusion would still not apply.  The exclusion does not bar coverage for liability that the policyholder would face even in the absence of the contract assuming third party liability, such as negligence or statutory claims.  *See* Lagatta Decl. Ex. A at 13 of 230

("[E]xclusion does not apply to liability for damages … [t]hat the insured would have in the absence of the contract or agreement."); *see also Auto-Owners Ins. Co. v. NewMech Cos., Inc.*, 678 N.W.2d 477, 483 (Minn. Ct. App. 2004) (contractual liability exclusion did not bar coverage for insured homebuilder that contractually assumed liability for repair costs because it was also "legally liable" under statutory warranties).  These are precisely the types of claims Target settled.  *See* Lagatta Decl. Ex. E ¶¶ 100-126 (class action complaint asserting negligence and statutory claims against Target).

Nor can ACE rely on the Impaired Property Exclusion.  It bars coverage for property damage arising out of defects in Target's "products" or "work," or out of Target's failure to perform in accordance with a contract.  *See* Lagatta Decl. Ex. A at 16, 27, 31 of 230; Ex. C at 7, 10-11 of 113.  But the "loss of use" of the payment cards did not arise out of any faulty products Target supplied or any of its work under, or failure to comply with the terms of, any contract.  Rather, the Issuing Banks alleged that Target breached a duty to protect customers' financial information by negligently securing its electronic systems.  Lagatta Decl. Ex. E ¶¶ 2, 15-16, 22-24, 76-83, 100-126; *see also Eyeblaster*, 613 F.3d at 802-03 (finding impaired property exclusion inapplicable).

In fact, in pre-suit correspondence ACE conceded that the Impaired Property Exclusion would not apply so long as Target sought costs only for the replacement of the payment cards (as opposed to restoring them to use).  *See* Lagatta Decl. ¶ 19 & Ex. J at 5 of 5.  No payment cards could be "restored to use," and so Target and ACE should agree that the Impaired Property Exclusion does not apply.

## V.  CONCLUSION

For the foregoing reasons, the Court should grant Target's motion for partial summary judgment.

Dated:  May 25, 2020

Covington & Burling LLP

*/s/  Gretchen Hoff Varner*
David B. Goodwin (CA, #104469)
Gretchen Hoff Varner (CA, #284980)
COVINGTON & BURLING LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, CA 94105-2533
Tel.:  (415) 591-6000
Fax:  (415) 591-6091
Email:  dgoodwin@cov.com
        ghoffvarner@cov.com

John B. Lunseth II (#065341)
Mira Vats-Fournier (#0399692)
TAFT, STETTENIUS & HOLLISTER, P.A.
2200 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
Phone:  612-977-8400
Fax:  612-977-8650
Email:  jlunseth@taftlaw.com
        mvats-fournier@taftlaw.com

*Attorneys for Plaintiff*
*Target Corporation*
