# UNITED STATES DISTRICT COURT

# DISTRICT OF MINNESOTA

| | |
|---|---|
| Target Corporation, a Minnesota corporation, | Court File No. 0:19-CV-2916 |
| Plaintiff, | |
| v. | **DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND IN SUPPORT OF ITS CROSS-MOTION FOR SUMMARY JUDGMENT** |
| ACE American Insurance Company, a Pennsylvania corporation and ACE Property & Casualty Insurance Co., a Pennsylvania corporation, | |
| Defendants. | |

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

STATEMENT OF ISSUE .................................................................................... 3

STATEMENT OF FACTS ................................................................................... 3

ANALYSIS ......................................................................................................... 11

    I.      Summary Judgment Standard and Rules of Insurance Policy
          Construction ................................................................................ 11

    II.     The ACE Policies Do Not Provide Indemnity Coverage for Target's
          Settlement Payments. ................................................................. 14

          A.     Target's Settlement Did Not Satisfy a Legal Obligation to Pay
                "Damages Because of Loss of Use of Tangible Property." ............. 14

               1.     As A Matter of Law, Card Claimants Did Not Lose
                    Use of the Payment Cards. ..................................................... 14

               2.     As Matter of Law, Payment Card Replacement Costs
                      Are Not "Damages Because of Loss of Use." ...................... 20

          B.     Even if Replacement Costs were "Property Damage," it
                Would Not Be Property Damage Caused by an "Occurrence.".......33

    CONCLUSION ............................................................................................. 39

# TABLE OF AUTHORITIES

## CASES

*3M v. Travelers Indem. Co.*, 457 N.W.2d 175 (Minn. 1990) ............................................ 23

*Advanced Network, Inc. v. Peerless Ins. Co.*, 190 Cal. App. 4th 1054 (Cal. App. 4th Dist. 2010) ........................................................................ 24, 28, 30

*American Family Insurance Co. v. Walser*, 628 N.W.2d 605 (Minn. 2001) .............. 36, 37

*Atmel Corp. v. St. Paul Fire and Marine Ins. Co.*, 430 F. Supp. 2d 989 (N.D. Cal. 2006) ...................................................................................... 22, 29, 33

*Bahr v. Boise Cascade Corp.*, 766 N.W.2d 910 (Minn. 2009) ........................................ 13

*Bering v. Interins. Exch. of the Auto. Club*, 2002 WL 31320598, (Cal. Ct. App. Oct. 17, 2002) ............................................................................... 18, 30

*Bobich v. Oja*, 258 Minn. 287, 104 N.W.2d 19 (1960) .................................................... 11

*Bright Wood v. Bankers Standard Insurance Co.*, 665 N.W.2d 544 (Minn. App. 2003) .................................................................................... 34, 35, 38

*Camp's Grocery, Inc. v. State Farm Fire & Casualty Co.*, 2016 WL 6217161, (N.D. Ala. Oct. 25, 2016) .......................................................................... 19, 20, 23

*Canadian Universal Ins. Co. v. Fire Watch, Inc.*, 258 N.W.2d 570 (Minn. 1977) ....................................................................................................... 12

*Carlson v. Allstate Ins. Co.*, 749 N.W.2d 41 (Minn. 2008) ............................................. 12

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ................................................................ 11

*Collin v. American Empire Ins. Co.*, 21 Cal. App. 4th 787 (Cal. App. 2nd Dist. 1994) ............................................................................... 27, 28, 29, 30

*Emp'r Mut. Liab. Ins. Co. of Wis. v. Eagles Lodge of Hallock, Minn.*, 282 Minn. 477, 165 N.W.2d 554 (1969) ........................................................ 12

Eng'g *& Const. Innovations, Inc. v. L.H. Bolduc Co.*, 825 N.W.2d 695 (Minn. 2013) ....................................................................... 11, 12, 21, 27, 28, 29

*Eyeblaster v. Federal Ins. Co.*, 613 F.3d 797 (8th Cir. 2010) ............................... 31, 32, 33

*F&H Constr. v. ITT Hartford Ins. Co.*, 118 Cal. App. 4th 364 ........................................ 29

*Federated Mut. Ins. Co. v. Concrete Units, Inc.* 363 N.W.2d 751 (Minn. 1985) ..................................................................2, 21, 23, 24, 26, 27, 28, 29, 31, 33

*GATX Leasing Corp. v. National Union Fire Insurance Co.*, 1994 WL 383909 (N.D. Ill. July 19, 1994), *aff'd*, 64 F.3d 1112 (7th Cir. 1995) .......................38

*Ins. Co. of N. Am. v. Cease Elec., Inc.*, 688 N.W.2d 462 (Wisc. 2004) ...........................20

*Interstate Fire & Cas. Co. v. Auto-Owners Ins. Co.*, 433 N.W.2d 82 (Minn. 1988) ............................................................................................................13

*Jenoff, Inc. v. N.H. Ins. Co.*, 558 N.W.2d 260 (Minn. 1997) ............................................12

*Red Ball Leasing v. Hartford Accident & Indem. Co.*, 915 F.2d 306 (7th Cir. 1990) ................................................................................................................38, 39

*Reinsurance Ass'n of Minn. v. Johannessen*, 516 N.W.2d 562 (Minn. App. 1994) ............................................................................................................12

*Republic Nat'l Life Ins. Co. v. Loraine Realty*, 279 N.W.2d 349 (Minn. 1979) ..............................................................................................................................29

*Ricci v. DeStefano*, 557 U.S. 557 (2009)..........................................................................11

*SCSC Corp. v. Allied Mut. Ins. Co.*, 536 N.W.2d 305 (Minn. 1995) ................................13

*Sony Computer Entertainment America Inc. v. American Home Assurance Company*, 532 F.3d 1007 (9th Cir. 2008) ....................................................13

*Sovereign Bank v. BJ's Wholesale Club, Inc.*, 533 F.3d 162 (3d Cir. 2008)1, 17, 18, 20, 23, 25

*St. Paul Fire and Marine Insurance Co. v. National Computer Systems, Inc.*, 490 N.W.2d 626 (Minn. App. 1992), *review denied* (Minn. Nov. 17, 1992) ............................................................................................................19, 20, 31

*THV Investments, LLC v. Certain Underwriters at Lloyds, London*, 2018 WL 2410812 (Cal. App. 4th Dist.)....................................................................28

*U.S. Fire Ins. Co. v. Fireman's Fund Ins. Co.*, 461 N.W.2d 230 (Minn. App. 1990) ............................................................................................................13

*Vicor Corp. v. Vigilant Ins. Co.*, 674 F. 3d 1 (1st Cir. 2012) ......................................22, 29

*Vogel v. Russo*, 235 Wis.2d 504, 613 N.W.2d 177 (Wisc. 2000) ........................20, 24, 28

*Wisc. Pharm. Co., LLC v. Neb. Cultures of Calif., Inc.*, 876 N.W.2d 72 (Wisc. 2016) .......................................................................20, 23, 24, 26, 28, 30, 31

*Wyatt v. Wyatt,* 239 Minn. 434, 58 N.W.2d 873 (1953).................................................... 12

**STATUTES**

Minn. Stat. § 325E.64 .................................................................................................... 9

**RULES**

Fed. R. Civ. P. 56(c)(2) .................................................................................................. 11

**REGULATIONS**

15 U.S.C. § 1643 ........................................................................................................... 17

## INTRODUCTION

Target Corp. seeks indemnity coverage from its commercial general liability insurer, ACE American Insurance Company ("ACE American") and ACE Property & Casualty Insurance Co. ("ACE Property & Casualty") (collectively "ACE") for a single type of damage it paid in settlement to the underlying plaintiffs (Card Claimants)—the cost to replace tangible debit and credit cards (Payment Cards) whose embedded data was compromised after cyber thieves hacked and infected Target's computer network. ACE is entitled to summary judgment because Target has failed its burden to establish the elements required to trigger that coverage, namely, that its settlement satisfied a legal obligation to pay "damages because of loss of use of tangible property" caused by an "occurrence."

Target has failed in two ways to satisfy its burden to establish that the Card Claimants claimed "damages because of loss of use of tangible property." First, as a matter of law and undisputed fact, no one lost the use of the physical Payment Cards. After the data breach, cardholders still had exclusive possession of their cards, and they could continue to use them in the same manner, and to perform the same function, as they had before the breach: to access their financial accounts to make payments. The Target cyber thieves stole data, not Payment Cards. Contrary to Target's assertion, the cardholder (and only the cardholder) could still use the *physical payment* card for safe and secure access to financial accounts. The courts agree that a data breach does not result in a loss of use of tangible Payment Cards. *See, e.g.*, *Sovereign Bank v. BJ's Wholesale Club, Inc.*, 533 F.3d 162, 174 (3d Cir. 2008) (stating in the wake of an identical data breach that "[t]he

fraudulent activity simply did not render the cards useless. The cardholders could continue to use [the cards] to make purchases after the information was compromised").

Second, as a matter of law, replacement costs—the sole damage for which Target seeks indemnity—are "damages because of loss of value," not "damages because of loss of use." Under Minnesota law, diminution in value falls outside loss-of-use coverage. *See, e.g.*, *Federated Mut. Ins. Co. v. Concrete Units, Inc.* 363 N.W.2d 751 (Minn. 1985). In the underlying action, the Card Claimants sought reimbursement for the replacement-card costs solely because of loss of value. When Target's security system allowed cyber thieves to compromise the exclusivity of cardholder data, the physical Payment Cards did not lose their ability to function as Payment Cards. They lost their *value* as Payment Cards. With the Payment Cards no longer having value, the Card Claimants replaced them. Loss-of-use damages, by contrast, measure the amount needed to compensate the claimant for a loss incurred while, and because, the tangible property cannot be used. Rental costs (incurred for a down-time replacement) and lost profits (foregone while profit-producing tangible property is down) are well-recognized examples of loss-of-use damages, none of which are present here.

This distinction between non-covered loss of, or diminution in, value and covered loss of use is well illustrated by Target's own "lock-and-key" analogy, an analogy which proves the fallacy of Target's arguments. Loss-of-use coverage requires a *loss of use in fact,* not merely in value. When its owner loses exclusive control of a lock's key, the lock does not lose its ability to *function* as a lock. It loses its *value* as a lock. However, loss of use coverage requires a *loss of use in fact*, not merely in value.

2

Additionally, Target has also failed its burden to establish that the Payment Card replacement costs were caused by an "occurrence." The insurance at issue only applies to "property damage" caused by an "occurrence," which is defined as "an accident." Here, the Card Claimants purposefully deactivated and replaced the Payment Cards in order to mitigate the risk of future economic losses. Under Minnesota law, such alleged resulting "damage," if any, is not caused by an accidental occurrence.

Therefore, ACE is entitled to summary judgment as a matter of law.

## STATEMENT OF ISSUE

Is ACE entitled to summary judgment because Target has failed as a matter of law to establish the elements required for coverage under the primary and umbrella policies at issue, namely that its settlement satisfied a legal obligation to pay "damages because of loss of use of tangible property" caused by an "occurrence"?

## STATEMENT OF FACTS

### The Relevant Policies

This insurance-coverage action arises out of insurance policies Defendants ACE provided for Plaintiff Target Corporation ("Target"), under separate policies covering the same policy period (February 1, 2013, to February 1, 2014). ACE American issued primary policy No. G27017381 (the "Primary Policy"), and ACE Property & Casualty issued the third-layer excess policy No. G27048985 (the "Excess Policy") (collectively "the Policies"). The Primary Policy provided $4,500,000 per occurrence and $50,000,000 aggregate coverage, after a self-insured retained limit of $500,000. (Lagatta Dec. Ex. A p. 4-5 of 230). The Excess Policy provided $25,000,000 in coverage per occurrence and in

aggregate. (Lagatta Dec. Ex. B p. 5 of 230). The intermediate excess layers' policies were not issued by ACE and further are not at issue here.

The Primary Policy insuring agreement provides coverage for "bodily injury" and "property damage":

**SECTION I - COVERAGES**

**COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY**

    **1. Insuring Agreement**

        **a.** We will pay the insured for the "ultimate net loss" in excess of the "retained limit" because of "bodily injury" or "property damage" to which this insurance applies. No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under DEFENSE, INVESTIGATION, SETTLEMENT, LEGAL EXPENSES, AND INTEREST ON JUDGMENTS. But the amount we will pay for the "ultimate net loss" because of damages is limited as described in SECTION Ill -LIMITS OF INSURANCE.

        **b.** This insurance applies to "bodily injury" and "property damage" only if:

            **(1)** The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

            **(2)** The "bodily injury" or "property damage" occurs during the policy period;

* * * *

(Lagatta Dec. Ex. A p. 12 of 230 § I.A.1). The Primary Policy also includes the following definitions:

4

## SECTION V - DEFINITIONS

* * * *

**12.** "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

* * * *

**16.** "Property damage" means:

    **a.** Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

    **b.** Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

For the purposes of this insurance, electronic data is not tangible property.

As used in this definition, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

* * * *

**20.** "Ultimate net loss" means the total sum, after recoveries or salvages collectible, that the insured becomes legally obligated to pay as damages by reason of settlements, judgments or any arbitration or other alternative dispute method entered into with our written consent and includes interest that accrues after entry of the judgment and deductions for recoveries and salvages which have been or will be paid. "Ultimate net loss" does not include any of the expenses incurred by the insured or us in connection with defending the claim or "suit".

(Lagatta Dec. Ex. A p. 29-30 of 230).[1]

The Excess Policy's coverage grant states as follows:

### SECTION I. INSURING AGREEMENTS

A. COVERAGE

We will pay, on your behalf, "loss" arising out of an "occurrence" but only after all "underlying insurance" has been exhausted by the payment of the limits of such insurance for covered injury or damage that takes place during our policy period. If "underlying insurance" does not pay a "loss" for reasons other than the exhaustion of an aggregate limit of insurance, then we will not pay such "loss".

The definitions, terms, conditions, limitations and exclusions of the first policy of "underlying insurance" in effect at the inception date of this policy (as identified in the Declarations), apply to this coverage unless they are inconsistent with provisions of this policy or relate to premium, subrogation, any obligation to defend, the payment of expenses, amounts of limits of insurance, cancellation or any renewal agreement.

(Lagatta Dec. Ex. B p. 5 of 21). The Excess Policy defines the following terms:

---

[1] When the policy definitions are inserted into the granting clause, the granting clause reads as follows:

We will pay the insured for the [total sum . . . that the insured becomes legally obligated to pay as damages] . . . because of . . . [loss of use of tangible property that is not physically injured] to which this insurance applies.

(Legatta Dec. Ex. A p. 12 of 230 § I.A.1.a; *id.* at p. 29-30 of 230 §§ V.16, V.20). Because this quotation reference is cumbersome, this brief will use the phrases "damages because of loss of use" and "legally obligated to pay damages because of loss of use of tangible property" as shorthand for reference to the policy's granting clause, and will cite only to Section I.A.1.a of the primary policy.

## SECTION III DEFINITIONS

A. "Loss" means the amount paid or payable in cash in the settlement or satisfaction of claims or suits for which the insured is liable, either by adjudication or compromise with our written consent, after making proper deduction for all recoveries and salvages. If the limits of the applicable "underlying insurance" are exhausted by the payment of defense expenses as well as damages, then "loss" also includes defense expenses under this insurance and defense expenses also erode the limits of this insurance.

B. "Occurrence" in this policy will follow the definition of "occurrence" as defined in the first policy of "underlying insurance" in effect as of the inception date of this policy.

\* \* \* \*

D. "Underlying insurance" means the policy or policies of insurance as described in the Declarations and Schedule of Underlying Insurance forming a part of this policy.

(Lagatta Dec. Ex. B p. 7-8 of 21). Outside of the above, the Excess Policy otherwise follows the definitions in the First Policy of Underlying Insurance listed in the Schedule of Underlying Insurance. (Lagatta Dec. Ex. B p. 5 of 21). That policy, the first excess policy issued by National Union Insurance Company, defines property damage as follows:

IV.   **Definitions**

\* \* \* \*

K. **Property Damage** means:

1. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

2. Loss of use of tangible property that is not physically injured. All such loss shall be deemed to occur at the time of the Occurrence that caused it.

7

(Legatta Dec. Ex. C p. 10 of 113). The National Union policy also adds language by Endorsement to the definition of "property damage":

**ENDORSEMENT NO. 6**

**<u>Miscellaneous Changes Endorsement</u>**

<u>This policy is amended as follows:</u>

\* \* \* \*

**II. Section IV Definitions** is amended as follows:

**Section IV. Definitions** is *amended by adding* the following to Paragraph K. **Property Damage**:

> For the purposes of this insurance, electronic data is not tangible property.
>
> As used in this definition, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

(Legatta Dec. Ex. C p. 29-30 of 113 § II) (italics added).

**<u>Underlying Facts</u>**

The parties do not dispute the underlying facts. In November and December 2013, Target's electronic network was breached, and the hackers gained access to payment information for millions of customers' credit cards. As a result of this data breach, Target was sued by both customers whose information was stolen and financial institutions that issued the credit cards. The lawsuits by these Card Claimants were consolidated in Minnesota as multi-district litigation (MDL No. 14-2522 (Minn. 2014)). (*See* Legatta Dec. ¶ 8; Legatta Dec. Ex. E).

8

In August 2014, the Card Claimants filed a consolidated class action complaint based on Target's alleged failure to adequately secure payment information on its systems. (*Id.*). The complaint asserted four claims: (1) negligence, based on Target's alleged breach of various duties it owed the class plaintiffs, including the duties to (a) use and exercise reasonable care in obtaining, retaining, securing, and deleting personal and financial information of customers, and (b) provide security to ensure that computer systems and networks adequately protected this customer information; (2) violation of the Minnesota Plastic Card Security Act (Minn. Stat. § 325E.64), which imposes specific duties on companies that accept credit card payments—such as Target—to safeguard transaction payment information and not to retain payment information for more than 48 hours, and dictates a merchant's responsibilities if it breaches these statutory duties; (3) negligence per se under Minn. Stat. § 325E.64; and (4) negligent misrepresentation by omission. (*Id.* at ¶¶ 100-134). The class plaintiffs assert that they were "primarily responsible for paying for card replacement and for reimbursing fraudulent charges," (*id.* at ¶ 85), and that they

> suffered substantial losses . . . include[ing], but is not limited
> to, sums associated with notifying customers of the data
> breach, reissuing debit and credit cards, reimbursing customers
> for fraudulent transactions, monitoring customer accounts to
> prevent fraudulent charges, addressing customer confusion and
> complaints, changing or canceling accounts, and the decrease
> or suspension of their customers' use of affected cards during
> the busiest shopping season of the year.

(*Id.* at ¶ 2; *see also, e.g.*, *id.* at ¶ 86 ("Plaintiffs . . . were forced to dedicate significant capital and human resources to the task of addressing the breach including, but not limited to, reissuing cards, changing or closing accounts, notifying customers of the breach of their

cards, investigating claims of fraudulent activity, refunding customers for fraudulent charges, and increasing fraud monitoring on potentially impacted accounts. Plaintiffs . . . also lost interest and transaction fees (including interchange fees) as a result of decreased, or ceased, card usage in the wake of the Target data breach."); ¶ 123 ("Plaintiffs . . . suffered harm, including, but not limited to, costs for reissuing credit/debit cards, changing or closing accounts, opening or reopening accounts, refunding or crediting cardholder accounts in response to fraudulent charges, issuing notice to potentially effected cardholders, and other actions necessary to rectify, prevent and/or mitigate fraud as a result of Target's violation.").

Target ultimately settled the consolidated class action lawsuit in May 2016, for approximately $58 million. (Legatta Dec. Ex. H). It also apparently settled claims against it by several major credit card brands for approximately $80 million. (Legatta Dec. ¶¶ 14-15). According to Target, these settlements are based on two types of damages, only one of which forms the basis for its claims against ACE: the cost of replacing physical payment cards. (Target at 7).

**<u>The Current Action</u>**

Target provided notice of the claims arising from its data breach to ACE. ACE denied coverage under the Policies on the grounds that the sums for which indemnity was sought were not damages because of "property damage" as defined by the Policies, caused by an "occurrence," defined by the Policies as an "accident." ACE has maintained this coverage position to date. Target commenced the current action against ACE seeking recovery of the replacement costs for the Payment Cards. The parties now bring cross-

motions for summary judgment on their respective declaratory judgment causes of action. (*See* Complaint Count I (Declaratory Judgment as to the ACE Primary Policy); Complaint Count III (Declaratory Judgment as to the ACE Excess Policy); Counterclaim for Declaratory Judgment).

## ANALYSIS

### I.   Summary Judgment Standard and Rules of Insurance Policy Construction

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). The moving party bears the burden of establishing that there are no genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "On a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts." *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (quotation omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Id.* In such a circumstance, the moving party is entitled to judgment as a matter of law. *Celotex Corp.*, 477 U.S. at 317.

"The extent of an insurer's liability is governed by the language of the insurance policy." *Eng'g & Const. Innovations, Inc. v. L.H. Bolduc Co.*, 825 N.W.2d 695, 704 (Minn. 2013) (citing *Bobich v. Oja*, 258 Minn. 287, 294, 104 N.W.2d 19, 24 (1960)). The court's objective when interpreting insurance contracts is to "ascertain and give effect to the intentions of the parties as reflected in the terms of the insuring contract." *Jenoff, Inc. v.*

11

*N.H. Ins. Co.*, 558 N.W.2d 260, 262 (Minn. 1997). Where the language of an insurance policy "is clear and unambiguous," the court must effectuate the intent of the parties by "interpret[ing] the policy 'according to plain, ordinary sense.'" *Carlson v. Allstate Ins. Co.*, 749 N.W.2d 41, 45 (Minn. 2008) (quoting *Canadian Universal Ins. Co. v. Fire Watch, Inc.*, 258 N.W.2d 570, 572 (Minn. 1977)). The court may not adopt a "construction of an insurance policy which entirely neutralizes one provision . . . if the contract is susceptible of another construction which gives effect to all its provisions and is consistent with the general intent." *Bolduc*, 825 N.W.2d at 705 (quoting *Wyatt v. Wyatt,* 239 Minn. 434, 437, 58 N.W.2d 873, 875 (1953)).

When interpreting a contract, the court must "read the terms of an insurance contract 'in the context of the entire contract,' and do not construe terms so strictly 'as to lead to a harsh and absurd result.'" *Bolduc*, 825 N.W.2d at 705 (quoting *Emp'r Mut. Liab. Ins. Co. of Wis. v. Eagles Lodge of Hallock, Minn.*, 282 Minn. 477, 479–80, 165 N.W.2d 554, 556 (1969)). The court interprets a policy provision as a whole and in light of its place within the policy. *Id.* at 707. The court should not interpret a contract in a way that "isolates words and phrases from their context rather than giving them meaning in accordance with the obvious purpose of the whole policy." *Reinsurance Ass'n of Minn. v. Johannessen*, 516 N.W.2d 562, 565 (Minn. App. 1994).

Moreover, a policy's context may be informed by the existence of risk-specific coverage either in the insured's portfolio or otherwise available in the marketplace. *See, e.g.*, *Sony* Computer *Entertainment America Inc. v. American Home Assurance Company*, 532 F.3d 1007 (9th Cir. 2008) (construing definition of "negligent publication" coverage

grant in Media Liability policy narrowly, where the policy's affirmative coverage provisions were limited to the types of claims normally faced by media publishers); *cf. U.S. Fire Ins. Co. v. Fireman's Fund Ins. Co.*, 461 N.W.2d 230 (Minn. App. 1990) (comparing policies and applying "closest to the risk" test to determine primacy of coverages); *Interstate Fire & Cas. Co. v. Auto-Owners Ins. Co.*, 433 N.W.2d 82 (Minn. 1988) (same, but applying "total policy insuring intent" test). In this case, Target purchased an entirely separate tower of risk-specific "cyber liability" coverage. (*See* Target's Rule 26(a) Disclosures § II). Such policies are written specifically to cover cyber-liability risks such as data breaches, a specialty coverage that would not be necessary if a garden-variety commercial general liability policy provided coverage for such a loss. Target, however, failed to purchase a sufficient amount of "cyber liability" coverage to indemnify it for the full amount of its payouts, causing it to now improperly reach for its commercial general liability policies to cover its shortfall. (Legatta Dec. ¶¶ 17-18). These facts inform the full context in which the Court must view the terms of the policies at issue here.

It is well-established "that the burden of proof rests upon the party claiming coverage under an insurance policy." *Id.* As a result, "[i]n an action to determine coverage," the insured must "establish a prima facie case of coverage." *SCSC Corp. v. Allied Mut. Ins. Co.*, 536 N.W.2d 305, 311 (Minn. 1995), *overruled on other grounds by Bahr v. Boise Cascade Corp.*, 766 N.W.2d 910 (Minn. 2009). In any particular case, "[w]hat constitutes a prima facie showing of coverage depends on the language of the particular policy." *Id.*

II.    **The ACE Policies Do Not Provide Indemnity Coverage for Target's Settlement Payments.**

As preliminary matter, ACE respectfully notes three things for the Court to bear in mind throughout. First, this case involves only the duty to indemnify.[2] An insurer's duty to defend is not at issue. Second, the Policies are substantively the same, so the analysis below treats them the same—using the primary policy language as the specimen. Finally, the absence of physical injury plays no role in either party's analysis. As that provision is not in dispute, the analysis below will not repeat the phrase "that is not physically injured" when quoting the policy.

A.    **Target's Settlement Did Not Satisfy a Legal Obligation to Pay "Damages Because of Loss of Use of Tangible Property."**

Target seeks indemnity coverage for a single type of damage it allegedly paid in settlement to the Card Claimants—the cost of replacing existing Payment Cards with new ones. (Target at 7) (stating that "[i]n seeking coverage from ACE, Target is *exclusively* seeking indemnification for the losses associated with . . . payment card replacement costs") (emphasis added). As a matter of law, the Policies do not provide coverage for those payments.

1.    **As A Matter of Law, Card Claimants Did Not Lose Use of the Payment Cards.**

Coverage applies only to "damages because of loss of use of tangible property." Target's attempt to satisfy this requirement is founded on a false premise—that the "physical payment cards [were] rendered useless by the data breach." (Target at 2). This is

_____

[2] *See, e.g.*, Target at 6.

so, says Target, because the cards "could no longer perform their intended function." (*Id.* at 17). Moreover, Target continues, a Payment Card's function is "to provide secure access only to the cardholder." (*Id.* at 21). With these contentions as its premises, Target ultimately argues that its "liability for the payment card replacement costs falls within coverage." (*Id.* at 26). Target's argument is both factually inaccurate and legally unsupported. The Court should reject it, and order summary judgment in ACE's favor.

Target states that "[p]ayment cards permit consumers to purchase goods and services because they are connected to each customer's account at a financial institution." (Target at 20). This is only partially true. The *data* on a Payment Card permits the consumer to purchase goods and services. Anyone who has purchased something online or via telephone or mobile payment knows that the physical card itself is unnecessary—card number, expiration date, security code, and billing zip code are what permit electronic credit and debit transactions. A physical Payment Card functions only to facilitate efficient *point-of-sale* purchases because it permits embedded data to be transmitted to the merchant's computer network via "swipe" or "insert." As such, the customer need not enter the data manually or share it verbally with the point-of-sale merchant. This makes the process efficient and eliminates human actions beyond swiping or inserting (and sometimes entering a PIN).

In short, Payment Cards serve two relevant functions—they carry data and they permit data transmission. But they do not, as Target contends, function to make credit and debit transactions "safe and secure." (*See, e.g.*, Target at 2) (stating that Payment Cards' "intended function" is to "provide the cardholder (and only the cardholder) *safe and secure*

15

access to financial accounts") (emphasis original). Rather, security is the function *of the merchant's computer system.* The cyber criminals did not breach the Payment Cards; they breached Target's network. (*See* Complaint ¶¶ 1, 26) (stating that cyber thieves "st[ole] payment card *data* and personal contact *information*") (emphasis added). That was the whole point of the suits against Target—Target's *system* failed to provide the security necessary to protect the data after it was transmitted from the Payment Cards to the network. At no point prior to, during, or after the data breach were there issues with the physical cards. In other words, the original Payment Cards functioned exactly as intended and could continue to do so after cyber criminals breached and infected Target's network.

Simply, Target has constructed its argument using a false connection between a card's data and a card's use as a tangible object. One example in particular exposes the underlying factual fallacy. Target's brief states: "When the *data* connected to those [financial] accounts is compromised . . . *the physical payment cards* associated with those compromised accounts cannot safely be used without the risk of fraud." (Target at 20) (emphasis added). This assertion contradicts the undisputed facts. Cardholders still had possession of their Payment Cards, even after the breach. Contrary to Target's assertion, the cardholders *could* still use the physical Payment Cards for "safe and secure access to financial accounts." (Target at 2). No one lost the use of the Payment Cards, even under Target's "intended-function" analysis.

Granted, the Card Claimants did not *want* their cardholders to continue using the Payment Cards. This was not, however, because the *physical cards* could no longer perform their function of carrying and transmitting the data. They still could. It was instead

16

because cyber criminals might use the *data* they captured from Target's network for fraudulent transactions, a potentially staggering amount of which the issuing Card Claimants would be legally barred from collecting from the cardholder (i.e. transactions above $50). *See, e.g.*, *Sovereign Bank v. BJ's Wholesale Club, Inc.*, 533 F.3d 162, 174 (3rd Cir. 2008) (citing 15 U.S.C. § 1643 and discussing the $50 limit on a cardholder's obligation for fraudulent transactions). In short, the Card Claimants replaced the cards because they no longer wanted to use the *data* on them. That is not loss of use of tangible property, as required by the Policies. It is true that Target faced *liability* for damages because its system failed to protect cardholder data. It is also true that this included potential liability for the cost to replace cards that facilitated in the transmission of such compromised data. But this liability is not *covered liability* because the card-replacement costs were not "damages because of loss of use of tangible property."

The courts that have considered this question agree that a data breach does not result in the loss of use of Payment Cards. In *BJ's Wholesale*, cited immediately above, hackers committed the exact crime committed by the Target cyber criminals, breaching a large merchant's (BJ's Wholesale) computer network and obtaining credit-card data from 9.2 million card users. As here, the card issuers replaced all existing cards, and had unreimbursed losses for that cost. The loss-of-use question arose in the context of whether the card issuers could recover their replacement costs in tort. Applying the economic-loss doctrine, the Third Circuit ruled that they could not. *Id.* at 180-81. In so ruling, the court rejected the very foundational premise Target asserts here – that the "physical payment cards [were] rendered useless," (Target at 2):

> The Visa cards . . . were cancelled. . . The cards remained intact and useable until cancelled by [the credit union]. *The fraudulent activity simply did not render the cards useless.* The *cardholders* could continue to use [*the cards*] to make purchases after the *information* was compromised. Indeed . . . [the credit union] *deemed* the cards useless . . . because [it] was exposed to liability for unauthorized charges.

*Id.* (emphasis added); *see also Bering v. Interins. Exch. of the Auto. Club*, 2002 WL 31320598, *8 (Cal. Ct. App. Oct. 17, 2002) (holding that "[c]ustomers' credit card information stolen [by an employee] does not constitute the . . . loss of use of tangible property"). The same conclusion must follow in this case. The fact that a network breach compromised intangible information did not render the tangible Payment Cards "useless." Cardholders (and only the cardholders) could continue to use their Payment Cards in the same manner, and to perform the same function, as they had before the breach. As *BJ's Wholesale* makes clear, the Card Claimants *deemed* the Payment Cards "useless" because it was *undesirable* for them to continue allowing their use. That does not constitute a loss of use. As a matter of law, the Card Claimants did not lose the use of the Payment Cards.

Further, Minnesota insurance law follows the same rule as *BJ's Wholesale* for claims involving stolen information. In *St. Paul Fire and Marine Insurance Co. v. National Computer Systems, Inc.*, a Boeing Computer Systems' employee stole proprietary information and provided it to his new employer, National Computer Systems (NCS), who then used it to Boeing's detriment. 490 N.W.2d 626 (Minn. App. 1992), *review denied* (Minn. Nov. 17, 1992). As here, NCS settled the underlying action and then sought indemnity from its insurer. St. Paul's plain-language policy defined "property damage" as "damage to tangible property of others . . . includ[ing] loss of use of others' property that

hasn't been physically damaged." *Id.* at 630. In ruling that St. Paul's policy provided no indemnity coverage for the settlement, the court reached two conclusions that control here. First, the court stated that the stolen information "was not tangible." *Id.* at 631.[3] Second, the court ruled that the employee's actions "did not make the [proprietary] information unusable; [his actions] only deprived Boeing of the *exclusive* use of the information." *Id.* (emphasis original).

Similarly, in *Camp's Grocery, Inc. v. State Farm Fire & Casualty Co.*, three credit unions sued the insured and its franchisor after cyber criminals breached the store's computer network and stole customer credit- and debit-card data. Among the credit unions' claimed damages were losses "for reissuance of cards." 2016 WL 6217161, *1 (N.D. Ala. Oct. 25, 2016). Analyzing the same definition of "property damage" as the one here, the court ordered summary judgment for State Farm, stating that the credit unions did not claim "damage to any cards *as tangible property*." *Id.* at *8 (emphasis added). Instead, ruled the court, "the Credit Unions assert that Camp's lax computer network security allowed the *intangible electronic data contained on the cards* to be compromised such that the magnetically encoded card *numbers* could no longer be used." *Id.* (first emphasis original, second emphasis added). As in *BJ's Wholesale* and *National Computer*, the *Camp's*

---

[3] The ACE Primary Policy also expressly so states. (*See* Legatta Dec. Ex. A p. 30 of 230 § V.16 (providing that "[f]or the purposes of this insurance, electronic data is not tangible property"); *see also* Legatta Dec. Ex. C p. 29 of 113 (adding identical language to the policy from which the ACE Excess Policy derives its definitions)).

*Grocery* claimants sustained damages because they lost exclusive control over intangible data. But they did not sustain "damages because of loss of use of tangible property."

The above rulings require judgment in favor of ACE for the instant action. Here, as in the above cited cases, the Card Claimants merely lost *control* of intangible information; they did not lose its use. Moreover, they did not lose control of the tangible Payment Cards, much less their use. The cards always remained in the cardholders' (and only the cardholders') possession, and they could continue to use them in the same manner, and to perform the same function, as they had before the breach. *See also Wisc. Pharm. Co., LLC v. Neb. Cultures of Calif., Inc.*, 876 N.W.2d 72 (Wisc. 2016) (applying same "property damage" definition at issue here and stating that "'loss of use' under the insurance policy . . . by its plain language contemplates some sort of *loss of use in fact*, not a reduction in value") (quoting *Vogel v. Russo*, 235 Wis.2d 504, ¶ 26, 613 N.W.2d 177 (Wisc. 2000), *abrogated in part on other grounds by Ins. Co. of N. Am. v. Cease Elec., Inc.*, 688 N.W.2d 462 (Wisc. 2004)) (emphasis added). As a matter of law, the Card Claimants did not suffer "loss of use" of Payment Cards. Target's liability, therefore, was not for "damages because of loss of use of tangible property." ACE is entitled to summary judgment.

### 2. As Matter of Law, Payment Card Replacement Costs Are Not "Damages Because of Loss of Use."

Minnesota courts "do not construe individual words or phrases in insurance policies in isolation." *Bolduc*, 825 N.W.2d at 706. Despite this settled rule, Target has constructed its argument by isolating the phrase "loss of use" and divorcing it from the surrounding words and their context. (*See, e.g.*, Target at 17-26); *compare id. with Bolduc*, 825 N.W.2d

20

at 705 (stating that "we read the terms of an insurance contract 'in the context of the entire contract'") (citation omitted). According to Target, literally any situation involving the inability to use something tangible triggers the coverage at issue here. But this isolation argument ignores the fact that coverage applies only to "damages *because of* loss of use of tangible property." (Lagatta Dec. Ex. A p. 12 of 230 § I.A.1.a) (emphasis added). Courts have consistently construed this language such that coverage applies only when the measure of the claimed damages compensates the claimant for a loss incurred while, and because, the tangible property cannot be used. Damages because of a loss of value are therefore not "damages because of loss of use."

The leading Minnesota case on this subject, *Federated Mutual Insurance Co. v. Concrete Units, Inc.* so ruled. 363 N.W.2d 751 (Minn. 1985). There, a farm co-op (Brownsdale) contracted to have a concrete grain elevator built. Concrete Units, Federated's insured, contracted to supply the concrete. A problem with the concrete delayed the completion, and consequently Brownsdale could not use the grain elevator for several weeks. Brownsdale sued, claiming in part that "it had lost the use of its elevator because of the construction delays." *Id.* at 754. Federated's policy defined property damage as "loss of use of tangible property which has not been physically injured or destroyed."

The court made two rulings—it decided what is *not* a loss-of-use damage and it decided what is. On the latter point, Brownsdale sought to recover three itemized damages to compensate for losses it incurred during the grain-elevator down time: (1) The piling of 30,000 bushels of corn at ten cents per bushel; (2) the loss of one month's use of storage space that would have been available absent the delayed completion; and (3) the inability

to dry 8,000 bushels of corn per day, at ten cents per bushel, for 24 days. *Id.* The court ruled that Federated owed Concrete Units a duty to defend and indemnify because "each of the three items of damage . . . is *based on lost use* of the elevator." *Id.* at 756 (emphasis added). In short, the court ruled that the listed items were for loss-of-use damages because they were based on—*i.e.,* measured by—the losses Brownsdale incurred because of, and during, the grain-elevator down time. *See also id.* at 757 (stating that for claim to fall within loss-of-use coverage, damages "must be causally related to . . . the lost use of the elevator"). This is the essence of "damages because of loss of use." *See also Atmel Corp. v. St. Paul Fire and Marine Ins. Co.*, 430 F. Supp. 2d 989, 992 (N.D. Cal. 2006) (rejecting insured's argument that loss-of-use coverage applies to "any and all damages *related to* the failure of the [computer] chips in Seagate's [disk] drives, and [that it] does not require a nexus with Seagate's (or its customers') inability to *use* the drives") (first emphasis added, second emphasis original); *Vicor Corp. v. Vigilant Ins. Co.*, 674 F. 3d 1, 13 (1st Cir. 2012) (quoting and adopting *Atmel* analysis).

But Target does not seek coverage for settlement dollars paid to compensate the Card Claimants for damages they incurred during, and because of, (non-existent) Payment Card down time. It seeks coverage *exclusively* for its liability for Payment-Card replacement costs. (Target at 7). And the Card Claimants incurred those costs because Target's lax system security forced them to cease using the compromised *data* at peril of potentially staggering exposure to fraudulent transactions. *See Camp's Grocery,* 2016 WL 6217161 at *8 (stating that "the Credit Unions assert that Camp's lax computer network security allowed the *intangible electronic data contained on the cards* to be compromised

22

such that the magnetically encoded card *numbers* could no longer be used.") (first emphasis original, second emphasis added); *BJ's Wholesale Club,* 533 F.3d at 180-81 (stating that "after the *information* was compromised . . . [the credit union] *deemed* the cards useless . . . because [it] was exposed to liability for unauthorized charges") (emphasis added). Granted, replacing the cards avoided potentially greater losses via fraudulent transactions (which would similarly not be covered by the Policies); but dollars expended for "[p]urely preventative measures are not covered in the absence of property damage." *3M v. Travelers Indem. Co.*, 457 N.W.2d 175, 184 (Minn. 1990). Utilizing the analysis of *Concrete Units*, Target's card-replacement settlement costs were not for "damages because of loss of use."

As for what is *not* a loss-of-use damage, the *Concrete Units* court held: "[W]e conclude that 'diminution in value' is not . . . 'loss of use of tangible property.'" 363 N.W.2d at 756 (original emphasis deleted). Courts across the country uniformly hold that replacement costs are damages because of loss of value, not because of loss of use. For example, in *Wisconsin Pharmacal*, suppliers for the maker of nutritional supplements (Pharmacal) provided a non-conforming ingredient, which Pharmacal used along with other ingredients to produce probiotic supplement tablets. 876 N.W.2d 72. After Pharmacal learned about and disclosed its mislabeled product, retailers recalled it, and Pharmacal destroyed it. *Id.* at 76. Pharmacal sued its suppliers, and the latter's liability insurers denied coverage, in part, because the suit did not allege damages because of "[l]oss of use of tangible property that is not physically injured." *Id.* at 80.

As with Target in this case, the insured in *Pharmacal* argued that the non-conforming ingredient rendered the tangible tablets "useless"—because they were

destroyed and never used—thus triggering coverage based upon "loss of use of tangible property." *Id.* at 83. The Wisconsin Supreme Court rejected this argument because the damages Pharmacal sought were for *diminution in value*, not loss of use:

> However, we previously have stated that "diminution in value—*even to the point of worthlessness*—is not the same as 'loss of use' under the insurance policy, which by its plain language contemplates some sort of *loss of use in fact*, not a reduction in value."

*Id.* (*quoting Vogel*, 236 Wis.2d at ¶ 26) (emphasis added). The court further explained: "The recalled tablets were *worthless* due to the inclusion of [the non-conforming ingredient] and were subsequently discarded. . . . Pharmacal did not lose the *use* of the tablets; rather, it permanently lost the entire *value* of the tablets." *Id.* at 83-84; s*ee also Advanced Network, Inc. v. Peerless Ins. Co.*, 190 Cal. App. 4th 1054, 1064 (Cal. App. 4th Dist. 2010) (holding that "[c]overage for 'loss of use' does not apply to an underlying action in which the claimant seeks only the replacement *value* of converted property") (emphasis added). The same diminution-in-value analysis applies under *Concrete Units*, which expressly rejected the notion that diminution in value equates to loss of use. 363 N.W.2d at 756.

Again, the phrase "loss of use" does not appear in isolation. The policy provides coverage for "*damages because of* loss of use of tangible property," not damages because of a diminution in value, even to the point of worthlessness. The Payment Cards became worthless to the Card Claimants (not unusable) because they carried compromised data. The cards could be used, but the Card Claimants deemed it undesirable to do so because Target's lax system security forfeited their exclusive control over the data they carried. The

cost to replace the cards was damage because of a loss of value, damage that falls outside the definition of "property damage" under Minnesota law.

Target's lock-and-key analogy serves only to expose the factual and legal fallacy of its argument. Target's brief recites the following: "A front-door lock whose key has been copied and distributed among the town's criminals, for example, can still be 'locked' with the key, but the lock has 'lost its use' as an object that protects the home from intruders and must be replaced." (Target at 2). Later, Target declares that "like . . . a front door lock whose key has been copied and stolen, the payment cards associated with the hacked accounts immediately lost their ability to function as intended—*i.e.*, to provide secure access only to the cardholder." (Target at 21).

This analogy fails in several ways. First, the latter statement is simply untrue, as demonstrated above at pp. 15-21. Until the Card Claimants canceled them, the Payment Cards did not lose their ability to provide secure access only to the cardholder, much less "immediately." *See BJ's Wholesale Club,* 533 F.3d at 180-81 (stating that the "Visa cards . . . were cancelled. . . . The cards remained intact and useable until cancelled by [the credit union]"). The Target cyber thieves stole data, not Payment Cards.

Second, a house key's function is to lock and unlock a door. But the key's *owner* must maintain its exclusivity. A door lock does not keep the key safe. When the owner— or in Target's example, a neighbor who borrowed the key—loses exclusive control of the key, the lock does not lose its ability to function as a lock. It loses its *value* as a lock. As the Wisconsin Supreme Court made clear in *Pharmacal*, loss-of-use coverage requires a *loss of use in fact*, not merely in value. The facts and outcome in *Concrete Units*

demonstrate the difference—the grain elevator there could not, in fact, function as a grain elevator. And the time-based damages Brownsdale sought were based on that fact, making them "damages because of loss of use."

Third, because no one wants to use a lock after losing exclusive control over the key, a person liable for losing the key may well be held liable for the cost of replacing the lock. But the person's liability is not *covered* liability because replacement costs are not loss-of-use damages.[4] Under *Concrete Units*, loss-of-use damages are those that are measured by the losses a claimant incurs because of, and during, the tangible property's down time. In the lock-and-key example, one colorable loss-of-use damage could be hotel expenses incurred if no available locksmith could make the change until a day or two later. The loss-of-use damage would be the cost to rent a hotel room, but not the cost to replace the lock.

California courts have long recognized this. *See, e.g.*, *Collin v. American Empire Ins. Co.*, 21 Cal. App. 4th 787, 818 (Cal. App. 2nd Dist. 1994) (citing example of a stolen car and stating that the "value of the 'loss of use' of the car is the rental value of a substitute vehicle; the value of the 'loss' of the car is its replacement cost"). This stolen car example also answers Target's argument that the absence of the modifier "temporary"—as in, "temporary loss of use"—somehow circumvents *Concrete Units*. (Target at 25). According

---

[4] Using the example for a third time, Target tries to assume that liability is necessarily coextensive with *covered* liability, stating that the "policyholder [neighbor] may be held liable for – and the CGL insurance would then cover – all of the [homeowner's] damages, including the cost of re-keying the door." (Target at 15). Were that the law, liability policies would say nothing except the policy limit and who the insured is.

to Target, no Minnesota law supports the concept that loss-of-use damages have a temporal component. This view, if true—which *Concrete Units* shows on its face it is not—would have loss-of-use coverage illogically apply in the stolen car example to the replacement cost of the car itself.

In addition to ignoring and contradicting *Concrete Units*, this argument runs headlong into the Minnesota Supreme Court's decision in *Bolduc*, which rejected the same argument. In that case, the phrase "caused by acts or omissions" was at issue. 825 N.W.2d at 698. The putative additional insured (ECI) isolated the term "acts" and argued that the word meant *literally* any act, regardless whether the act was one imbued with fault. *Id.* at 706. If fault were required, argued ECI, the policy would say "negligent acts or omissions." *Id.* at 703. The Minnesota Supreme Court rejected this argument, stating that when "interpreted as a whole in light of its place within a liability insurance policy," the phrase "caused by acts or omissions" *means* "negligent acts or omissions." *Id.* at 706. The policy language, said the court, "cannot be divorced from the concept of fault." *Id.*

The same analysis (and outcome) applies to Target's temporary-loss-of-use argument. The ACE policy does not solely say "loss of use." Rather, it says "legally obligated to pay as *damages because of* loss of use of tangible property." (Legatta Dec. Ex. A p. 12 of 230 § I.A.1.a) (emphasis added). When interpreted as a whole, as *Bolduc* requires, this language cannot be divorced from its temporal component. *Concrete Units* made this clear when it recognized that the time-based damages at issue in that case were "based on lost use of the elevator." 363 N.W.2d at 756. Countless other courts agree. *See, e.g.*, *Peerless Ins. Co.*, 190 Cal. App. 4th at 1064 (stating that "[w]hile the 'loss of use'

27

provision in Peerless's CGL policy is not modified by the term 'temporary,' the *impermanent nature* of 'loss of use' damages is implicit") (emphasis added); *Wisc. Pharmacal*, 876 N.W.2d at 87 (stating that "loss of use damages refer to the rental value of *temporary* replacement property, rather than the value of replacing the property itself") (emphasis added); *id.* (stating that loss-of-use damages do *not* accrue when something is "*permanently* unusable . . . [and] do not constitute loss of use damages but, rather, 'the value of the property itself'") (citing *Collin*, 21 Cal. App. 4th at 818-19) (emphasis added); *Vogel*, 613 N.W.2d at 177 (rejecting loss-of-use coverage because "[t]he homeowners lost the entire value of their home; they did not simply lose its use *for some period of time*") (emphasis added); *THV Investments, LLC v. Certain Underwriters at Lloyds, London*, 2018 WL 2410812, *6 (Cal. App. 4th Dist.) (ruling loss-of-use coverage inapplicable because "each of the categories of damages that THV sought in the Underlying Action were intended to *permanently* replace property, not to compensate for a *temporary* loss of use of property" (original emphasis deleted, emphasis added); *Vicor Corp.*, 674 F. 3d at 13 (for coverage to apply, "[t]he claimed damages must be tied to the *actual period* during which the use of the non-physically injured property was lost and to the loss of use itself") (emphasis added); *id.* at 14 (stating that coverage applies only to damages that "accrued *pending repair*" of out-of-service tangible property); *Atmel*, 430 F. Supp. 2d at 994 (agreeing that damages for loss of use "may be determined by rental value or loss of profits"); *F&H Constr. v. ITT Hartford Ins. Co.*, 118 Cal. App. 4th 364, 377 (rejecting loss-of-use coverage because underlying plaintiff did "not seek damages for the rental value (or its equivalent) for the loss of the use . . . during the *time period* modifications were made")

(emphasis added); *Collin*, 21 Cal. App. 4th at 818 (agreeing with insurer's argument that "loss of use refers to rental or income value of property which has been damaged or rendered unusable"). Insurance-policy construction is not a process of dissection; it is a process of synthesis. *Republic Nat'l Life Ins. Co. v. Loraine Realty*, 279 N.W.2d 349, 354 (Minn. 1979). Target's attempt to isolate the words "loss of use" from their surrounding words and context must fail. As the Minnesota Supreme Court made clear in *Concrete Units*, loss-of-use damages are temporal in nature.

Target's argument must also fail because it would make the phrase "of use" superfluous. *See, e.g.*, *Bolduc*, 825 N.W.2d at 705 (stating that "[w]e will not adopt a 'construction of an insurance policy which entirely neutralizes one provision . . . if the contract is susceptible of another construction which gives effect to all its provisions and is consistent with the general intent'") (alteration by court) (citation omitted). The Card Claimants did not recover for the loss *of use* of Payment Cards; they recovered replacement costs for the *complete loss* of Payment Cards. *See Collin*, 21 Cal. App. 4th at 818 (stating that the "value of the '*loss of use*' of the [stolen] car is the rental value of a substitute vehicle; the value of the '*loss*' of the car is its replacement cost) (emphasis added). Adopting Target's construction would call for a policy covering liability for "loss of tangible property," leaving the term "of use" without a function. This is universally held to be impermissible. In *Collin*, for example, the court noted that clients of a contractor lost the use of their personal property when the contractor converted the same from their home. But according to the court, "the damages [the homeowners'] recovered were not 'loss of use' damages but the value of the property itself." *Id.* at 818-19. Since the policy covered

29

damages because of loss *of use*, not damages because of *loss*, the policy provided no indemnity coverage for a judgment against the insured contractor. *Id.* at 819. *See also Bering*, 2002 WL 31320598 at *9 (following *Collin* and stating that "'loss of use of property is different from 'loss' of property"). Similarly, the *Pharmacal* court agreed that the manufacturer of the probiotic tablets lost their use because the non-conforming ingredient made them "permanently unusable," but it went on to rule that "such damages do not constitute loss of use damages." 867 N.W.2d at 88. Instead, said the court, the damages were for "loss of property." *Id.* at 89 (citing *Collin*, 21 Cal. App. 4th at 818-19).

*Pharmacal* is especially instructive for another reason. As with Target here, Pharmacal *chose* not to use the probiotic tablets but to destroy them and make new ones instead. This is admittedly different from cases like *Peerless* and *Collin*, where the insured converted the tangible property, and the claimant never got it back. But as *Pharmacal* makes clear, this difference does not change the outcome, because the nature of the damage sought (*i.e.*, damages because of loss of use versus damages because of loss of value), not the precise manner of the cause of the damage, controls coverage. The *Pharmacal* court stated: "[The probiotic tablets] were discarded *due to their lack of value*. Therefore, Pharmacal's underlying claims are not for loss of use damages because they relate to the permanent uselessness of the tablets and not to the value of temporary replacement property." 876 N.W. 2d at 88 (emphasis added).

Finally, Target failed to cite any Minnesota law on loss-of-use coverage (*e.g.*, *Concrete Units* and *National Computer Systems*), seemingly because it views the Eighth Circuit's decision in *Eyeblaster v. Federal Ins. Co.*, 613 F.3d 797 (8th Cir. 2010), as

authority that forces this Court to rule in its favor. (Target at 18, n.3) (referring to rule that circuit decisions interpreting state law are binding absent an intervening state-court decision). This argument is both a perversion of the *Erie* doctrine and a misapplication of *Eyeblaster*.

As for *Eyeblaster's* status as "binding" authority, the parties there indeed agreed that "the Federal policies are controlled by Minnesota law." *Id.* at 801. But in deciding the question presented here—loss of use of tangible property that is not physically injured—the court did not cite a *single* Minnesota case. *Id.* at 802 (citing one case from the Eastern District of Virginia and one from the Western District of Oklahoma) (citations omitted). Nor did it purport to "interpret" Minnesota law. Indeed, to interpret law is to ascertain its substance from existing law. The *Eyeblaster* court did not inquire into the substance of Minnesota law; instead, it cited one case that applied Virginia state law and one that applied Oklahoma state law. *Id.* (citations omitted). Target's suggestion that *Eyeblaster* created a barrier to the application of controlling Minnesota appellate decisions not only perverts the *Erie* doctrine, it implies that Target realizes it cannot prevail under Minnesota law.

As to the substance of *Eyeblaster*, it is true that the appellate court ruled that the insurer had a *duty to defend*, but the decision fails to support Target's *indemnity* claim. In that case, a computer user sued Eyeblaster alleging that an Eyeblaster website infected his computer with spyware; that the infected computer had three years of stored client tax-return data; and that he could not use the tangible computer to transfer those files because the spyware would be transferred with it; as a result, he lost thousands of dollars to recreate them manually. *Id.* at 800-02. The plaintiff further alleged that the computer was "taken

31

over and could not operate" or that it would "operate so slowly that it will in essence become inoperable." *Id.* 802.

Unlike this case—which presents only the question of indemnity, follows a settlement in the underlying case, and is based *exclusively* on one type of damage—*Eyeblaster* presented only the question of the duty to defend, preceded any resolution of the underlying claim, and involved myriad allegations of damage. Moreover, because the issue was the duty to defend, which is broader than the duty to indemnify, the insurer could prevail *only* if "'each claim asserted in the lawsuit clearly falls outside the policy.'" *Id.* at 801 (citation omitted). The appellate court ruled that the insurer did not establish that *each* alleged damage clearly fell outside the scope of "loss of use of tangible property that is not physically injured." In so ruling, the court stated as quoted below. Note, however, that Target's brief quotes only part of what the court stated (omitting the entire first sentence), an omission that plainly changes the meaning and legal effect of what the court said:

> [Plaintiff] asserts that his computer has three years of client tax returns that he cannot transfer because he believes the spyware files would also be transferred, *and he therefore must reconstruct those records on a new computer.* He thus argues that his computer is no longer usable, as he claims among his losses "the cost of his existing computer."

*Id.* at 802 (emphasis added). In short, the *Eyeblaster* plaintiff alleged that he lost the use of the tangible computer that he used to service clients, and that he either lost profits or incurred expenses until he could conduct his business on a new computer. These are the very kinds of damages that triggered a duty to defend in *Concrete Units*, where the plaintiff lost the use of its grain elevator and thereby lost profits from its inability to dry corn, and

32

incurred expenses from its need to rent other storage space. 363 N.W.2d at 756; *see also Atmel*, 430 F. Supp. 2d at 994 (agreeing that damages for loss of use "may be determined by rental value or loss of profits"). These are not, however, the type of damages at issue here, with there being no duty to either defend or indemnify a data breach claim seeking recovery of the loss of payment card *value*. As a matter of Minnesota law, the damages alleged in *Eyeblaster* supported the outcome in *Eyeblaster*, an outcome that is entirely consistent with, and compels an order for, summary judgment in ACE's favor on the type of damages for which indemnity is sought here.

**B.    Even if Replacement Costs were "Property Damage," it Would Not Be Property Damage Caused by an "Occurrence."**

To fall within coverage, there must be "property damage" caused by an "occurrence," which is defined in the policies as "an accident." It is not enough that there simply be "an accident" swirling somewhere in the universe of events surrounding the cyber-*attack*, or Target's conduct leading up to the same. The "property damage" for which insurance coverage is sought must be *caused by* "an accident." On this, the policy language is clear:

> b.    This insurance applies to . . . "property damage" only if:
>
> (1)    The . . . "property damage" is caused by an "occurrence" [defined as an accident].

(Lagatta Dec. Ex. A p. 12 of 230 § I.A.1.b(1)).

As demonstrated above, coverage fails **for** the lack of "property damage," making the "occurrence" requirement academic. But even if the replacement costs were damages because of "property damage," the "occurrence" requirement would also fail. This is so

because the Card Claimants themselves knowingly, intentionally and purposefully canceled the cards and incurred the replacement costs so as to mitigate future economic losses incurred through fraudulent transactions. Thus, if the "property damage" is, as Target erroneously claims, the "loss of use" of the cards due to their being cancelled and replaced by the Card Claimants, that "loss of use" was caused by Card Claimants' purposeful act. The cards were not canceled and replaced by accident.

That such conduct does not invoke coverage is a conclusion clearly supported by Minnesota law. In Bright *Wood v. Bankers Standard Insurance Co.*, a construction defect insurance coverage case where the only accidental damage was to a component supplied by the insured – the insured's own work and product. 665 N.W.2d 544 (Minn. App. 2003). But because the defective component was embedded in the finished work performed by others, to effectuate the repairs the insured had to destroy and replace that other, otherwise undamaged, work. The insured thus claimed this constituted covered damage accidently caused to tangible property representing the work of others. The court of appeals rejected that contention, saying:

> Here the damage to other property occurred because the repair was deliberately undertaken. The resulting damage is not an accidental occurrence.

*Id.* at 549. *Bright Wood* thus tells us that even if that which the use was lost were the plastic cards, that loss of use was the result of the non-covered intentional decision to deactivate and replace them so as to mitigate future damage.

Moreover, there is nothing in *Bright Wood that* would allow its holding to be distinguished based on the fact that in this case the decision to deactivate and replace the

Payment Cards was that of the Card Claimants, and not Target. That the holding in *Bright Wood* would have been the same had the insured hired a subcontractor to destroy the otherwise undamaged work of others so as to effectuate the repairs to its own negligently performed work, as opposed to doing the repairs itself, is self-evident. The court's focus was never on *who* deliberately undertook the repairs. Its holding was premised on the fact that the damage resulting from those repairs was deliberately caused.

Target is thus completely wrong when it says that whether there was an accident is determined from *the standpoint of the policyholder*, Target." (Target at 11) (emphasis in original). This is not what the Policies say, and in making that argument Target conflates the Policies' "occurrence," *i.e.*, accident, requirement with their exclusion for damage expected or intended from the standpoint of the insured. The "from the standpoint of the insured" language is only found in the ACE Policies in connection with the exclusion for the intentional acts of the insured. It is nowhere to be found in the policy language requiring that the "property damage" be caused by an "occurrence." Unlike under the "intentional acts" exclusion, the determination of whether the damage for which coverage is sought was caused by an "accident" thus need not be made from the insured's standpoint.

This conclusion is mandated by the very case upon which Target rests its argument. Target cites to *American* Family *Insurance Co. v. Walser*, 628 N.W.2d 605 (Minn. 2001), for the proposition that an "accident" is "determined from the standpoint of the policyholder." However, *Walser* actually supports the proposition that the accident must be determined from the standpoint of the actor who causes the "property damage." At issue in *Walser* was whether an underlying claim for injury arising from intentional conduct

35

qualifies as an accidental "occurrence" if the injury itself is "an unexpected, unforeseen, or undesigned . . . consequence" of the intentional conduct. *Id.* at 611. *Walser*'s analysis focused on reconciling Minnesota "intentional act" exclusion precedent—under which the exclusion applies only if both the act and the injury are intentional—with the definition of "occurrence." Finding it would be incongruous if "the coverage analysis [of an accidental "occurrence"] is more restrictive—results in narrower coverage—than our intentional act exclusion analysis," the court likewise interpreted "accident" to encompass non-intentional injury arising from intentional conduct. *Id.*

At no time, however, did *Walser* suggest that the conduct at issue must be "accidental" from the insured's standpoint for purposes of the "occurrence" analysis. To the contrary, the court took great pains to ensure it was not treating the "occurrence" coverage grant coextensively with the "intentional acts" exclusion:

> We do not conclude or suggest that the scope of coverage for accidents will always coincide with the scope of an exclusion for intentional acts. Rather, we conclude that in analyzing whether there was an accident for purposes of coverage, lack of specific intent to injure will be determinative, just as it is in an intentional act exclusion analysis.

*Id.* at 612.

The court's decision not to use an object in the clause "lack of specific intent to injure will be determinative," as opposed to "[the insured's] lack of specific intent to injure will be determinative," suggests that the court had in mind that an "occurrence" is determined from the standpoint of the actor where the actor is not also the insured. Reading the policy as a whole and in context, this interpretation is entirely consistent with the plain

policy language, which expressly includes the "standpoint of the insured language" only in the "intentional acts" exclusion but not in the definition of "occurrence."

Having erroneously concluded that the correct standard for determining an occurrence is "whether an accident is 'unexpected and unintended' . . . from the standpoint of the policyholder," Target exacerbates its error by arguing that its own negligent failure to maintain data security constitutes an "occurrence" that caused the theft of its data. (Target at 12-13). This argument also fails.

As alluded to above, the correct definition of an "accident" is "an unexpected, unforeseen, or undesigned happening or consequence" from the standpoint of the actor, *Walser*, 628 N.W.2d at 611, and not whether Target "expected or intended" the injury to occur. Target cannot begin to suggest that the actors'—*i.e.*, Card Claimants'—decision to deactivate the cards was anything other than knowing, intentional and purposeful. Nor can Target argue that its *negligent* acts were the *cause* of the Card Claimants' *purposeful* acts, any more than the insured in *Bright Wood* was successful in claiming that its *negligent* work was the cause of the *deliberate* destruction of the third party property.

In addition to this statement of Minnesota law contained in *Bright Wood,* the United States District Court for the Northern District of Illinois in *GATX Leasing Corp. v. National Union Fire Insurance Co.*, is in accord, addressing an analogous set of facts and identical policy language. 1994 WL 383909, at *1–2 (N.D. Ill. July 19, 1994), *aff'd*, 64 F.3d 1112 (7th Cir. 1995). There, two oil refiners sued the insured petroleum storage company and its creditor (GATX) in the underlying action, alleging that the insureds conspired to steal their petroleum products from the storage facility. *Id.* GATX's general liability insurer denied

coverage for the claim and a coverage action ensued. *Id.* The insured acknowledged that the theft itself was an intentional act, but argued that its own negligence in failing to prevent the theft constituted a covered accidental "occurrence." *Id*. at *5-6.

The court disagreed with the insured, holding that "[w]hen harm is caused by the intentional act of some party, it is not caused by accident; it is not caused by an "occurrence," even if the insured was negligent in causing or allowing the intentional act." *Id*. at *5 (citing *Red Ball Leasing v. Hartford Accident & Indem. Co*., 915 F.2d 306, 311 (7th Cir. 1990) (emphasis added). The court stated:

> To call an intentional act an "accident" merely because it was not prevented out of negligence is a stretch. As stated by the Seventh Circuit in *Red Ball*:
>
>> Injury that is caused directly by negligence must be distinguished from injury that is caused by a deliberate and contemplated act initiated at least in part by the actor's negligence at some earlier point. The former injury may be an accident.... However, the latter injury, because it is intended and the negligence is attenuated from the volitional act, is not an accident.

*Id*. at * 6 (citing *Red Ball* at 311). Accordingly, the court concluded that "any negligence by GATX in failing to prevent or stop the intentional acts of employees or third parties was not an 'accident' or an 'occurrence.'" *Id*. at *7 (emphasis added).

The same result is dictated here. Even if replacement costs were "property damage," which they are not, it would not be "property damage" caused by an "occurrence." *Because* the insurance issued by ACE applies to "property damage" only if it is caused by an "occurrence," Target's claim for coverage must fail, with summary judgment appropriately entered in favor of ACE.

## CONCLUSION

For these reasons, Defendant respectfully requests Plaintiff's motion be denied, and that summary judgment be granted in its favor, holding that Defendants owe Plaintiff no coverage for the matters at issue in their complaint.

Respectfully submitted,

Dated: June 24, 2020

/s/ Charles E. Spevacek
Charles E. Spevacek (#126044)
William M. Hart (#150526)
**Meagher & Geer, P.L.L.P**
33 South Sixth Street, Suite 4400
Minneapolis, Minnesota 55402
(612) 338-0661
(612) 338-8384 Fax
cspevacek@meagher.com

*Attorneys for ACE American
Insurance Company and ACE
Property & Casualty Insurance
Company*

13577595.1