# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| Target Corporation, a Minnesota corporation,<br><br>    Plaintiff,<br><br>  v.<br><br>ACE American Insurance Company, a Pennsylvania corporation, and ACE Property & Casualty Insurance Co., a Pennsylvania corporation,<br><br>    Defendants. | **Case No. 0:19-cv-02916 (WMW/DTS)** |

## TARGET CORPORATION'S RESPONSE TO
## ACE'S CROSS-MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

I.      INTRODUCTION AND SUMMARY OF ARGUMENT ...................................... 1

II.     ARGUMENT ........................................................................................................ 4

        A.      ACE Cannot Escape the Eight Circuit's Binding
                Interpretation of Minnesota Law in *Eyeblaster*, Which
                Compels Coverage In This Case. .................................................................. 4

        B.      The Data Breach Resulted in the "Loss of Use" of the
                Payment Cards. ............................................................................................. 9

                1.      ACE's New Theory that "Loss of Use of Tangible
                        Property" Means "Loss of Use *Exclusively
                        Performed* by Tangible Property" Has No Basis
                        in the Policies and Should Be Rejected ............................................ 10

                2.      ACE's Cases Do Not Support Its New "Loss
                        of Use Exclusively Performed by" Theory. ..................................... 15

        C.      ACE's Argument that "Loss of Use" Includes Only
                *Temporary* "Loss of Use" Has No Basis in the Policy
                Language or Case Law. ................................................................................ 19

                1.      ACE's Minnesota Case Law. ........................................................... 21

                2.      ACE's Non-Minnesota Case Law. ................................................... 24

        D.      ACE's "Risk-Specific Policy Analysis" is Not Applied in
                Minnesota and Even ACE's Case Law Does Not Support
                Applying it Here. ......................................................................................... 27

        E.      Target's Liability for Card Replacement Costs Were
                Caused by a Covered "Occurrence." ........................................................... 32

III.    CONCLUSION .................................................................................................... 36

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Am. Emp'rs Ins. Co. v. Doe*,
 165 F.3d 1209 (8th Cir. 1999) ....................................................................................... 35

*Am. Family Ins. Co. v. Walser*,
 628 N.W.2d 605 (Minn. 2001).......................................................................... 32, 34, 35

*Am. Ins. Co. v. Crown Packaging Int'l*,
 813 F. Supp. 2d 1027 (N.D. Ind. 2011) ....................................................................... 22

*Anthem Electronics, Inc. v. Pacific Emp'rs Ins. Co.*,
 302 F.3d 1049 (9th Cir. 2002) ....................................................................................... 25

*Atmel Corp. v. St. Paul Fire & Marine Ins. Co.*,
 430 F. Supp. 2d 989 (N.D. Cal. 2006) .......................................................................... 27

*Batts v. Tow-Motor Forklift Co.*,
 66 F.3d 743 (5th Cir. 1995) ............................................................................................. 9

*Bering v. Interinsurance Exchange of the Auto. Club*,
 2002 WL 31320598 (Cal. App. Oct. 17, 2002) ........................................................... 19

*Bright Wood v. Bankers Standard Ins. Co.*,
 665 N.W.2d 544 (Minn. App. 2003)............................................................................. 34

*Camp's Grocery, Inc. v. State Farm Fire & Cas. Co.*,
 2016 WL 6217161 (N.D. Ala. Oct. 25, 2016) ............................................................. 18

*Collin v. Am. Empire Ins. Co.*,
 21 Cal. App. 4th 787 (1994) .......................................................................................... 26

*CPS Chem. Co., Inc. v. Continental Ins. Co.*,
 536 A.2d 311 (N.J. App. Div. 1988).............................................................................. 30

*Edgley v. Lappe*,
 342 F.3d 884 (8th Cir. 2003) ...................................................................................... 3, 29

*Eng'g & Constr. Innovations v. L.H. Bolduc Co.*,
 825 N.W.2d 695 (Minn. 2013)................................................................................. 22, 28

*Eyeblaster, Inc. v. Fed. Ins. Co.*,
2008 WL 4539497 (D. Minn. Oct. 7, 2008) ................................................................. 8

*Eyeblaster, Inc. v. Fed. Ins. Co.*,
613 F.3d 797 (8th Cir. 2010) ................................................................................*passim*

*F & H Const. v. ITT Hartford Ins. Co. of Midwest*,
118 Cal. App. 4th 364 (2004) ....................................................................................... 27

*Federated Mut. Ins. Co. v. Concrete Units, Inc.*
363 N.W.2d 751 (Minn. 1985)........................................................................... 7, 21, 23

*Franklin v. W. Nat'l Mut. Ins. Co.*,
574 N.W.2d 405 (Minn. 1998)......................................................................................... 8

*GATX Leasing Corp. v. Nat'l Union Fire Ins. Co.*,
1994 WL 383909 (N.D. Ill. July 19, 1994),
*aff'd*, 64 F.3d 1112 (7th Cir. 1995)............................................................................... 35

*Gen. Cas. Co. of Wis. v. Wozniak Travel, Inc.*,
762 N.W.2d 572 (Minn. 2009)....................................................................................... 22

*Gen. Mills, Inc. v. Gold Medal Ins. Co.*,
622 N.W.2d 147 (Minn. App. 2001).............................................................................. 18

*Hartzell Indus., Inc. v. Fed. Ins. Co.*,
168 F. Supp. 2d 789 (S.D. Ohio 2001) .......................................................................... 23

*Hickman v. SAFECO Ins. Co. of Am.*,
695 N.W.2d 365 (Minn. 2005)....................................................................................... 29

*Hruska v. Chandler Assocs., Inc.*,
372 N.W.2d 709 (Minn. 1985)....................................................................................... 29

*Interstate Fire & Cas. Co. v. Auto-Owners Ins. Co.*,
433 N.W.2d 82 (Minn. 1988).......................................................................................... 31

*Kokins v. Teleflex, Inc.*,
621 F.3d 1290 (10th Cir. 2010) ....................................................................................... 9

*M.M. ex rel. L.R. v. Special Sch. Dist. No. 1*,
512 F.3d 455 (8th Cir. 2008) ........................................................................................... 9

*Liberty Mut. Ins. Co. v. Wheelwright Trucking Co., Inc.*,
851 So. 2d 466 (Ala. 2002)............................................................................................ 23

iii

*Lynott v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*,
    871 P.2d 146 (Wash. 1994) ......................................................................................... 30

*Marine Ins. Co. v. Nat'l Computer Systems, Inc.*,
    490 N.W.2d 626 (Minn. App. 1992) ............................................................................. 16

*Marshall Produce Co. v. St. Paul Fire & Marine Ins. Co.*,
    98 N.W.2d 280 (Minn. 1959) ................................................................................... 16, 18

*Midwest Family Mut. Ins. Co. v. Wolters*,
    831 N.W.2d 628 (Minn. 2013) ................................................................................. 15, 28

*Minn. Mining & Mfg. Co. v. Travelers Indem. Co.*,
    457 N.W.2d 175 (Minn. 1990) ..................................................................................... 15

*Mork Clinic v. Fireman's Fund Ins. Co.*,
    575 N.W.2d 598 (Minn. Ct. App. 1998) ....................................................................... 35

*Nathe Bros. v. Am. Nat'l Fire Ins. Co.*,
    615 N.W.2d 341 (Minn. 2000) ..................................................................................... 22

*Netherlands Ins. Co. v. Main Street Ingredients, LLC*,
    745 F.3d 909 (8th Cir. 2014) ....................................................................................... 18

*Owners Ins. Co. v. European Auto Works, Inc.*,
    695 F.3d 814 (8th Cir. 2012) ....................................................................................... 15

*Pan Am. World Airways, Inc. v. Aetna Cas. & Sur. Co.*,
    505 F.2d 989 (2d Cir. 1974) ......................................................................................... 30

*RAM Mut. Ins. Co. v. Meyer*,
    768 N.W.2d 399 (Minn. Ct. App. 2009) ....................................................................... 35

*Remodeling Dimensions, Inc. v. Integrity Mut. Ins. Co.*,
    819 N.W.2d 602 (Minn. 2012) ....................................................................................... 7

*Sand Cos., Inc. v. Gorham Housing Partners III, LLP*,
    2010 WL 5154378 (Minn. App. Dec. 21, 2010) ........................................................... 23

*Selective Ins. Co. of Am. v. SmartCandle LLC*,
    781 F.3d 983 (8th Cir. 2015) ....................................................................................... 20

*Sony Computer Ent. Am. Inc. v. Am. Home Assur. Co.*,
    532 F.3d 1007 (9th Cir. 2008) ................................................................................. 31, 32

*Sovereign Bank v. BJ's Wholesale Club, Inc.*,
  533 F.3d 162 (3d Cir. 2008).........................................................................................17

*State Farm Fire & Cas. Co. v. McPhee*,
  336 N.W.2d 258 (Minn. 1983)...................................................................................6, 12

*Thee Sombrero, Inc. v. Scottsdale Ins. Co.*,
  28 Cal. App. 5th 729, 737 (2018) ............................................................................22, 26

*THV Investments, LLC v. Certain Underwriters at Lloyds of London*,
  2018 WL 2410812 (Cal. App. May 29, 2018)...............................................................27

*Travelers Indem. Co. v. Bloomington Steel & Supply Co.*,
  718 N.W.2d 888 (Minn. 2006)..................................................................................30, 35

*Travertine Corp. v. Lexington-Silverwood*,
  683 N.W.2d 267 (Minn. 2004).....................................................................................2, 19

*U.S. Fire Ins. Co. v. Fireman's Fund Ins. Co.*,
  461 N.W.2d 230 (Minn. App. 1990).............................................................................31

*Vargas v. Ins. Co. of N. Am.*,
  651 F.2d 838 (2d Cir. 1981)..........................................................................................30

*Vicor Corp. v. Vigilant Ins. Co.*,
  674 F.3d 1 (1st Cir. 2012).............................................................................................27

*Vogel v. Russo*,
  613 N.W.2d 177 (Wis. 2000)........................................................................................25

*W. Nat. Mut. Ins. Co. v. Frost Paint & Oil Corp.*,
  1998 WL 27247 (Minn. App. Jan. 27, 1998)...........................................................23, 32

*Westfield Ins. Co. v. Weis Builders, Inc.*,
  2004 WL 1630871 (D. Minn. July 1, 2004) .................................................................23

*Wis. Pharm. Co., LLC v. Neb. Cultures of Calif., Inc.*,
  876 N.W.2d 72 (Wis. 2016)......................................................................................18, 25

*Woida v. N. Star Mut. Ins. Co.*,
  306 N.W.2d 570 (Minn. 1981)........................................................................................7

# I.    INTRODUCTION AND SUMMARY OF ARGUMENT

*Eyeblaster, Inc. v. Federal Ins. Co.*, 613 F.3d 797 (8th Cir. 2010), is the only case applying Minnesota law that squarely addresses the issues that these motions present, and it squarely requires a ruling in favor of coverage.  Yet ACE waits until page 30 of its cross-motion for summary judgment to even mention *Eyeblaster*, and then, when it finally does, ACE tells the Court that it would be a "perversion" for this Court to follow the Eighth Circuit's reasoning.  ACE Mem. at 31.  But it is not a "perversion" for this Court to follow governing precedent; it is, of course, what this Court is bound to do as the Eighth Circuit's rulings bind this Court.

*Eyeblaster* requires rejection of each of ACE's arguments against insurance coverage.  This Court's summary judgment analysis should begin and can end with *Eyeblaster*.

ACE's other arguments fail to pass muster under well-settled principles of Minnesota insurance coverage law, notably, the same principles that the Eighth Circuit applied in *Eyeblaster*.

***First***, ACE asserts that the data breach did not result in the "loss of use" of the payment cards at all since cardholders could have given out their account numbers (and CCV or PIN numbers) when making in-person purchases, rather than use their payment cards.  But most people do not view that option as comparable to using a payment card, which involves substantially more privacy and utility to the cardholder when compared to reciting 16-digit account numbers to the person at the supermarket checkout counter or remembering and punching all of those numbers into a machine in front of the other

1

people in line.  Indeed, under ACE's reasoning, there would be no coverage for loss of
use of a car because the car owner may reach the destination by walking, without using
the car.  But that is not how the insurance policies work.

The underlying plaintiffs alleged that they were forced to spend millions of dollars
to replace the cards as a result of the data breach—costs they would not have incurred if
the payment cards could still be put to their intended use.  There is no credible dispute
that the plaintiffs incurred those costs to replace the payment cards; that they sought to
recover those costs, and more, from Target; and that Target's settlement payments
encompassed these costs.  ACE's argument that the Policies' open-ended coverage for
"loss of use" does not apply if there is some other way to perform the same function as
the tangible property that cannot be used is not reasonable, and is foreclosed by
*Eyeblaster*, the plain language of the Policies, and Minnesota law.

**Second**, ACE asserts that the coverage for "loss of use" applies only to *temporary*
loss of use.  But ACE's proposed temporal limitation on "loss of use" does not appear in
the Policies; is not recognized in Minnesota case law (ACE stretches 2,000 miles away to
try to find support for its argument in a now-discarded line of older California cases, and
does not offer any Minnesota law supporting its contention); and is inconsistent with
Minnesota Supreme Court authority, *see Travertine Corp. v. Lexington-Silverwood*, 683
N.W.2d 267, 271 (Minn. 2004).

**Third**, ACE asserts that Target has no coverage under the Policies because it also
had coverage for data breach losses under different insurance policies and should have
gone to those other insurance policies for coverage.  But ACE did not place those

2

insurance policies in the record on this motion, so no factual support exists for its

argument.  In any event, *Eyeblaster* precludes ACE's argument: in *Eyeblaster*, the Eighth

Circuit found coverage under both a commercial general liability ("CGL") policy, like

the ACE Policies, and a cyber liability policy, like the ones that ACE now contends

should be the only policies that pay.  *Eyeblaster*, 613 F.3d at 802.  Moreover, insurance

coverage depends on the language of the insurance policy, and the ACE policy nowhere

says that ACE can avoid coverage for losses that fall within the plain language of the

ACE insurance merely because a different insurance policy may also provide coverage.

This argument thus violates cardinal principles of contract interpretation by looking past

the plain language of the contract.  *See Edgley v. Lappe*, 342 F.3d 884, 888 (8th Cir.

2003).

  ***Finally***, ACE argues that the "intentional" decision to replace the compromised

payment cards somehow broke the causal chain between the accidental "Occurrence" (the

data breach) and the resulting damages (card replacement costs): that is, ACE contends

that if an underlying plaintiff intentionally takes steps to fix a loss caused by the insured's

alleged negligence, there is no accident and, hence, no CGL coverage.  That

counterintuitive argument is contrary to longstanding Minnesota law.  In Minnesota, as in

virtually every other state, the relevant conduct for purposes of determining whether an

accident has taken place is the conduct *of the insured*: a traffic accident remains an

accident even if the victim intentionally goes to the hospital and then incurs losses

(hospital bills); and an accidental breach of payment card information remains an

3

accident even if the Issuing Banks spend money to fix the problem.  ACE offers no basis

for departing from this longstanding rule, and none exists.

The Court should grant Target's motion for partial summary judgment and should

deny ACE's cross-motion.

## II.    ARGUMENT

### A.    ACE Cannot Escape the Eight Circuit's Binding Interpretation of Minnesota Law in *Eyeblaster*, Which Compels Coverage In This Case.

*Eyeblaster*—the controlling authority in this matter—concerned an underlying

lawsuit alleging that Eyeblaster's internet advertising had infected his computer with

spyware and significantly decreased its performance.  *See* Target's Opening Mem. at 18-

21 (discussing *Eyeblaster*, 613 F.3d at 801).  Attempts to repair the computer restored

some but not all of its functions.  *Id*.  Eyeblaster tendered the defense of the victim's

lawsuit under both its CGL policy, which provided coverage like that of the ACE

Policies, and its cyber liability coverage, an Information and Network Technology Errors

or Omissions policy, which insured against losses involving "software, data, and other

electronic information."  *Id*. at 804.  The Eighth Circuit held that both policies would

provide coverage for a judgment or settlement if the plaintiff proved his allegations, and

specifically with respect to the CGL policy, that the underlying plaintiff's demand for

"the cost of his existing [less-functional] computer" was covered as damages because of

the "loss of use of tangible property that is not physically injured."  *Id*. at 802.

*Eyeblaster* requires rejection of each of ACE's four arguments against coverage.

First, if the "loss of use" of undamaged tangible property caused by a cyber attack did not

4

constitute "loss of use" under a CGL policy (*see* ACE Mem. at 14-20), then the Eighth

Circuit could not have found coverage for the computer in *Eyeblaster*, where the Court of

Appeals found coverage for loss of use as a result of a cyber attack. Second, if the "loss

of use" provision provided coverage only for "temporary" loss of use, *see id*. at 20-21,

26-30, then there could have been no coverage for the cost of replacing the *permanently*

unusable computer in *Eyeblaster*. Third, if the availability of coverage under a different

line of insurance meant that coverage was unavailable under a CGL policy, *see id*. at 12-

13, then the Eighth Circuit could not have found coverage under both Eyeblaster's CGL

policy *as well as* its cyber liability policy. Finally, if an underlying plaintiff's

"intentional" decision to replace useless tangible property precluded the finding of an

accidental "Occurrence," *see id*. at 33-38, then there could have been no accident (and

thus no coverage) after the underlying plaintiff in *Eyeblaster* intentionally replaced his

partially functioning computer with a fully functional computer.

In other words, if *any* of ACE's arguments were correct, the Eighth Circuit could

not have found coverage in *Eyeblaster*. That the Court of Appeals found coverage

requires rejection of ACE's cross-motion for summary judgment and confirms that

Target's motion for partial summary judgment should be granted.

ACE's attempts to distinguish *Eyeblaster* all fail.

*First*, ACE argues that the Court can disregard the Eighth Circuit's decision

because it did not apply Minnesota law. *See* ACE Mem. at 31. ACE is mistaken. The

Eighth Circuit started its legal discussion by stating that "There is no dispute that the

Federal policies are controlled by Minnesota law." *Eyeblaster*, 613 F.3d at 801. The

Court then went on to cite and apply Minnesota law on each of the substantive legal issues that it was addressing.  *See, e.g.*, *id.* ("Under Minnesota law, an insurer's duty to defend is distinct from and broader than its duty to indemnify the insured"); *id.* at 802 ("Under Minnesota law, an insured is entitled to have its case considered by the fact-finder once it has established a prima facie case.  The insurer then has the burden to prove that an exclusion applies."); *id*. at 804 ("Minnesota law places the burden on the insurer to prove that it has no duty to defend;" "Under Minnesota law, if the insured presents facts that arguably demonstrate coverage or if the insurer becomes aware of such facts, the insurer then bears a 'heavy burden' of proving that it has no duty to defend.").  The Eighth Circuit then decided the case by applying the "plain meaning" of the insurance policy language, which is what Minnesota law requires.  *See State Farm Fire & Cas. Co. v. McPhee*, 336 N.W.2d 258, 261 (Minn. 1983) ("When the language of a policy is not ambiguous, we will give effect to its plain meaning.").

ACE's suggestion that the Eighth Circuit was, *sub silentio*, applying the law of some other state is based solely on the fact that—after finding coverage under the plain meaning of the CGL policy—the Eighth Circuit cited two decisions from outside of Minnesota that also found coverage for the "loss of use" of computers.  *See Eyeblaster*, 613 F.3d at 802.  But this does not mean that the Eighth Circuit suddenly decided halfway through the opinion that it would rule under Virginia or Oklahoma law.  Courts of course frequently cite to out-of-state cases addressing similar facts to support their reasoning without ruling that out-of-state law suddenly governs.

6

Nor is there merit to ACE's attempt to convince this Court to disregard *Eyeblaster* because the Eighth Circuit did not go through all of the twists and turns of ACE's complicated and strained analysis, or that *Eyeblaster* did not cite *Federated Mutual Insurance Co. v. Concrete Units, Inc.* 363 N.W.2d 751 (Minn. 1985). To the contrary, the Eighth Circuit's analysis demonstrates that the restrictions on coverage that ACE seeks in its cross-motion are not actually supported by its Policies or by Minnesota law. Further, even if this Court had the authority to second-guess the Eighth Circuit's reasoning, a good reason exists why the Eighth Circuit did not mention *Concrete Units*: that decision does not actually stand for the proposition for which it is cited by ACE (*i.e.*, that only *temporary* "loss of use" is covered by CGL policies), and *Concrete Units* thus was irrelevant to the Eighth Circuit's decision.

*Second*, ACE attempts to distinguish *Eyeblaster* on the ground that the decision addressed the insurer's "duty to defend," as opposed to the duty to indemnify a settlement or judgment. *See* ACE Mem. at 32. But ACE ignores the point, explained in Target's opening memorandum, that this distinction is immaterial to this motion. The key difference between the duty to defend and the duty to indemnify is that the former turns on the *allegations* against the insured, whereas the latter turns on what is actually proven. *Eyeblaster*, 613 F.3d at 801; *Remodeling Dimensions, Inc. v. Integrity Mut. Ins. Co.*, 819 N.W.2d 602, 616-17 (Minn. 2012).

By finding a duty to defend, the Eighth Circuit necessarily concluded that the underlying lawsuit against the insured did not "fall[] outside the policy." *Eyeblaster*, 613 F.3d at 804; *see also Woida v. N. Star Mut. Ins. Co*., 306 N.W.2d 570, 574 (Minn. 1981)

7

(if there can be no duty to indemnify as a matter of law, there is no duty to defend). This means that the underlying plaintiff's allegations in *Eyeblaster* pleaded a loss that the policy would cover, if factually proven, *as a matter of law*. *Eyeblaster*, 613 F.3d at 804; *Franklin v. W. Nat'l Mut. Ins. Co.*, 574 N.W.2d 405, 407 (Minn. 1998) (an insurer does not owe a duty to defend if the underlying claim "fall[s] outside the scope of coverage"). The duty to defend is only characterized as broader than the duty to indemnify because, if those allegations are not ultimately proven, or turn out to be false, the insurer is still required to pay for a defense.

This means that the Eighth Circuit could not have reached its decision in *Eyeblaster* without holding that the plaintiff in that case alleged a loss within the scope of coverage *as a matter of law*. If ACE were correct—*i.e.*, if coverage for "loss of use of tangible property that is not physically injured" could not apply in this situation—then *Eyeblaster* would not have found that the plaintiffs' allegations triggered a duty to defend.

*Finally*, ACE misstates the grounds upon which the Eighth Circuit found coverage in *Eyeblaster* and suggests that what was really at issue was not the replacement cost of the unusable computer, but allegations that the underlying plaintiff "lost profits or incurred expenses until he could conduct his business on a new computer." ACE Mem. at 32. ACE's argument has no basis in the actual language of the *Eyeblaster* decision. There is no discussion of coverage for "lost profits." There is no discussion of coverage for "incurred expenses." Nor did the district court decision mention either of those items. *See Eyeblaster, Inc. v. Fed. Ins. Co.*, 2008 WL 4539497 (D. Minn. Oct. 7, 2008). The

8

only loss that the Eighth Circuit considered in connection with its "loss of use" analysis was the replacement cost of the computer compromised by the spyware attack—*i.e.*, "the cost of his existing computer." *Eyeblaster*, 613 F.3d at 802.

*    *    *    *

At bottom, ACE is unhappy that the Eighth Circuit's decision in *Eyeblaster* forecloses the arguments it wants to make here. That does not change the fact that *Eyeblaster* is binding and not distinguishable. This should end the inquiry.[1] For these reasons, Target respectfully requests that this Court apply *Eyeblaster's* governing interpretation of Minnesota law, reject each of ACE's arguments against coverage, and grant Target's motion for partial summary judgment.

## B. The Data Breach Resulted in the "Loss of Use" of the Payment Cards.

It is common sense that as a result of the data breach, consumers and banks lost the ability to use the compromised payment cards. One day consumers had payment cards that they could use to access their financial accounts. They next day, a data breach required the financial institutions to replace all of those payment cards because the cards

---

[1] To the extent that ACE (or even this Court) believes that *Eyeblaster* reached the wrong conclusion, the appropriate forum to challenge *Eyeblaster* is on appeal, either by convincing the Court of Appeals to submit a certified question to the Minnesota Supreme Court or by asking the Eighth Circuit *en banc* to reject the ruling in *Eyeblaster*; ACE cannot ask this Court to invent a different rule. *See, e.g.*, *M.M. ex rel. L.R. v. Special Sch. Dist. No. 1*, 512 F.3d 455, 459 (8th Cir. 2008) (holding that the district court erred by not following binding Eighth Circuit precedent because, even though the district court believed the appellate court's analysis to be "cursory" and "not support[ed]," the decision had "decided the question for the courts of this circuit"); *Kokins v. Teleflex, Inc.*, 621 F.3d 1290, 1295 (10th Cir. 2010) (district courts are bound by federal circuit court's prior interpretation of state law); *Batts v. Tow-Motor Forklift Co.*, 66 F.3d 743, 747 (5th Cir. 1995) (same).

9

could no longer be used to securely access financial accounts.  ACE's arguments to the

contrary are wrong.

### 1. ACE's New Theory that "Loss of Use of Tangible Property" Means "Loss of Use *Exclusively Performed* by Tangible Property" Has No Basis in the Policies and Should Be Rejected.

In its portion of the 26(f) report, ACE asserted that the data breach did not result in

the "loss of use" of the payment cards because they remained "completely useful [for

other purposes] as a piece of tangible plastic," suggesting that "an enterprising

Minnesotan could still use the plastic card to clear a frosted windshield where no ice

scraper was available."  *See* Dkt. No. 20 at 3.  As Target's opening memorandum

explained, this interpretation is inconsistent with the language of the Policies and would

render coverage illusory, as any otherwise useless tangible object not physically injured

can be used as a paper weight.  *See* Target Opening Mem. at 23-24.  ACE does not try to

defend its Rule 26(f) argument in its cross-motion for summary judgment.

ACE instead comes up with an equally unsatisfactory attempt to discount the fact

that the payment cards could not be used, arguing that payment cards had no use to begin

with.  ACE submits that all that is needed to access cardholder accounts is the

information stored on the card (which the cardholder could just recite verbally if

necessary), not the piece of tangible plastic itself.  *See* ACE Mem. at 15.  In other words,

according to ACE, some of the largest and most sophisticated financial institutions in the

world spent tens of millions of dollars to reissue payment cards for no reason.  There is

no logical or legal basis for ACE's new artificial limitation on the Policies' unqualified

grant of coverage for "loss of use of tangible property that is not physically injured." The Court should reject it.

*First*, and most fundamentally, the financial institutions spent the money to replace the compromised payment cards and claimed it back against Target. This is not an expense that Target itself incurred, but a liability that Target was able to resolve through settlement. ACE's position is effectively that Target overpaid to settle the claims by the financial institutions because Target could have told those institutions that they should instruct their cardholders to stop using credit cards and charge all purchases virtually. But this argument—to the extent that ACE actually seeks to pursue it—does not go to *coverage* for these losses. It is an argument that ACE should be making to the jury if ACE were to challenge the reasonableness of the settlements that Target entered into with the financial institutions. Whether the jury would credit ACE's argument is unlikely: millions of bank officials and consumers with cards that they diligently protect would no doubt be surprised to hear that their cards serve no function; but this is not the place in which to resolve ACE's assertion, which concerns damages, not liability.

*Second*, regardless of how ACE phrases this argument, the reality is that once an account is compromised through a data breach, the physical payment cards associated with the compromised accounts need to be replaced. Payment cards bearing the compromised account information are deactivated and replaced with new payment cards bearing new information as a matter of course after a data breach. *See* Declaration of Amanda Lagatta in Support of Plaintiff Target Corporation's Motion for Partial Summary Judgment, Ex. E ¶¶ 86, 123. If ACE were right, and payment cards could somehow be

used as intended after a data breach, there would be no reason to replace them.  Banks

would not spend millions of dollars to print new pieces of plastic and then file lawsuits to

recover their expenses.[2]  Minnesota law requires courts to interpret policy language

according to its "plain meaning," *see McPhee*, 336 N.W.2d at 261, and there is no plainer

meaning to "loss of use" than the fact that data breaches are routinely followed by mass

replacement of payment cards.

*Third*, ACE's argument that "loss of use" coverage does not apply to payment

cards if the financial institutions' customers had alternative ways of paying for the same

things quickly falls apart.

ACE asserts that a payment card "functions *only* to facilitate efficient *point-of-sale*

purchases" and "eliminate[] human actions beyond swiping or inserting (and sometimes

entering a PIN)," and has no role in secure access to or the transfer of account and credit

information whatsoever.  ACE Mem. at 15 (first emphasis added, second in original).

Accordingly, ACE claims that a payment card is a mere convenience, and precisely

because it is possible to securely access financial accounts without a payment card, a

payment card does not—cannot—have that function.  *Id*.  In other words, ACE's

argument boils down to the assertion that because cardholders can "securely" access and

use their financial accounts through other methods, the cardholders did not "lose" that

"use" when their payment cards were breached.  *Id.*

---

[2]     It is theoretically possible for each cardholder to return a compromised card to the
bank for re-coding so the card could be used again, but that surely would have been far
more expensive than simply replacing the card, and in any event that is not what the
banks chose to do in the real world.

12

But an insurer that agrees to provide CGL coverage to its insured for lawsuits seeking damages because of "loss of use" cannot argue that the insured loses coverage because the plaintiffs filing the lawsuits should have figured out a workaround after the data breach. Nor is ACE's proposal a genuine workaround: to use account information to make an in-person purchase (rather than inserting or swiping a payment card) means that the cardholders must remember their 16-digit card numbers plus their CCV or PIN numbers, and either recite them aloud to a stranger or punch them into a machine.

In any event, an insurer must take the claims against their insured as presented and cannot avoid coverage merely because the insurer thinks it has a better idea. Nor should ACE be heard to complain on that score. ACE had the right under the Policies to associate in Target's defense and advise Target about defenses to liability, Lagatta Decl. Ex. A at 21 of 230, but ACE did not exercise that right and it is too late for ACE to try to concoct a defense strategy now that it failed to suggest at the time—let alone a defense strategy that had zero chance of succeeding before any Minnesota (or other) jury.

Moreover, ACE does not offer a reasonable interpretation of term "loss of use." ACE effectively asks the Court to re-write the Policies and change the unqualified grant of coverage for "loss of use of tangible property" into a highly-restricted grant of coverage only for a "loss of a use that *can be performed only by* that specific piece of tangible property"—a mouthful that does not appear in the Policies and which no plain reading of "loss of use" would support. Contrary to ACE's assertion, under the language of the Policies it simply does not matter whether card holders could make virtual purchases without their payment cards. Even if the payment cards did function solely as

13

a "convenience"—so that cardholders would not have to memorize and recite their account information every time they make a purchase—the cardholders allege that they did, and indeed did, "lose the use" of those payment cards (and that convenience) as a result of the data breach, and Target compromised claims for liability for the costs of replacing them. That is all that is required to trigger coverage under the plain meaning of the "loss of use" provision.[3]

The defects in ACE's argument are even more apparent when considered in connection with the stolen and copied front-door key analogy discussed in Target's opening memorandum. *See* Target Opening Mem. at 2-3, 15. Just as consumers might be able to memorize and recite their account information and thus make purchases without a payment card, a lock can be opened without a key (albeit with greater effort) by using a lockpick to raise the necessary interior pins in the lock. Under ACE's theory, the fact that a lockpick allows a homeowner to open the front door without a key means that the key *does not have the use* of permitting secure access to the home. Instead, ACE would apparently tell homeowners that the key merely allows them to open a lock "efficiently," but is not "used" to open locks because that "use" can be accomplished through other methods (such as picking the lock). Any theory that results in the

---

[3]     As with ACE's first "ice-scraper" argument, *see* Dkt. No. 20 at 3, this theory too would lead to absurd results. For example, under ACE's theory, a car that cannot be used to drive would not qualify for "loss of use" coverage under a CGL policy because a car is not "necessary" to travel from point A to point B, as biking or walking can also fulfill that role.

conclusion that a key is not "used" to open locks cannot be credible, yet that is effectively what ACE is telling the Court.

For these reasons, ACE's new position is not reasonable and should be rejected on that ground. Moreover, to prevail on this theory, ACE must do more than convince the Court that its position is reasonable. ACE must establish both that ACE's interpretation of "loss of use" is reasonable *and* that Target's interpretation is unreasonable. *See Owners Ins. Co. v. European Auto Works, Inc.*, 695 F.3d 814, 821 (8th Cir. 2012) ("If an insurance policy provision is 'reasonably subject to more than one interpretation,' Minnesota law requires that it be construed in favor of coverage.") (quoting *Minn. Mining & Mfg. Co. v. Travelers Indem. Co.*, 457 N.W.2d 175, 179 (Minn. 1990)); *Midwest Family Mut. Ins. Co. v. Wolters*, 831 N.W.2d 628, 636 (Minn. 2013) ("Language in a policy is ambiguous if it is susceptible to two or more reasonable interpretations. Any ambiguity is resolved in favor of the insured.") (citations omitted).

Accordingly, even were the Court to find ACE's new "exclusive use" theory *a* reasonable interpretation of the policy language (which it should not), there is no credible argument that ACE's theory is the *only* reasonable interpretation, or that Target's contrary interpretation is unreasonable, and so the Policies must be construed in favor of coverage and Target's motion for partial summary judgment granted.

### 2. ACE's Cases Do Not Support Its New "Loss of Use Exclusively Performed by" Theory.

ACE's argument is not only illogical, it is unsupported by case law. None of ACE's authorities supports its interpretation of this policy language.

15

### a)   ACE's Minnesota Case Law.

ACE cites only one case applying Minnesota law in support of its "loss of use" theory, *St. Paul Fire* & *Marine Insurance Co. v. National Computer Systems, Inc*., 490 N.W.2d 626 (Minn. App. 1992). *See* ACE Mem. at 19-20.  That decision offers no support whatsoever to ACE.  In fact, *National Computer* did not concern the "loss of use of tangible property that is not physically injured" insuring agreement at all.  Rather, in that case, the insured's employee was alleged to have misappropriated binders containing confidential information from Boeing, his former employer, and Boeing sued for breach of contract, trade secret misappropriation, and unfair competition.  290 N.W.2d at 629.

In the subsequent insurance coverage action, the sole issue was whether Boeing "alleged damage to tangible property," and the court found that it had not.  *Id.* at 630-31. This was because Boeing "was not suing NCS for Peters' misappropriation of the binders."  *Id*. at 631.  Boeing did not make any claims, and NCS did not incur any losses, relating to alleged loss of use of "the binders in which Boeing's information was kept." *Id*.  In other words, unlike in this case (and unlike in *Eyeblaster*), the underlying plaintiff did not seek coverage for the cost of *replacing the tangible property* that had contained the information: Boeing did not sue to make new binders.  Replacement costs for tangible property rendered useless was simply not at issue and so *National Computer* offers no guidance to this Court and no support for ACE.

### b)   ACE's Non-Minnesota Case Law.

Without any Minnesota law supporting its interpretation (let alone without the necessary Minnesota Supreme Court authority rejecting *Eyeblaster*), ACE resorts to four

16

out-of-state cases that do not apply Minnesota law or, in at least one instance, insurance law, at all. None of these cases provide any support for ACE's new theory on exclusive "loss of use" and each is distinguishable on so many and so significant grounds that the Court should reject them all out-of-hand.

*First*, ACE cherry-picks a few lines from a Third Circuit decision that has nothing to do with insurance coverage, let alone "loss of use" coverage under a CGL policy. *Sovereign Bank v. BJ's Wholesale Club, Inc.*, 533 F.3d 162 (3d Cir. 2008), addressed whether a data breach caused "physical damage" (not "loss of use") to payment cards such that plaintiffs could pursue remedies under an exception to the economic loss doctrine. *Id.* at 179. *Sovereign Bank* held that there was no "physical damage" for the obvious reason that the data breach and resulting fraudulent transactions "had no *physical effect*" on the payment cards. *Id.* (emphasis added).

ACE seizes on the comment that the payment cards were "intact and useable," and were not rendered "useless," but ignores that those statements were made in the context of whether it was *physical damage* that rendered the payment cards useless. *Id.* That conclusion is obvious: data breaches do not physically damage the plastic or magnetic strip on payment cards. But this does not help ACE to avoid insurance coverage. *Sovereign Bank* never considered the completely different questions that are relevant to this insurance coverage dispute: whether the data breach required the undamaged payment cards to be replaced because they could no longer be used safely, and whether—even if those payment cards could still be swiped to pay for a transaction—they could reasonably fulfill their intended use after the data breach.

17

**Second**, ACE cites *Camp's Grocery, Inc. v. State Farm Fire & Casualty Co.*, 2016 WL 6217161 (N.D. Ala. Oct. 25, 2016), an unpublished Alabama case rejecting coverage under a CGL policy that did not involve the "loss of use" language in the insuring agreement addressed by the court. *See id*. at \*8 (applying insuring agreement for "acts or omissions caused *physical harm or damage* to any cards as tangible property.") (emphasis added). *Camp's Grocery*'s conclusion regarding a lack of "physical harm or damage" to payment cards says nothing about coverage under the "loss of use" insuring agreement at issue in these cross-motions.

**Third**, ACE cites Wisconsin authority, *Wisconsin Pharmacal Co., LLC v. Nebraska Cultures of California, Inc.*, 876 N.W.2d 72 (Wis. 2016), for the proposition that "loss of use" coverage "by its plain language contemplates some sort of loss of use in fact, not a reduction in value." *Id*. at 83. Setting aside the fact that Wisconsin law does not apply to this insurance dispute, that case involved a product that *never worked to begin with* because it incorporated a defective ingredient before it was completed. *Id.* at 83-84. The Court does not need to address, for purposes of this motion, whether there can be no "loss of use in fact" of something that was *never usable*. *Id*. But this does not help ACE here because the payment cards were all useable prior to the data breach.[4]

---

[4]     *Wisconsin Pharmacal's* holding under Wisconsin law that incorporation of a defective ingredient or adulteration is not property damage of any kind is also at odds with Minnesota law. *See, e.g.*, *Marshall Produce Co. v. St. Paul Fire & Marine Ins. Co.*, 98 N.W.2d 280, 283 (Minn. 1959); *Gen. Mills, Inc. v. Gold Medal Ins. Co.*, 622 N.W.2d 147, 152 (Minn. App. 2001); *see also Netherlands Ins. Co. v. Main Street Ingredients, LLC*, 745 F.3d 909, 916-17 (8th Cir. 2014) (because food product was "adulterated," whether or not it in fact "could be *safely* consumed," there was property damage) (emphasis in original).

*Finally*, ACE cites *Bering v. Interinsurance Exchange of the Automobile Club*, 2002 WL 31320598 (Cal. App. Oct. 17, 2002). *Bering* is an unpublished California Court of Appeal opinion and thus cannot be cited for any relevant purpose. *See* Cal. R. Ct. 8.1115(a). Accordingly, even if California law were applicable, *Bering* does not reflect California law. This is for good reason, as that decision provides no analysis whatsoever, and simply states that the theft of credit card information "does not constitute the destruction or loss of use of tangible property." 2002 WL 31320598, at *8. It did not mention or address payment cards, the need to replace payment cards associated with compromised accounts, or the costs of replacing those payment cards.

In short, none of the cases that ACE cites supports ACE's new theory.

## C.   ACE's Argument that "Loss of Use" Includes Only *Temporary* "Loss of Use" Has No Basis in the Policy Language or Case Law.

ACE next asks the Court to read the provision providing coverage for "loss of use to tangible property that is not physically injured" to mean "[*temporary*] loss of use to tangible property that is not physically injured." ACE Mem. at 26-30. The Court should decline to insert "temporary" into the insurance policy, as that would be contrary to Minnesota law. *See Travertine Corp. v. Lexington-Silverwood*, 683 N.W.2d 267, 271 (Minn. 2004) ("courts should not rewrite" an insurance policy).

Even if the loss of use of the payment cards were permanent,[5] ACE identifies no language in the Policies that even hints—let alone states expressly and unambiguously—

---

[5]   In fact, the loss of use of the cards was *temporary*, at least conceptually. That is, theoretically, cardholders could have mailed their cards back to the issuing bank, which

19

that the "loss of use" must be temporary for coverage to attach. That alone is enough for this Court to reject ACE's argument.

In support of its position, ACE seeks to disregard the plain meaning of two words—"because of." ACE asserts that coverage is limited to "temporary loss of use," and not any type of "loss of use," because the Policy provides coverage for "*damages because of* loss of use of tangible property that is not physically injured." ACE Mem. at 27 (emphasis provided by ACE). According to ACE, the words "because of" mandate not just causation, but also a temporal limitation such that the damages must result from *temporary* "loss of use," not a *permanent* loss of use. *Id*. at 27-29.

Insurance policy language is given its plain and ordinary meaning in the context of the insurance policy, a meaning that typically is determined by consulting a dictionary. *See, e.g., Selective Ins. Co. of Am. v. SmartCandle LLC*, 781 F.3d 983, 985 (8th Cir. 2015). However, no dictionary that Target could locate provides a definition of "because of" that imports a temporal meaning in addition to its obvious and well-known causal meaning. *See, e.g.*, Merriam-Webster, *Definition of because*, https://www.merriam-webster.com/dictionary/because (last visited July 24, 2020) ("for the reason that"); Oxford English Dictionary, *because, adv., conj., and n.*, https://www.oed.com/view/Entry/16742 (last visited July 24, 2020) ("By reason *of*, on account *of*"); Cambridge

---

in turn could have sanded down the plastic, reprinted it, modified the codes on the card to eliminate the data that was stolen, and mailed the cards back. That, of course, would have been far more expensive than replacing the cards, but the fact remains that the cards could, in theory, have been repaired and put back into use, rendering the loss of use temporary as ACE posits is required for coverage.

Dictionary, *Meaning of **because** in English*, https://dictionary.cambridge.org/us/

dictionary/english/because (last visited July 24, 2020)  ("as a result of").  It appears that

ACE has pulled this new definition from thin air.  Nor do the cases help ACE's effort to

rewrite its insurance policies.

### 1. ACE's Minnesota Case Law.

The sole Minnesota case that ACE cites for its definition of "because of" is

*Federated Mutual Insurance Co. v. Concrete Units, Inc.*, 363 N.W.2d 751 (Minn. 1985).

ACE Mem. at 21-22, 27, 29.  In that case, the court found that certain damages were

covered property damage under "loss of use" because they were "based on" and "causally

related to" lost use of an elevator.  363 N.W.2d at 756-57.  That is all *Concrete Units* said

about what damages are covered as "loss of use."  ACE reads "based on" and "causally

related" to mean that a claim must in all circumstances be *measured by* losses the insured

"incurred because of, *and during*," the period the property was unusable.  ACE Mem. at

22 (emphasis added).  Neither the ACE Policies—nor *Concrete Units*—says anything of

the sort.  "Based on" and "causally related to," like "because of," are words of *causation*,

not temporal limitations like "during" or "temporary."  The phrase "legally obligated to

pay as damages because of" has no "temporal component," notwithstanding ACE's

argument to the contrary.  *Id*. at 27.  Despite ACE's assertions, nowhere does *Concrete

Units* suggest—let alone "show[] on its face"—that "because of" does not carry is plain

meaning of causation (and nothing else).  *Id*.

ACE's effort to parse some unspoken temporal restriction out of *Concrete Units* is

contrary to Minnesota law, which requires that insurance policy language of "inclusion,"

like the coverage grant for damages caused by loss of use, be "broadly construed." *Gen.*

*Cas. Co. of Wis. v. Wozniak Travel, Inc.*, 762 N.W.2d 572, 575 (Minn. 2009). If ACE

intended to exclude coverage for damages sustained because of the *permanent* "loss of

use" of tangible property, it was required to do so in clear and conspicuous language.

*See, e.g.*, *Nathe Bros. v. Am. Nat'l Fire Ins. Co.*, 615 N.W.2d 341, 344 (Minn. 2000)

("[W]hen interpreting an insurance policy, we will avoid an interpretation that will forfeit

the rights of the insured under the policy, unless such an intent is manifest in 'clear and

unambiguous' language."). ACE did not do that, and Minnesota law does not permit

ACE to insert that limiting language now that Target has paid its premiums and suffered

a loss covered by the actual words used in the Policies.[6]

      In fact, numerous courts have recognized that "loss of use," without any qualifier,

means the loss of *any* significant use of property—permanent or temporary, total or

partial, complete or diminished. *See, e.g.*, *Am. Ins. Co. v. Crown Packaging Int'l*, 813 F.

Supp. 2d 1027, 1044 (N.D. Ind. 2011) (holding coverage would exist for the "loss of use"

of liquid soap that was rendered unusable and scrapped after printing error on soap

containers rendered the soap in those containers unsalable); *Thee Sombrero, Inc. v.*

*Scottsdale Ins. Co.*, 28 Cal. App. 5th 729, 737 (2018) ("[T]he reasonable expectations of

---

[6]    Nor does ACE offer a reading of the policy as a whole, or other context within the policy, indicating in any way that loss of use must be "temporary." Target's interpretation of "loss of use" as not having any temporal limitation does not render the words "of use" "superfluous," ACE Mem. at 29, nor "entirely neutralize[]" any "provision" of the policy. *Eng'g & Constr. Innovations v. L.H. Bolduc Co.*, 825 N.W.2d 695, 705 (Minn. 2013). Notably, ACE does not (and cannot) point to any such provision in the ACE Policies that Target's interpretation renders meaningless.

the insured would be that 'loss of use' means the loss of *any* significant use of the premises, not the total loss of all uses.") (emphasis in original); *Liberty Mut. Ins. Co. v. Wheelwright Trucking Co., Inc.*, 851 So. 2d 466, 494-95 (Ala. 2002) ("The failure … to specify the extent of the loss of use, whether complete uselessness or diminishment in value for a particular purpose, means that, at a minimum, the provision is ambiguous and therefore due to be construed against [the insurer]."); *Hartzell Indus., Inc. v. Fed. Ins. Co.*, 168 F. Supp. 2d 789, 795 (S.D. Ohio 2001) ("The policy does not specify that the loss of use must be total as opposed to partial."). ACE does not mention this authority.

Nor, contrary to ACE's claim, does *Concrete Units* create a distinction between damages because of "loss of use" and damages because of "loss of value." ACE Mem. at 23-25. Target has searched in vain for any Minnesota case law that has ever interpreted *Concrete Units* to establish the purported categories of loss that ACE advocates in its cross-motion. What *Concrete Units* actually held was that "diminution in value" is not "property damage" under either definition of that term in the policy at issue. 363 N.W.2d at 756.[7] But this uncontroversial holding has nothing to do with this case or coverage for

---

[7] Courts following *Concrete Units* have consistently held that while diminution in value is not itself property damage under Minnesota law, a CGL policy that covers damages "because of property damage" also covers economic loss and diminution in value. *See, e.g.*, *Sand Cos., Inc. v. Gorham Housing Partners III, LLP*, 2010 WL 5154378, at \*\*4-5 (Minn. App. Dec. 21, 2010); *W. Nat. Mut. Ins. Co. v. Frost Paint & Oil Corp.*, 1998 WL 27247, at \*2 (Minn. App. Jan. 27, 1998); *Westfield Ins. Co. v. Weis Builders, Inc.*, 2004 WL 1630871, at \*\*9-10 (D. Minn. July 1, 2004) ("*Concrete Units* did not address whether a claim for diminution in value was covered under the 'because of' phrase. Thus, its holding is inapplicable to the determination of whether a claim for diminution in value can be covered under the 'because of' language.… [T]he Court's inquiry does not stop after it determines that [a] claim of diminution in value is not

the payment card replacement costs that Target seeks here. This is because the Issuing

Banks did not allege that the payment cards merely became less valuable—and they did

not seek to recoup the economic loss they suffered because the cards' market value

decreased—as a result of the data breach. The Issuing Banks were forced to cancel and

reissue payment cards because the cards could no longer effectively or safely be *used* to

perform their intended function.

### 2. ACE's Non-Minnesota Case Law.

Because no Minnesota case law actually supports its argument, ACE attempts to

characterize what it represents as *Concrete Units'* holding as representative of some

broader line of cases nationwide, claiming that "[c]ourts across the country uniformly

hold that replacement costs are damages because of loss of value, not because of loss of

use." ACE Mem. at 23. But as Target has already explained, and as ACE ignores, the

Eighth Circuit, applying Minnesota law, held precisely to the contrary in *Eyeblaster*. *See*

Section II.A, above. There is no need for a fifty-state survey as no dispute exists that this

diversity action is governed by Minnesota law. *See* Dkt. No. 20 at 3. But even setting

aside this Eighth Circuit authority, ACE once again misconstrues and mischaracterizes

the cases on which it relies. Rather than representing some uniform agreement "across

---

property damage; rather, it must also determine whether such a claim is 'causally related'
to an item of property damage"). In this case, the ACE Policies define property damage
as "loss of use of tangible property that is not physically injured." Ergo, although the
issue is not presented in this case, the ACE Policies, as per Minnesota law, would also
cover loss of value because of the loss of use of tangible property not physically injured.

the country," the decisions ACE cites arise in Wisconsin and California, and even they do not stand for the propositions that ACE wishes they did.

*First*, ACE repeats its inapposite discussion of *Wisconsin Pharmacal*, which held that "diminution in value" caused by an incorporated defective ingredient (before the product was completed) did not result in "loss of use" because the product had never been usable.  *See* ACE Mem. at 23-24 (citing *Vogel v. Russo*, 613 N.W.2d 177 (Wis. 2000), for the same proposition about "diminution in value").  But again, the Issuing Banks did not seek reimbursement of (and so Target does not seek coverage for) some diminution in value of the payment cards.  The payment cards were not worth five dollars before the data breach and only three dollars after.  Instead, the Issuing Banks sought from Target the cost of replacing the payment cards entirely because they could no longer be used.  This has nothing to do with "diminution in value," but is instead the exact form of loss that the Eighth Circuit in *Eyeblaster* recognized was covered under the same CGL insuring agreement.  *See* Section II.A, above.

*Second*, ACE cites a now-abandoned line of older cases applying California law. As an initial matter, ACE's heavy reliance on California law cannot defeat Target's reasonable interpretation of the plain language of the ACE Policies under Minnesota law as guided by *Eyeblaster*.  But even were California law relevant, ACE does not mention that more recent cases applying California law to coverage for "loss of use" have rejected the argument that ACE is making, such as *Anthem Electronics, Inc. v. Pacific Employers Insurance Co.*, 302 F.3d 1049 (9th Cir. 2002), which found coverage under California law for losses caused by the presence of the insured's defective circuit boards in a third

party's devices, including the cost of replacing failed devices, and *Thee Sombrero, Inc. v. Scottsdale Ins. Co.*, 28 Cal. App. 5th 729, 737 (2018), which reflects contemporary California legal holdings around "loss of use" and found coverage for the loss in value of real property when it was not able to be used as originally intended.

ACE's cases (all of which rely on a 1994 intermediate appellate decision) do not support its position. *Collin v. American Empire Insurance Co.*, 21 Cal. App. 4th 787, 818 (1994), held that the conversion of property does not result in "loss of use." The case is immediately distinguishable because Target does not seek insurance coverage for liability for the loss of use of converted property: the card holders still possessed their payment cards; they just could not use them because they were unsafe and had to be disabled by the financial institutions. Perhaps more important, ACE misstates the holding of that case. *Collin* does not hold, as ACE suggests, *see* ACE Mem. at 26, that replacement costs *cannot be* "loss of use" damages. Instead, *Collin* merely stated that loss of use *damages* "*may be* determined with reference to the *rental value* of a substitute," but not the "value of the property itself." 21 Cal. App. 4th at 818 (first emphasis added, second in original) (citation omitted). The court made no pronouncement that all "loss of use" damages must be measured by rental value, or that the reference to "rental" value implied that only *temporary* losses of use were covered under a CGL policy. In short, *Collin* is a case about the measure of damages, not the existence of coverage.

Nor do any of the other California cases help ACE's position. These cases focus on the incorporation of defective components, ingredients, or workmanship into the insured's own product. These are not risks that are generally covered by CGL insurance,

and it is in that context that these decisions must be understood.  While that would be sufficient ground to dismiss all of them, a careful review further reveals that none actually applies a temporal limitation to coverage for loss of use under circumstances akin to those in this case.[8]

### D.    ACE's "Risk-Specific Policy Analysis" is Not Applied in Minnesota and Even ACE's Case Law Does Not Support Applying it Here.

Unable to marshal any support for its interpretation of the insurance policy language, ACE claims that Target's losses arising out of the data breach are not covered not because of any provision of the policy or applicable law, but merely because the ACE Policies are called "commercial general liability" policies rather than "cyber liability" policies, and Target made a claim for other losses under the latter type of insurance policy.  ACE Mem. at 12-13.  ACE's "risk-specific policy contextual analysis" has no support in the law.

*First*, ACE did not put the cyber liability policies into evidence, so ACE has no basis for arguing about the coverage they provide or do not provide.

---

[8]    *See Atmel Corp. v. St. Paul Fire & Marine Ins. Co.*, 430 F. Supp. 2d 989, 994 (N.D. Cal. 2006) (holding that coverage for damages because of loss of use must have nexus with inability to use the property and that replacement costs at issue did not; "The Court does not hold … that loss of use damages can *only* consist of rental value or its equivalent.") (emphasis in original); *F & H Const. v. ITT Hartford Ins. Co. of Midwest*, 118 Cal. App. 4th 364, 377 (2004) (stating that insured sought "liability insurance for inferior or defective workmanship, a risk not covered by commercial liability insurance"); *Vicor Corp. v. Vigilant Ins. Co.*, 674 F.3d 1, 14 & n.8 (1st Cir. 2012) (same; citing no policy language for conclusion that loss of use damages must be tied to specific period of lost use).  ACE's other case, *THV Investments, LLC v. Certain Underwriters at Lloyds of London, 100% Syndicate 5151*, 2018 WL 2410812 (Cal. App. May 29, 2018), is unpublished and, as noted, cannot be cited; it also addresses the irrelevant subject of "out of pocket payments" incurred in connection with a botched real estate transaction.

*Second*, assuming for the sake of argument that those cyber policies provide coverage for some of the same risks as the ACE CGL Policies, there is nothing at all unusual about a policyholder purchasing more than one line of insurance, and then obtaining coverage under more than one line for different losses arising out of the same occurrence.  Multi-line claims happen every day.  For example, a serious corporate defalcation claim could trigger crime coverage (for losses to the business from a theft), director and officer coverage (if, for example, shareholders were to file a derivative action against the officers of the company for inadequate oversight of the employee who stole the money), and errors and omissions coverage (if the theft affected the company's customers, who turned around and sued).  Or a truck accident could involve motor vehicle coverage (for the cost of repairing the truck), liability coverage (for claims by the other drivers injured in the accident), and cargo insurance (for the damaged contents of the truck).  Or, as in *Eyeblaster*, as here, an insured can obtain coverage under both a CGL policy and a cyber policy.  *Eyeblaster*, 613 F.3d at 802.

*Third*, it is hornbook Minnesota law that insurance policies are interpreted based, and that the scope of the coverage they provide turns, on the language actually contained in the policy.  *See, e.g.*, *Eng'g & Constr. Innovations v. L.H. Bolduc Co.*, 825 N.W.2d 695, 704 (Minn. 2013) ("The extent of an insurer's liability is governed by the language of the insurance policy."); *Wolters*, 831 N.W.2d at 636 ("In interpreting insurance contracts, we must ascertain and give effect to the intentions of the parties as reflected in the terms of the insuring contract.") (quotations omitted).

An insurer, or a court applying Minnesota law, may not ignore that language because it thinks that some other policy that the insured bought, or could have bought, would have been a better fit for the risk and the facts of the loss. Nor can an insurer offer extrinsic evidence (such as evidence about other insurance policies) to interpret its insurance policies unless it first identifies language in the insurance policy that is ambiguous on its face. *See Hickman v. SAFECO Ins. Co. of Am.*, 695 N.W.2d 365, 369 (Minn. 2005); *Edgley v. Lappe*, 342 F.3d 884, 888 (8th Cir. 2003) (if policy language is unambiguous, "[t]here is no need … to look beyond the plain language of the contract"). ACE does not make that threshold showing and thus cannot rely on extrinsic evidence, such as the existence of a different insurance program, to interpret the coverage that its CGL policy provides.

*Fourth*, an insurer cannot use extrinsic evidence (such as information about some other insurance policy) to rewrite its own insurance policy. *See Hruska v. Chandler Assocs., Inc.,* 372 N.W.2d 709, 713 (Minn. 1985). If ACE had wanted to exclude data-breach related losses from its general liability policy, it needed to do so not by pointing to the existence of different insurance policies issued by different insurers but by adding language to its own policy to bar coverage for losses that flow from data breaches. Such language exists and is available to insurers. *See, e.g.*, Insurance Services Office, Inc., Form CG 21 06 05 14, https://www.techriskreport.com/wp-content/uploads/sites/26/2019/05/ISO-Form-CG-21-06-05-14.pdf (last visited July 24, 2020) (excluding coverage for "damages arising out of any access to or disclosure of any person's or organization's confidential or personal information, including … financial information [or] credit card

information"). Critically, instead of adding such exclusionary language to its Policies, ACE expressly *deleted* from its Policies a provision that would have excluded damages arising out of the loss of use of electronic data. *See* Target Opening Mem. at 29 (discussing deletion of exclusion for "[d]amages arising out of the loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate electronic data.")

It is a basic rule of insurance policy interpretation that if an insurer is aware of language that unambiguously excludes a peril but chooses not to use that language in its insurance policy, the insurer cannot read its insurance policy as if the language that it omitted is part of the policy text. *See, e.g.*, *Travelers Indem. Co. v. Bloomington Steel & Supply Co.*, 718 N.W.2d 888, 895 (Minn. 2006) (rejecting insurer's interpretation of policy language because it "could have unilaterally included provisions in its policies that would have unambiguously excluded coverage"); *see also Lynott v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 871 P.2d 146, 151 (Wash. 1994) (insurer "did not use that available, standard form endorsement which would have identified with particularity the transaction which it now claims it intended to exclude"); *CPS Chem. Co., Inc. v. Continental Ins. Co.*, 536 A.2d 311, 318 (N.J. App. Div. 1988) ("[i]f the insurers had desired to so radically constrict the coverage provided by their standard-form policies, they could easily have accomplished their intent by employing clear and unequivocal language"); *Vargas v. Ins. Co. of N. Am.*, 651 F.2d 838, 841 (2d Cir. 1981) ("[h]ad [the insurer] wished to preclude coverage … language to accomplish that objective was readily available"); *Pan Am. World Airways, Inc. v. Aetna Cas. & Sur. Co.*, 505 F.2d 989,

1000 (2d Cir. 1974) ("[v]arious exclusionary terms in use or being considered for use prior to the present loss would have excluded the loss had they been employed").

*Fifth*, as noted, in *Eyeblaster*, the Eighth Circuit found coverage under both a CGL policy and a cyber policy, just as Target seeks CGL coverage from ACE after having previously obtained coverage under (and exhausted) its cyber policies. *See supra* at Section II.A; Target Opening Mem. at 28-29; *Eyeblaster*, 613 F.3d at 801-02, 804-05 (finding coverage under CGL *and* INT E&O policies). ACE provides no basis at all for distinguishing this portion of the *Eyeblaster* decision.

*Sixth*, the Minnesota cases ACE cites are entirely inapposite; both are focused on which policy in a *contribution action between insurers* is "primary," as opposed to "excess," when those policies purport to be excess to one another due to conflicting "other insurance" clauses. *See Interstate Fire & Cas. Co. v. Auto-Owners Ins. Co.*, 433 N.W.2d 82, 85-86 (Minn. 1988); *U.S. Fire Ins. Co. v. Fireman's Fund Ins. Co.*, 461 N.W.2d 230, 234-35 (Minn. App. 1990). The question of which of a policyholder's multiple insurers pays the first dollar of coverage has nothing to do with whether an insurance policy, by its plain language, covers the policyholder's loss.[9]

*Seventh*, *Sony Computer Entertainment America Inc. v. American Home Assurance Co.*, 532 F.3d 1007, 1014 (9th Cir. 2008) (California law), is of no help to

---

9       If there is a dispute about which policy should respond when multiple policies cover the same loss, then the law is settled: each insurance policy that provides coverage must pay the policyholder first, and an insurer that thinks that some other insurer should pay first or pay more may then seek contribution from other insurers on the loss. *See, e.g.*, *Interstate Fire & Cas. Co. v. Auto-Owners Ins. Co.*, 433 N.W.2d 82, 83 (Minn. 1988). The policyholder should not be penalized by this intra-insurer dispute.

ACE either.  In that case, the Ninth Circuit referred to the specialized purpose of a media liability policy in interpreting a term contained in that same policy.  That in no way suggests that this Court should narrowly interpret the terms in the broad, commercial *general liability* ACE Policies because some *other policies not at issue* and with different language may provide narrower coverage, and indeed, no court has relied on *Sony* for the proposition that ACE now asks this Court to adopt.

### E.     Target's Liability for Card Replacement Costs Were Caused by a Covered "Occurrence."

Finally, ACE claims that there is no covered occurrence under the Policy because the financial institutions decided to and did intentionally replace their payment cards after learning of the data breach.  *See* ACE Mem. at 33-38.  This is wrong for the reasons Target laid out in its opening memorandum, which explained that the cards lost their use and needed to be replaced immediately upon the data breach.  *See* Target Opening Mem. at 13-14.  That fact alone resolves the analysis.

It is also wrong because whether an "Occurrence"—defined as an "accident"—has taken place is determined from the standpoint of the policyholder.  *See Am. Family Ins. Co. v. Walser*, 628 N.W.2d 605, 612 (Minn. 2001); *see also W. Nat'l Mut. Ins. Co. v. Frost Paint & Oil Corp*., 1998 WL 27247, at *1 (Minn. Ct. App. Jan. 27, 1998) ("[T]here is an 'occurrence' as long as the insured did not engage in conscious wrongdoing.").  Thus, so long as the policyholder lacked the "specific intent to injure," a third party's intent to injure does not affect coverage.  *Walser*, 628 N.W.2d at 612.

Applied here, it is undisputed that the policyholder, *Target*, did not engage in intentional acts or conscious wrongdoing. Hackers broke into Target's payment system and stole payment card information. The financial institutions made a decision to deactivate and replace the payment cards, which is entirely appropriate as part of their efforts to mitigate and remedy their losses caused by Target's alleged negligence. That was an accident from Target's perspective: Target did not act "intentionally" in either event. ACE's position would eliminate coverage for even the most routine insurance claims. Injured parties almost always incur costs in order to mitigate and remedy the damage caused by an "Occurrence," and the fact that they do so "intentionally" does not vitiate coverage.

For example, a driver injured in a serious car accident may make the "intentional" decision to go to the hospital and then the surgeon may make the "intentional" decision to amputate a leg. Afterwards, the driver may sue a policyholder for substantial damages. But it would be contrary to common sense and accepted insurance law to hold that these "intentional" decisions taking place after the "Occurrence" (*i.e.*, the car accident) eliminate the policyholder's access to insurance coverage to settle the driver's claim. In this case, the Issuing Banks made the reasonable and necessary decision to remedy the harm caused by the "Occurrence" (*i.e.*, the data breach) by cancelling and then issuing new payment cards. That "intentional" decision has no impact on coverage.

ACE's theory also conflicts with *Eyeblaster*. In that case, a cyber attack resulted in the loss of use of tangible property—*i.e*., a computer whose functions were severely limited by a spyware attack. The underlying plaintiff determined that he could no longer

33

use the infected computer, replaced it, and sued Eyeblaster for the replacement cost. 613 F.3d at 802. If ACE's view of the law were correct, the fact that the underlying plaintiff in *Eyeblaster* made the "intentional" (and reasonable) decision to replace his computer and seek the replacement cost from the insured would have vitiated insurance coverage for the claim. That the Eighth Circuit found coverage despite this purportedly "intentional" decision to replace the computer is confirmation that ACE's interpretation is incorrect. *Id.*

Unsurprisingly, ACE could not cite a single case for its view of the law. *Bright Wood v. Bankers Standard Insurance Co.*, 665 N.W.2d 544 (Minn. App. 2003), rejected coverage based on exclusions, and thus never reached the question of whether there was a covered occurrence.

ACE's interpretation of *American Family Insurance Co. v. Walser* is simply wrong. ACE argues that *Walser* stands for the proposition that when the "actor" in a chain of events is not the policyholder, the question of whether an event is "accidental" is determined from the standpoint of the actor, not the policyholder. ACE Mem. at 36. But that misstates the holding of *Walser*, quite seriously. *Walser* stated that "in analyzing whether there was an accident for purposes of coverage, lack of specific intent to injure will be determinative." It is true that *Walser* did not specify *in that sentence* that it is the policyholder's intent that is relevant, 628 N.W.2d at 612, though of course an accident victim would not normally intend to injure him- or herself. In any event, the opinion did not need to spell out this self-evident point, because *immediately after* that sentence, *Walser* states:

> Here, the American Family policy provides coverage for
> bodily injury caused by an occurrence, which in turn is
> defined as an accident.  When the policy is construed with our
> definition of accident, the policy provides coverage for bodily
> injury caused by an incident in which the resulting harm was
> unintended or unexpected ***by the insured***.

628 N.W.2d at 612-13 (emphasis added).

Nor is ACE's interpretation of *Walser* consistent with Minnesota law.  Courts applying Minnesota law regularly acknowledge that coverage exists for insureds—like Target—that were alleged to be negligent in failing to stop or prevent the damage caused by another party's intentional act.  *See, e.g.*, *Mork Clinic v. Fireman's Fund Ins. Co.*, 575 N.W.2d 598, 600-02 (Minn. Ct. App. 1998) (negligent hiring and supervision claims against insured employer arising out of employee's alleged intentional sexual abuse constitutes a covered "Occurrence"); *Am. Emp'rs Ins. Co. v. Doe*, 165 F.3d 1209, 1211-12 (8th Cir. 1999) (same); *see also Bloomington Steel*, 718 N.W.2d at 894-95 (sole shareholder's intent to cause physical injury could not be imputed to insured corporation); *RAM Mut. Ins. Co. v. Meyer*, 768 N.W.2d 399, 404 (Minn. Ct. App. 2009) ("[T]he word 'accident' is defined to include unintended consequences of an insured's actions").[10]

For these reasons, the card replacement costs resulted from a covered "Occurrence."  There is no authority for ACE's position that the Issuing Banks'

---

[10]     *GATX Leasing Corp. v. National Union Fire Insurance Co*., 1994 WL 383909, at *1–2 (N.D. Ill. July 19, 1994), *aff'd*, 64 F.3d 1112 (7th Cir. 1995), which applies Illinois law, is contrary to Minnesota authority (and common sense).

reasonable and necessary decision to cancel and reissue payment cards after the data

breach in any way undermines Target's right to coverage under the ACE Policies.

## III. CONCLUSION

For the foregoing reasons, the Target respectfully requests that the Court grant

Target's motion for partial summary judgment and deny ACE's cross-motion for

summary judgment.

Dated:  July 24, 2020

Covington & Burling LLP

*/s/ Gretchen Hoff Varner*
David B. Goodwin (CA, #104469)
Gretchen Hoff Varner (CA, #284980)
COVINGTON & BURLING LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, CA 94105-2533
Tel.:  (415) 591-6000
Fax:  (415) 591-6091
Email: dgoodwin@cov.com
         ghoffvarner@cov.com

John B. Lunseth II (#065341)
Mira Vats-Fournier (#0399692)
TAFT STETTINIUS & HOLLISTER LLP
2200 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
Phone:  612-977-8400
Fax:  612-977-8650
Email:  jlunseth@taftlaw.com
         mvats-fournier@taftlaw.com

*Attorneys for Plaintiff Target Corporation*