# UNITED STATES DISTRICT COURT

# DISTRICT OF MINNESOTA

---

Target Corporation, a
Minnesota corporation,

      Plaintiff,

v.

ACE American Insurance
Company, a Pennsylvania
corporation and
ACE Property & Casualty
Insurance Co., a
Pennsylvania corporation,

      Defendants.

Court File No. 0:19-CV-2916

**DEFENDANTS' REPLY
MEMORANDUM IN SUPPORT
OF ITS CROSS-MOTION FOR
SUMMARY JUDGMENT**

---

# TABLE OF CONTENTS

TABLE OF CONTENTS ....................................................................................................I

TABLE OF AUTHORITIES................................................................................................ II

INTRODUCTION ............................................................................................................... 1

ARGUMENT...................................................................................................................... 2

    I.      Target Failed to Meet its Burden to Establish a Prima Facie Case of
          Coverage................................................................................................... 2

          A.      Target failed to produce any evidence establishing that the
                 Card Claimants Lost the Use of the Payment Cards. .......................... 3

          B.      As a Matter of Law, Payment Card Replacement Costs are
                 Not "Damages Because of Loss of Use."........................................ 15

          C.      As a Matter of Law, the Replacement of Payment Cards was
                 not "caused by an occurrence." ....................................................... 32

    II.     This Court Can and Should Consider the Insuring Context When
          Interpreting the ACE Policy Language. ...................................................... 34

CONCLUSION ................................................................................................................ 36

# TABLE OF AUTHORITIES

## CASES

*Acceptance Ins. Co. v. Canter*,
  927 F.2d 1026, 1027–28 (8th Cir. (Minn.) 1991) ........................................................ 35

*Advanced Network, Inc. v. Peerless Ins. Co.*,
  190 Cal. App. 4th 1054, 1064 (Cal. App. 4th Dist. 2010) ........................................... 32

*Allen v. Brown*, 159 Minn.
  61, 62, 198 N.W. 137, 137 (1924) ............................................................................... 16

*Am. Commerce Ins. Brokers, Inc. v. Minnesota Mut. Fire & Cas. Co.*,
  551 N.W.2d 224, 229 (Minn. 1996) .............................................................................. 35

*Am. Ins. Co. v. Crown Packaging Int'l*,
  813 F. Supp.2d 1027, 1024 (N.D. Ind. 2011) .............................................................. 21

*American Family Ins. Co. v. Walser*,
  628 N.W.2d 605 (Minn. 2001) ...................................................................................... 34

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242, 252 (1986) ................................................................................................ 4

*Atmel Corp. v. St. Paul Fire and Marine Ins. Co.*,
  430 F. Supp. 2d 989, 992 (N.D. Cal. 2006) ................................................................. 31

*Bahr v. Boise Cascade Corp.*,
  766 N.W.2d 910 (Minn. 2009) ........................................................................................ 3

*Bright Wood v. Bankers Std. Ins. Co.*,
  665 N.W.2d 544 (Minn. App. 2003) .................................................................. 32, 33, 34

*Camp's Grocery, Inc. v. State Farm Fire & Cas. Co.*,
  2016 WL 6217161 (N.D. Ala. Oct. 25, 2016) ......................................................... 5, 12

*Carroll v. Carroll's Lessee*,
  57 U.S. 275, 287 (1853) ................................................................................................ 28

*Celotex Corp. v. Catrett*,
  477 U.S. 317, 322–23 (1986) ........................................................................................ 15

*Collin v. American Empire Ins. Co.*,
  21 Cal. App. 4th 787, 818 (Cal. App. 2nd Dist. 1994) ................................................ 31

*Commodore Hotel Fire & Explosion Cases*,
    324 N.W.2d 245, 250 (Minn. 1982)........................................................................15, 16

*ConAgra, Inc. v. Inland River Towing Co.*, 252 F.3d 979, 983–85 (8th Cir. 2001) .........16

*Eyeblaster v. Federal Ins. Co.*,
    613 F.3d 797 (8th Cir. 2010) .............................................................................passim

*F&H Constr. v. ITT Hartford Ins. Co.*,
    118 Cal. App. 4th 364, 377 (Cal. App. 4th Dist. 2004) ...............................................31

*Federated Mut. Ins. Co. v. Concrete Units, Inc.*,
    363 N.W.2d 751 (Minn. 1985)...........................................................................passim

*Fernandez v. Keisler*,
    502 F.3d 337, 343 n.2 (4th Cir. 2007) ................................................................24, 28

*Gray v. FedEx Ground Package Sys., Inc.*,
    799 F.3d 995, 999 (8th Cir. 2015) .............................................................................7

*Great W. Cas. Co. v. Decker*,
    957 F.3d 910, 913 (8th Cir. 2020) .............................................................................22

*Hanson v. Hall*, 202 Minn.
    381, 387–88, 279 N.W. 227, 230–31 (1938) ........................................................16, 31

*Hartzell Indus., Inc. v. Fed. Ins. Co.*,
    168 F. Supp.2d 789, 795 (S.D. Ohio 2001) ................................................................30

*Herzig v. Larson-Sawchak*,
    464 N.W.2d 754, 755 (Minn. App. 1991)..................................................................17

*Ins. Co. of N. Am. v. Cease Elec., Inc.*,
    688 N.W.2d 462 (Wisc. 2004) ...................................................................................9

*Interstate Fire & Cas. Co. v. Auto-Owners Ins. Co.*,
    433 N.W.2d 82, 85-86 (Minn. 1988) ........................................................................36

*Liberty Mut. Ins. Co. v. Wheelwright Trucking Co., Inc.*,
    851 So. 2d 466, 494-95 (Ala. 2002)..........................................................................30

*MCI Commc'ns, Inc. v. Maverick Cutting & Breaking LLC*,
    374 F. Supp. 3d 789, 803 (D. Minn. 2019)................................................................16

*Metro. Prop & Cas. Ins. Co. v. Miller*,
    589 N.W.2d 297, 299 (Minn. 1999)....................................................................28, 29

*Mickman Bros. v. Farm Bureau Mut. Ins. Co.*,
    639 N.W.2d 890, 894–95 (Minn. Ct. App. 2002) .......................................................... 35

*Neidenbach v. Amica Mut. Ins. Co.*,
    842 F.3d 560, 566 (8th Cir. 2016) ............................................................................... 22

*Passmore v. Astrue*,
    533 F.3d 658, 660 (8th Cir. 2008) ........................................................................ 24, 27

*Sanzone v. Mercy Health*,
    954 F.3d 1031, 1038-39 (8th Cir. 2020), *as corrected* (Apr. 9, 2020) ............ 22, 24, 27

*SCSC Corp. v. Allied Mut. Ins. Co.*,
    536 N.W.2d 305, 311 (Minn. 1995) ............................................................................. 2

*Sony Computer Entertainment America Inc. v. American Home Assurance Co.*,
    532 F.3d 1007, 1014 (9th Cir. 2008) .......................................................................... 36

*Sovereign Bank v. BJ's Wholesale Club, Inc.*,
    533 F.3d 162, 180-81 (3d Cir. 2008) ............................................................. 4, 5, 11, 21

*St. Paul Fire & Marine Ins. Co. v. National Computer Systems, Inc.*
    490 N.W.2d 626 (Minn. App. 1992), *review denied* (Minn. Nov. 17, 1992) ........ 6, 7, 8

*Streu v. Dormire*,
    557 F.3d 960, 964 (8th Cir. 2009) ........................................................................ 24, 28

*THV Investments, LLC v. Certain Underwriters at Lloyds, London*,
    2018 WL 2410812 at *6 (Cal. App. 4th Dist.) ............................................................. 32

*U.S. Fire Ins. Co. v. Fireman's Fund Ins. Co.*,
    461 N.W.2d 230, 234-35 (Minn. App. 1990) ............................................................. 36

*United States v. Rubin*,
    609 F.2d 51, 69 (2d Cir. 1979) ................................................................................... 24

*Vogel v. Russo*,
    235 Wis.2d 504, ¶ 26, 613 N.W.2d 177 (Wisc. 2000) .................................................. 9

*Wisc. Pharm. Co., LLC v. Neb. Cultures of Calif., Inc.*,
    876 N.W.2d 72 (Wisc. 2016) ........................................................................ 9, 10, 15, 20

**RULES**

4A Minn. Prac., Jury Instr. Guides—Civil CIVJIG 92.10 (6th ed.) .................................. 17

## INTRODUCTION

The most striking aspects of Target's response memorandum are its complete failure to address many of ACE's arguments, its deft mischaracterization of the arguments it does address, and its abandonment of arguments that it featured in its opening memorandum. Target's loss-of-use section alone, (Target Resp. at 9-15), mischaracterizes ACE's arguments more than a dozen times. As but one example, Target states that ACE supports its position by "arguing that [the] payment cards had no use to begin with." (Target Resp. at 10). In truth, ACE contends that "Payment Cards serve two relevant functions—they carry data and they permit data transmission. But they do not, as Target contends, function to make credit and debit transactions 'safe and secure.'" (ACE Opening Mem. at 15) (quoting Target Opening Mem. at 2). Given this, ACE's *actual* loss-of-use argument, in a nutshell, is that (1) "[t]he original Payment Cards functioned exactly as intended and could continue to do so after cyber criminals breached and infected Target's network;" and (2) "the Card Claimants replaced the cards because they no longer wanted to use the *data* on them." (*Id.* at 15, 17 (emphasis original); *see also* ACE Opening Mem. at 1, 16, 18, 20 (making same arguments).[1] Target *completely* failed to address these points—among many others—because its response busies itself with false characterizations and rebuttals to them. This strategy has the double benefit of appearing to defeat (non-)arguments, on the one

---

[1] Target doubled its mischaracterization on the second point—while adding a tone of mockery—stating that "according to ACE, some of the largest and most sophisticated financial institutions in the world spent tens of millions of dollars to reissue payment cards for no reason." (Target Resp. at 10). Not only is this kind of false rhetoric unhelpful, it suggests that the Court should question why Target has so pervasively and blatantly tried to recast ACE's arguments.

hand, while avoiding ACE's actual arguments, on the other. ACE will identify and discuss this straw-argument strategy in the numerous places that Target's response memorandum employs it.

It is also telling that Target abandoned many arguments raised in its opening memorandum. One glaring example is Target's abandonment of the pervasive and aggressive reliance its opening memorandum placed on a lock-and-key example as something of an inescapable analogy supporting its position. (*See, e.g.*, Target Opening Mem. at 2) (arguing that just as its lock-and-key analogy establishes that "the lock has 'lost its use,'" so too "[t]he cards have lost their use"). Having now discovered that its analogy backfired—the lock in Target's story did not lose its ability to function as a lock; it lost its *value* as a lock—Target never mentions the lock in its response. Nor does it attempt to rehabilitate the analogy or dispute its demise.[2]

## ARGUMENT

**I.   Target Failed to Meet its Burden to Establish a Prima Facie Case of Coverage.**

A party seeking coverage carries the burden to "establish a prima facie case of coverage." *SCSC Corp. v. Allied Mut. Ins. Co.*, 536 N.W.2d 305, 311 (Minn. 1995), *overruled on other grounds by Bahr v. Boise Cascade Corp.*, 766 N.W.2d 910 (Minn.

---

[2] Target does, however, now try to claim that its analogy was really about the key. (Target Resp. at 14). But as noted below, Target's lock-pick story—complete with a summary of what ACE would tell homeowners about the function of a house key—is just another way for it to entirely avoid addressing ACE's true loss-of-use argument: That the Card Claimants did not lose the use of Payment Cards because "[t]he original Payment Cards functioned exactly as intended and could continue to do so after cyber criminals breached and infected Target's network." (ACE Opening Mem. at 15; *see also id.* at 1, 16-18, 20 (making same argument)).

2009). In any particular case, "[w]hat constitutes a prima facie showing of coverage depends on the language of the particular policy." *Id.*

In this case, prima facie coverage requires evidence establishing that Target became liable for "damages because of loss of use of tangible property" . . . "caused by an occurrence," which the policy defines as an accident. (Lagatta Dec. Ex. A p. 12 of 230 § I.A.1.a).[3] This required Target to (1) identify the tangible property; (2) establish as a fact that the claimant lost the use of the tangible property; (3) establish that the dollars paid as Payment Card replacement costs are "damages because of loss of use;" and (4) establish that the Payment Card replacement occurred by accident. Target failed to establish a prima facie case on the second, third, and fourth elements. As a matter of law, therefore, ACE is entitled to summary judgment.

### A.   Target failed to produce any evidence establishing that the Card Claimants Lost the Use of the Payment Cards.

No one disputes the fact that the Payment Cards are tangible property. But Target continues to found its loss-of-use argument (the second prima facie element) on a false and factually barren premise—that the Card Claimants "replace[d] all of those payment cards because the cards could no longer be used to securely access financial accounts." (Target Resp. at 9-10). Target provides no evidence and no record citation to support this assertion, only its notion of "common sense." (*Id.* at 9). What is missing from this legally deficient

---

[3] As in its opening memorandum, ACE will again use the phrases "damages because of loss of use" and "legally obligated to pay damages because of loss of use of tangible property" as shorthand for reference to the policy's granting clause, and will cite only to Section I.A.1.a of the primary policy. (*See* ACE Opening Mem. at 6 n.1).

approach is *evidence* that at any time before, during, or after the data breach the physical Payment Cards lost the ability to carry data and to perform safe data transmission to a vendor's computer system at point-of-sale transactions. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986) (stating that summary judgment is required when there is no evidence "upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed") (emphasis original). Nor is there any evidence that the cyber thieves stole and possessed any Payment Cards. They stole data. (*See* Complaint ¶¶ 1, 26) (stating that cyber thieves "st[ole] payment card *data* and personal contact *information*") (emphasis added). The original Payment Cards functioned as intended before the breach, and they could continue to do so after cyber criminals breached and infected Target's network. *See, e.g.*, *Sovereign Bank v. BJ's Wholesale Club, Inc.*, 533 F.3d 162, 180-81 (3d Cir. 2008) (discussing an identical data breach and stating that "[t]he fraudulent activity simply did not render the cards useless. *The cardholders could continue to use* [*the cards*] *to make purchases after the information was compromised*") (emphasis added).

Target criticizes ACE for using *BJ's Wholesale* as authority, (Target Resp. at 17), because, as ACE specifically disclosed in its opening memorandum, in that case "[t]he loss-of-use question arose in the context of whether the card issuers could recover their replacement costs in tort." (ACE Opening Mem. at 17). But the precise legal question being examined did not affect the factual accuracy of what the *BJ's Wholesale* court said—that after a data breach identical to the one here, cardholders could continue to use their tangible payment cards to make point-of-sale purchases, just as they had before. *Id.* Indeed,

continued the court, the card issuer merely "*deemed* the cards useless" because the loss of control over intangible *data* "exposed [it] to liability for unauthorized charges." *Id.* (emphasis added).

Target's critique of *Camp's Grocery* uses the same faulty distinction—that because the legal issue there was not identical, the court's analysis of why Payment Cards are replaced after a data breach somehow became wrong. (Target Resp. at 18) (discussing *Camp's Grocery, Inc. v. State Farm Fire & Cas. Co.*, 2016 WL 6217161 (N.D. Ala. Oct. 25, 2016)). But in describing an underlying claim identical to the one here, the *Camp's Grocery* court specifically stated that the card issuers replaced payment cards because "the *intangible electronic data contained on the cards* [was] compromised such that the magnetically encoded card *numbers* could no longer be used." *Camp's Grocery*, 2016 WL 6217161 at *8 (first emphasis original, second emphasis added)).[4]

As both *BJ's Wholesale* and *Camp's Grocery* make clear, Target's defective system security compromised intangible data, which caused the tangible Payment Cards to become *undesirable* for, not incapable of, continued use as tangible objects. And that fact indeed exposed Target to liability for the cost of replacing them. But its liability is not *covered* liability because the Payment Cards undisputedly, and at all times, functioned as tangible objects exactly as intended. The Card Claimants replaced the Payment Cards not because

---

[4] The ACE primary policy expressly states that "[f]or the purposes of this insurance, electronic data is not tangible property." (Legatta Dec. Ex. A p. 30 of 230 § V.16); *see also* Legatta Dec. Ex. C p. 29 of 113 (adding identical language to the policy from which the ACE excess policy derives its definitions)).

the tangible cards could no longer be used as intended, but because they needed to regain exclusive control over the intangible data the cards carried.

Target's footnote 2 is an admission of this. (Target Resp. at 12). As Target therein concedes, it is possible "for each cardholder to return a compromised card to the bank for re-coding so the card could be used again." (*Id.* at n.2). This shows beyond dispute not only that the original Payment Cards never lost their ability to carry and transmit data—that is, the ability to be used as intended—but also that the breach compromised *only* intangible data, not the cards. Target points out the possibility that re-coding "would have been far more expensive than simply replacing the card[s]," (*id.*), but no law supports the absurd notion that a claimant's obligation to mitigate its own damages somehow creates coverage. Target tries to assume that the bare fact of card replacement creates coverage because "data breaches are routinely followed by mass replacement of payment cards." (Target Resp. at 12). But generalities about cost-effective remedies are not a substitute for evidence establishing what the policy unambiguously requires—damages because of loss of use of tangible property. As Target itself concedes, the undisputed facts show that the tangible Payment Cards functioned as intended and could continue to do so after the breach. Because Target failed to establish an essential element of coverage, ACE is entitled to summary judgment.

Target also contends that the Minnesota Court of Appeals' decision in *St. Paul Fire & Marine Ins. Co. v. National Computer Systems, Inc.* "offers no support whatsoever to ACE," but this is just hyperbole. (Target Resp. at 16 (citing 490 N.W.2d 626 (Minn. App. 1992), *review denied* (Minn. Nov. 17, 1992)). A state appellate decision need not be on all

6

fours for a federal court, sitting in diversity, to apply it as evidence of how that state's highest court would resolve a given question. *See, e.g.*, *Gray v. FedEx Ground Package Sys., Inc.*, 799 F.3d 995, 999 (8th Cir. 2015) (stating that "we follow decisions from the intermediate state courts when they are the best evidence of [state] law") (citations omitted). And *National Computer* is predictive in a fact-specific and very compelling way.

Recall that in *National Computer* a Boeing Computer Systems employee stole proprietary information and provided it to his new employer, National Computer Systems (NCS), which used it to Boeing's detriment. NCS's liability policy in part defined "property damage" as "damage to tangible property," including "loss of use of the damaged property." 490 N.W.2d at 630. In addition to deciding that the proprietary information was not "tangible," the court discussed the origin of Boeing's damages (identical to this case) and whether Boeing had lost the use of the intangible information (identical to this case).

On the first point, the court stated that "it was the loss of the *confidential nature* of the information that led to Boeing's damages." *Id.* at 631 (emphasis added). The facts here are identical. Target did not incur liability because the Payment Cards could no longer function as Payment Cards. It incurred liability because its computer system failed to protect the *confidential nature* of the data transmitted from the cards to the system. The Card Claimants' remedy was to stop using the *data*, and card replacement was one step in that process. But that fact is utterly irrelevant to the cards or to their use as tangible objects. Target incurred liability because of its failure to protect the confidential nature of the Card Claimants' data, not because the Payment Cards could no longer perform their function as

tangible objects. *National Computer* is on target for this proposition and, as such, offers a compelling basis for the Court to order summary judgment in ACE's favor.

On the second point, the *National Computer* court stated that the employee's actions "did not make the [proprietary] information unusable; [his actions] only deprived Boeing of the *exclusive* use of the information." *Id.* (emphasis original). Again, the facts here are identical. Exclusivity does make some information valuable, and an actor in Target's position can become liable for compromising its exclusive nature. But as the *National Computer* court aptly pointed out, the liability is not for the loss of its use. Target claims that *National Computer* has no application to a loss-of-use issue, (Target Resp. at 16), but the court's statement on the topic plainly provides an alternative ground for the outcome there. The compromised information was not tangible property, nor did Boeing suffer the loss of its use. 490 N.W.2d at 630 (defining "property damage" as including "loss of use of the damaged property"). In this case, Target did not incur liability for *either* damages because of loss of use of the Payment Cards *or* for loss of use of intangible account data (which would be outside of coverage in any event).[5] It incurred liability for the failure to protect the confidential nature (exclusivity) of the Card Claimants' data. As a matter of law, that is not a legal obligation to pay damages because of loss of use of tangible property. *National Computer* is predictive authority supporting summary judgment in ACE's favor.

Target's cursory critique of the Wisconsin Supreme Court's decision in *Wisconsin Pharmacal*, (Target Resp. at 18), provides no meaningful reason for ignoring the rule

---

[5] *See* note 4, *supra*, at p. 5 (quoting policy provision stating that electronic data is not tangible property).

followed in that case, namely, that "'loss of use' under the insurance policy . . . by its plain language contemplates some sort of *loss of use in fact*, not a reduction in value.'" *Wisc. Pharm. Co., LLC v. Neb. Cultures of Calif., Inc.*, 876 N.W.2d 72 (Wisc. 2016) (quoting *Vogel v. Russo*, 235 Wis.2d 504, ¶ 26, 613 N.W.2d 177 (Wisc. 2000), *abrogated in part on other grounds by Ins. Co. of N. Am. v. Cease Elec., Inc.*, 688 N.W.2d 462 (Wisc. 2004)) (emphasis added). Recall that in *Wisconsin Pharmacal*, suppliers for the maker of nutritional supplements (Pharmacal) provided a non-conforming ingredient—the wrong gut bacteria—which Pharmacal used along with other ingredients to produce probiotic supplement tablets. After Pharmacal learned about and disclosed its mislabeled product, retailers recalled it, and Pharmacal destroyed it. *Id.* at 76. Target purports to avoid the controlling rule in that case—that "loss of use" must be established as a fact—on the ground that the nutritional supplement "never worked to begin with" because the manufacturer incorporated the non-conforming bacterial culture "before [the tablets were] completed." (Target Resp. at 18).

This argument overlooks a few things. First, Target's distinction, if it even is one, forgets that the other ingredients in the completed probiotic tablets did "work to begin with." But they too lost their value and had to be destroyed. And the insured argued for loss-of-use coverage, in part, on the ground that "the incorporation of a defective ingredient rendered the other ingredients . . . useless to Pharmacal [the underlying plaintiff], thereby constituting property damage due to 'loss of use of tangible property that is not physically injured." *Id.* at ¶ 40. Target's "never-usable" distinction is factually inaccurate and cannot be used to avoid the policy requirement that loss of use must be established as a fact.

Second, the rule applied in *Wisconsin Pharmacal* did not originate in that case. As the quoted rule and its legal citation directly above make clear, the rule that loss of use must be established as a fact came from *Vogel v. Russo*, another case involving identical loss-of-use policy language. So a purported factual distinction in *Wisconsin Pharmacal* would not somehow invalidate a rule that applies generally to all loss-of-use coverage cases under Wisconsin law. In short, Target's attempt to avoid the rule of law applied in *Wisconsin Pharmacal* is both legally and factually without basis. And, of course, Target wants to avoid that case because it is undisputed here that the Card Claimants did not, in fact, suffer a loss of use of their tangible Payment Cards.

Target also continues to insist that the Eighth Circuit's decision in *Eyeblaster v. Federal Ins. Co.* should "end the inquiry" in this case, (Target Resp. at 9), but even a fantastical reading of *Eyeblaster* could never unearth a holding that a data breach such as what occurred here results in a "loss of use of tangible" Payment Cards. 613 F.3d 797 (8th Cir. 2010).[6] *Eyeblaster* is not even about Payment Cards, so it says nothing about their function as tangible property, much less whether a data breach renders them incapable of being used to perform that function. That case is about a computer and its inability to function as a computer. Target's myopic reliance on *Eyeblaster* as universal "gotcha" authority—its response memorandum literally states that "ACE cannot escape" *Eyeblaster*,

---

[6] As for Target's contention that *Eyeblaster* controls the *third* prima facie element of coverage—which asks whether the dollars paid as Payment Card replacement costs were for "damages because of loss of use"—see, *infra*, at pp. 21-30.

(Target Resp. at 4)—does little more than expose its unwillingness to engage the arguments ACE actually makes.

Indeed, apart from criticizing ACE's case authority—which it does in a barren context, one case at a time, as though assembling a legal digest, (Target Resp. at 15-19)—Target's response is based *entirely* on mischaracterizations of ACE's argument. ACE made the following arguments, among others, in its opening memorandum: (1) Payment Cards "permit[] embedded data to be transmitted to the merchant's computer network via 'swipe' or 'insert,'" and "[a]s such, the customer need *not* enter the data manually or share it verbally with the point-of-sale merchant," (ACE Opening Mem. at 15) (emphasis added); (2) "[a]t no point prior to, during, or after the data breach were there issues with the physical cards," (*id.* at 16); (3) "even after the breach . . . the cardholders *could* still use *the physical Payment Cards* for 'safe and secure access to financial accounts,'" (*id.*) (first emphasis in original, second emphasis added) (quoting Target Opening Mem. at 2); (4) "[t]he original Payment Cards functioned *exactly* as intended and could continue to do so after cyber criminals breached and infected Target's network," (ACE Opening Mem. at 16) (emphasis added); and (5) "[T]he Card Claimants replaced the cards because they no longer wanted to use the *data* on them," (*id.* at 17) (emphasis original). ACE also quoted from a case factually on all fours with this one, in which the Third Circuit expressly agreed with those contentions, stating that "[t]he cardholders could continue to use [the cards] to make purchases after the information was compromised." (ACE Opening Mem. at 18) (quoting *BJ's Wholesale Club*, 533 F.3d at 180-81)). And it cited a federal district court case stating that an identical data breach produced a claim that the merchant's (that is, the party in

11

Target's position) "lax computer network security allowed the *intangible electronic data contained on the cards* to be compromised such that the magnetically encoded card __numbers__ could no longer be used." (*Id.* at 19) (quoting *Camp's Grocery*, 2016 WL 6217161 at *8 (first emphasis original, second emphasis added)).

Target never addresses any of these arguments. Instead, Target's response devotes seven full pages, (Target Resp. at 9-15), to inventing and "defeating" the following straw-person arguments:

● "ACE asserts that the data breach did not result in the 'loss of use' of the payment cards at all since cardholders could have given out their account numbers (and CCV or PIN numbers) when making in-person purchases, rather than use their payment cards." (*Id.* at 1).

● "ACE's argument [is] that the Policies' open-ended coverage for 'loss of use' does not apply if there is some other way to perform the same function as the tangible property." (*Id.* at 2).

● "ACE . . . argu[es] that payment cards had no use to begin with." (*Id.* at 10).

● "[A]ccording to ACE, some of the largest and most sophisticated financial institutions in the world spent tens of millions of dollars to reissue payment cards for no reason." (*Id.*)

● "ACE's position is effectively that Target overpaid to settle the claims by the financial institutions because Target could have told those institutions that they should instruct their cardholders to stop using credit cards and charge all purchases virtually." (*Id.* at 11).

● "ACE asserts that a payment card . . . has no role in secure access to or the transfer of account and credit information whatsoever." (*Id.* at 12).

● "ACE claims that . . . because it is possible to securely access financial accounts without a payment card, a payment card does not—cannot—have that function." (*Id.*)

● ACE's argument is "that 'loss of use' coverage does not apply to payment cards if the financial institutions' customers had alternative ways of paying for the same things." (*Id.*).

● "ACE's argument boils down to the assertion that because cardholders can 'securely' access and use their financial accounts through other methods, the cardholders did not 'lose' that use when their payment cards were breached." (*Id.*).[7]

● ACE "cannot argue that the insured loses coverage because the plaintiffs filing the lawsuits should have figured out a workaround after the data breach." (*Id.* at 13).

● ACE's workaround is for cardholders "to use account information to make an in-person purchase (rather than inserting or swiping a payment card)." (*Id.*).

● "ACE effectively asks the Court to re-write . . . coverage [to be] for 'loss of a use that *can be performed only by* that specific piece of tangible property." (*Id.*) (emphasis original).

---

[7] Moreover, the last part of this statement—asserting that the "payment cards were breached"—is undisputedly false. The cyber thieves breached Target's computer network and stole data. They did not breach or steal Payment Cards.

● ACE effectively "is telling the Court" that "a key is not 'used' to open locks." (*Id.* at 15).[8]

A straw-person fallacy "occurs when someone takes another person's argument or point, distorts it or exaggerates it in some kind of extreme way, and then attacks the extreme distortion, as if that is really the claim the first person is making."[9] One could not more accurately describe Target's seven-page argument on this point. ACE does not actually or "effectively" make a single one of the extreme and false replacement arguments Target attributes to it. And while busying the reader with extreme distortions, Target's response utterly ignored what ACE actually argued and provided no response to it whatsoever.

At bottom, what Target's straw-person distraction conceals is its complete failure to produce any evidence supporting the conclusion that at any time before or after the data breach the physical Payment Cards lost the ability to carry data and to perform safe, fraud-protected data transmission to a vendor's computer system at point-of-sale transactions. The undisputed facts show that the Payment Cards could always be used for that purpose, and that the Card Claimants never lost that use. The bare fact of card replacement is not self-validating evidence to the contrary. Because Target failed as a matter of law to establish an essential element of coverage—the claimants' loss of use of tangible Payment

---

[8] Because ACE does not argue that "consumers might be able to memorize and recite their account information and thus make purchases without a payment card," (Target Resp. at 14), and because that (non-)argument is the ostensible basis for Target's lock-pick story, (*id.*), ACE will not discuss the absurdity of its claimed relevance.

[9] Excelsior Online Writing Lab, *Straw Man Fallacy*, https://owl.excelsior.edu/argument-and-critical-thinking/logical-fallacies/logical-fallacies-straw-man/ (last visited August 3, 2020).

Cards—ACE is entitled to summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

**B.     As a Matter of Law, Payment Card Replacement Costs are Not "Damages Because of Loss of Use."**

**1.     Under Minnesota law, loss-of-use damages are time-based.**

The policy provides coverage for amounts Target "becomes legally obligated to pay as damages because of loss of use of tangible property." (Legatta Dec. Ex. A p. 12 of 230 § I.A.1.a; *id.* at p. 29-30 of 230 §§ V.16, V.20) (*see* ACE Opening Mem. at 6 n.1). Target concedes that when one thing (a legal obligation to pay damages) occurs "because of" another (loss of use of tangible property) the latter is the reason for—the cause of—the former. (Target Resp. at 20-21). Applying that to the policy language, coverage requires that a loss of use, as opposed to a loss of value (or any other kind of harm), must be the *reason* for the claimant's damages. The Minnesota Supreme Court has long recognized this distinction: "When a chattel is damaged, *not amounting to total destruction in value*, the damages include compensation for loss of use." *In re Commodore Hotel Fire & Explosion Cases*, 324 N.W.2d 245, 250 (Minn. 1982) (emphasis added). This alone dispatches Target's argument that Minnesota law does not distinguish between "loss of use" and "loss of value." (Target Resp. at 23). Granted, a plaintiff can recover damages in such a case, but the damages are *not* "because of a loss of use" of the tangible chattel. They are for its total destruction in value. As the court in *Wisconsin Pharmacal* explained the same principle, "[t]he recalled tablets were *worthless* due to the inclusion of [the non-conforming ingredient] and were subsequently discarded. . . . Pharmacal did not lose the *use* of the

15

tablets; rather, it permanently lost the entire *value* of the tablets." *Id.* at 83-84 (emphasis added).

Target also contends that the clause "damages because of loss of use" has no temporal component, but case after case after case holds that loss-of-use damages measure the amount needed to compensate the claimant for a loss incurred while, and because, the tangible property cannot be used. Rental costs (incurred for a down-time replacement) and lost profits (foregone while profit-producing tangible property is down) are well-recognized examples of damages incurred because of a loss of use of tangible property. And they are indisputably time-based damages. *See Allen v. Brown*, 159 Minn. 61, 62, 198 N.W. 137, 137 (1924) (stating that "[w]hen one asks damages for loss of use, . . . [it] includes *the question of the time* reasonably necessary to make the needed repairs") (emphasis added); *Hanson v. Hall*, 202 Minn. 381, 387–88, 279 N.W. 227, 230–31 (1938) (stating that commercial loss-of-use damages measured by "the reasonable value of the benefit which would have been derived from its use *during the period* it was undergoing repairs") (emphasis added); *In re Commodore Hotel Fire*, 324 N.W.2d at 251 (holding that owner of income-producing real property may recover as loss-of-use damages "his fixed unabatable overhead costs *during the reasonable time* of restoration or repair") (emphasis added); *ConAgra, Inc. v. Inland River Towing Co.*, 252 F.3d 979, 983–85 (8th Cir. 2001) (holding that owner of barge damaged in towing accident adequately proved loss-of-use damages by establishing the fact and value of barge business lost *during the time* of repair); *MCI Commc'ns, Inc. v. Maverick Cutting & Breaking LLC*, 374 F. Supp. 3d 789, 803 (D. Minn. 2019) (ruling under Minnesota law that loss-of-use damages properly measured by

cost of renting substitute); *Herzig v. Larson-Sawchak*, 464 N.W.2d 754, 755 (Minn. App. 1991) (same).

The Minnesota Jury Instruction Guides confirm these rules. First, loss-of-use damages do not apply at all when the tangible property is "damaged beyond repair." 4A Minn. Prac., Jury Instr. Guides—Civil CIVJIG 92.10 (6th ed.) (specifying loss-of-use damages as among recoverable kinds of damages only, "[i]f (*specify the property*) was *not* damaged beyond repair") (first emphasis original, second emphasis added). Second, loss-of-use damages, by definition, accrue only "*during the time* reasonably and necessarily required *(to make the needed repairs to)(to effect a cure for)* the property." *Id.* (first emphasis added, second emphasis original). Under Minnesota law, this is what it means to be "legally obligated to pay damages because of loss of use of tangible property." Thus, although the Card Claimants indeed recovered damages from Target, as a matter of law they were not "damages because of loss of use."

> **2.**    **Under *Concrete Units*, loss-of-use coverage applies to time-based damages (like rental costs and lost profits during down time), but not to replacement costs.**

Target claims that the Minnesota Supreme Court's decision in *Concrete Units* says nothing about either time-based damages or the absence of coverage for replacement costs. (Target Resp. at 21-23) (citing *Federated Mut. Ins. Co. v. Concrete Units, Inc.*, 363 N.W.2d 751 (Minn. 1985)). But Target simply ignores what the court said not only about the inherent question of time raised in any claim for loss-of-use damages, but also about the fact that loss-of-use damages are measured, as at least 60 previous years of the court's own precedent had ruled, by losses that accrue during a specific period of time. Target also

ignored the court's ruling that replacement costs are not "property damage" because they compensate for loss of value, not loss of use.

Recall that in *Concrete Units* a farm co-op (Brownsdale) contracted with Conger to have a concrete grain elevator built. Concrete Units, Federated's insured, sub-contracted with Conger to supply the concrete. A problem with the concrete delayed the completion, and consequently Brownsdale could not use the grain elevator for several weeks. Brownsdale sued, claiming in part that "it had lost the use of its elevator because of the construction delays." *Id.* at 754. Conger also sued, claiming in part that it could not use the defective concrete and seeking the cost of replacing it. *Id.* at 757.

As to loss of use as a time-based damage, the court stated that "Brownsdale lost the use of its grain elevator because of the construction *delays* caused by the defective concrete." *Id.* at 756 (emphasis added). Delay is a measure of time. Immediately thereafter, the court stated: "[E]ach of the three items of damage alleged in [Brownsdale's underlying] claim against Concrete Units is *based on* lost use of the elevator." The loss-of-use damages were based on time. Therefore, ruled the court, Federated must indemnify Concrete Units for the following delay-based damages: (1) The piling of 30,000 bushels of corn at ten cents per bushel; (2) the loss of one month's use of storage space that would have been available absent the delayed completion; and (3) the inability to dry 8,000 bushels of corn per day, at ten cents per bushel, for 24 days. *Id.* No other damages qualified for coverage on the ground that they were "damages because of loss of use." Under *Concrete Units*, "damages because of loss of use" means damages incurred during a period of down time.

18

The court's decision on the general contractor's (Conger) coverage claim confirms this, because the court ruled that replacement costs, even for replacement of tangible property that cannot be used, are not "property damage." As background, the *Concrete Units* court ruled that coverage applies to damages that are themselves "property damage," and also to consequential damages if they qualify as "damages because of property damage." *Id.* at 757 (discussing Federated's obligation vis-à-vis consequential damages and stating that the "phrase 'damage because of . . . property damage' requires the insurer to pay all damages which are causally related to an item of 'property damage'"). Because Conger had sub-contracted with Concrete Units to supply the concrete, it claimed damages for the cost of replacing the defective concrete (tangible property) because the concrete could not be used (according to Target, this would be loss of use of tangible property within the policy's "property damage" definition).[10]

The court, however, rejected coverage for concrete replacement costs, for two reasons. First, it rejected the argument that the concrete replacement costs were themselves "property damage," stating: "[W]e have already decided that 'diminution in value' of property is not 'property damage' as defined in this policy." *Id.* at 757. Under the holding in *Concrete Units*, replacement costs are not "property damage," and this is true even when the replaced item is tangible, and even when the replacement occurs because the original

---

[10] The granting clause in the *Concrete Units* policy stated that the insurer would pay the "sums which the insured shall become legally obligated to pay as damages because of . . . property damage." 363 N.W.2d at 754. The policy defined "property damage," in part, as "loss of use of tangible property which has not been physically injured." *Id.* Melding these produces the same clause at issue in this case: "damages because of loss of use of tangible property."

item cannot be used.[11] Target claims that it has "searched in vain for any Minnesota case that has ever [so] interpreted *Concrete Units*," but no search is needed—the case itself so holds. Replacement costs are not "property damage," which by definition means that they are not "damages because of loss of use of tangible property." *See also Wisconsin Pharm.*, 876 N.W.2d at 83 (reiterating rule that "diminution in value—even to the point of worthlessness—is not the same as 'loss of use' under the insurance policy, which by its plain language contemplates some sort of loss of use in fact, not a reduction in value") (citation omitted). The opposite was true for the time-based damages Brownsdale claimed, because decades of Minnesota law defined Concrete Units' liability for those damages as a "legal obligation to pay damages because of loss of use."

Second, because concrete replacement costs were not themselves "property damage," the court inquired into whether they would fall within coverage as consequential damages—*i.e.*, "damages which are causally related to an item of 'property damage.'" *Id.* The outcome was the same: "The cost of replacing the defective concrete . . . is not causally related to" any item of "property damage," including "the lost use of the elevator." *Id.* at 757.[12] Under the court's holdings, the cost to replace tangible and unusable concrete was not covered "property damage" under any theory.

---

[11] The latter element is missing here in any event, as demonstrated above in section I A.

[12] In this case, the Court need not consider coverage for Payment Card replacement costs as a consequential damage, because card replacement undisputedly occurred as a result of a compromise to *intangible* data, which, unlike a grain elevator, cannot be the object of "property damage." *See supra* at p. 5 n.4 (quoting policy provision stating that electronic data is not tangible property). Target concedes this in its footnote 7, stating that "the issue [of consequential damage] is not presented in this case." (Target Resp. at 23 n.7). For the

In sum, the Payment Cards lost their value because the Card Claimants no longer wanted to use the data they carried. Or, as the Third Circuit aptly described it, the Card Claimants "deemed them useless." *BJ's Wholesale Club*, 533 F.3d at 180-81. Lost value is not a "damage because of loss of use." The Minnesota Supreme Court has so ruled in *Concrete Units*, and the Court should therefore order summary judgment in ACE's favor.

### 3. The Eighth Circuit's decision in *Eyeblaster* neither presents a roadblock to the application of Minnesota cases compelling summary judgment in ACE's favor nor supports Target's position on the merits.

Target's attempt to "end the [Court's] inquiry" with the Eighth Circuit's decision in *Eyeblaster*, (Target Resp. at 9), thereby foreclosing the Court's examination of Minnesota Supreme Court precedent, including *Concrete Units*, not only is a perversion of the *Erie* doctrine, it is based on a misapplication of the case and its outcome and does not support Target's argument on the merits.

According to Target's reading of *Concrete Units*, Minnesota's highest court has not addressed the issue raised in this case—as Target frames it—and *Concrete Units* is therefore "irrelevant" as a source of Minnesota law for a federal court to consult on loss-of-use coverage. (Target Resp. at 7). The rule under *Erie* is exactly the opposite: If the state's highest court has not addressed and decided a particular issue of state law, then a federal court should consult the highest court's analogous case law as predictive evidence

---

same reason, Target's reliance on *Am. Ins. Co. v. Crown Packaging Int'l*, 813 F. Supp.2d 1027, 1024 (N.D. Ind. 2011), is misplaced. (Target Resp. at 22). In that case, "property damage" occurred to a tangible soap container, rendering its unusable contents "damage because of property damage." *Id.*

of how that same court would decide the issue were it presented with it. *See, e.g.*, *Great W. Cas. Co. v. Decker*, 957 F.3d 910, 913 (8th Cir. 2020) (stating that "[i]f the Minnesota Supreme Court has not spoken on a particular issue, we must attempt to predict how the Minnesota Supreme Court would decide [it] and 'may consider relevant state precedent, analogous decisions, considered dicta . . . and any other reliable data'") (citation omitted), *reh'g denied* (June 23, 2020).[13] *Concrete Units* would never be irrelevant to a federal court deciding a question involving loss-of-use coverage under Minnesota law. Indeed, its relevance is the very foundation of the *Erie* doctrine itself.

Despite this, Target uses a branch of *stare decisis* as grounds to end the analysis without applying actual Minnesota Supreme Court authority. *See Sanzone v. Mercy Health*, 954 F.3d 1031, 1038-39 (8th Cir. 2020), *as corrected* (Apr. 9, 2020) (stating that "[t]ypically, *stare decisis* requires this court to follow the opinions of prior panels"); *Neidenbach v. Amica Mut. Ins. Co.*, 842 F.3d 560, 566 (8th Cir. 2016) (stating rule that "'[a]bsent an intervening opinion by a [state] court,' we are bound by a prior panel's interpretation of state law") (citation omitted). But its argument is a perversion of that doctrine as well.

A case becomes precedent within the *Neidenbach* ruling only when the prior panel *interprets* state law. *Id.* (so stating). In response to that point, Target again mischaracterizes ACE's argument, stating that "ACE argues that the Court can disregard [*Eyeblaster*]

---

[13] ACE in no way concedes that *Concrete Units* did not decide the issue this case raises; it merely points out that even accepting Target's contrary contention would not "end the inquiry."

because it did not *apply* Minnesota law." (Target Resp. at 5) (emphasis added).[14] That mischaracterization misses the point—the *Eyeblaster* court undisputedly resolved the dispute without examining Minnesota's loss-of-use precedent, analogous decisions, considered dicta, or any other reliable data. The court relied upon cases applying Virginia and Oklahoma law, but more importantly it engaged in no analysis and reached no conclusion as to how those decisions fit within the predictive evidence the *Erie* doctrine mandates. Such a ruling does not create a precedential roadblock to the application of *actual* authority from the state's highest court.

Consistent with its analysis of *Eyeblaster* generally, Target seemingly believes that the very applicability of the *Erie* doctrine "necessarily" means that the *Eyeblaster* court examined all Minnesota case law, found that none of it directly applied, then engaged in an implied prediction that the Minnesota Supreme Court would choose the Oklahoma and Virginia decisions if faced with the *Eyeblaster* facts.[15] According to Target, the bare fact the *Eyeblaster* court applied Minnesota law means all other Minnesota precedent is off-limits to this court, even though the *Eyeblaster* court engaged in no interpretation of Minnesota law and undertook no analysis of how the Minnesota Supreme Court would rule

---

[14]ACE's opening memorandum specifically states that Minnesota law applied in *Eyeblaster*. (ACE Opening Mem at 31). Nor, incidentally, has ACE ever contended either that the Court should "disregard" *Eyeblaster* or that the court in that case "*sub silencio*" applied the law of some other state. (Target Resp. at 5-7). Instead, ACE contends that *Eyeblaster* neither presents a roadblock to the application of Minnesota cases compelling summary judgment in ACE's favor nor supports Target's position on the merits.

[15] Moreover, as discussed below (*infra* at p. 26), the *Eyeblaster* court cited these two cases for the singular and unremarkable proposition, completely irrelevant in this case, that a computer is "tangible property." *See* 613 F.3d at 802.

in that case, much less this one. But federal courts are "bound by holdings, not unwritten assumptions." *Fernandez v. Keisler*, 502 F.3d 337, 343 n.2 (4th Cir. 2007) (citation omitted). And holdings do not become part of a decision as if by magic wand. *See United States v. Rubin*, 609 F.2d 51, 69 (2d Cir. 1979) (stating that judges "cannot transmute dictum into decision by waving a wand and uttering the word 'hold'"), *aff'd,* 449 U.S. 424 (1981).[16] Cases do not become precedent on any given issue by necessary implication. *Streu v. Dormire*, 557 F.3d 960, 964 (8th Cir. 2009) (stating that "we are generally not bound by a prior panel's implicit resolution of an issue that was neither raised by the parties nor discussed by the panel").

This has long been the rule: "[W]hen an issue is not squarely addressed in prior case law, we are not bound by precedent through *stare decisis.*" *Passmore v. Astrue*, 533 F.3d 658, 660 (8th Cir. 2008). Moreover, "[q]uestions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents." *Sanzone*, 954 F.3d at 1038-39 (quoting *Webster v. Fall*, 266 U.S. 507, 511 (1925)). These rules apply doubly here—first to the broad contention that *Eyeblaster* created some impenetrable barrier to further inquiry on the question presented here (already discussed), and second to Target's contention that *Eyeblaster* "necessarily" reflects a wanded "holding" on time-based loss-of-use damages and replacement costs. (Target Resp. at 4-8).

---

[16] In this regard, Target's argument further perverts the doctrine by claiming that the Court is bound by the Eighth Circuit's *reasoning*. (Target Resp. at 1 (stating that Court must "follow the Eighth Circuit's reasoning"); Target Resp. at 7 (stating that Court has no "authority to second-guess the Eighth Circuit's reasoning")).

On the latter point, the *Eyeblaster* court said nothing about replacement costs. Inaccurately claiming that it did, Target argues that "the Eighth Circuit *held* . . . that the underlying plaintiff's demand for 'the cost of his *existing* [less functional] computer' was covered as damages because of the 'loss of use of tangible property." (Target Resp. at 4) (alteration original) (emphasis added). First, by definition the cost of *existing* tangible property is not a "replacement" cost. Second, the court actually said that a claim for the cost of the existing computer established that the claimant had plead as a fact that his existing computer was not usable, which explains why the *Eyeblaster* court referred to the existing computer in the first place: "He thus argues that his computer is no longer usable, *as he claims* among his losses 'the cost of his *existing* computer.'" 613 F.3d at 802 (emphasis added). The phrase "as he claims" is one of explanation, of causal connection. The court found the claim for the cost of the existing computer explained the argument that it was no longer usable. The court did not, however, squarely address, much less "hold" (by "magic wand" or otherwise), that replacement costs are within coverage as "damages because of loss of use." The quoted language is not even on the *topic* of replacement costs. *Eyeblaster* did not establish binding precedent on any issue presented in this case.

Moreover, the overall context of the court's discussion confirms this, as it shows that the parties' *actual* dispute in that case was whether the property at issue was tangible (the computer) or intangible (infected software containing tax return data), an issue not implicated here. 613 F.3d at 802. The court confirmed this by starting with the district court's ruling: "The district court concluded that the [claimant's] complaint does not allege

damage to tangible property because it only claims damage to software, which is by [policy] definition excluded." *Id.* at 801. The appellate court agreed with that ruling. *Id.*

The loss-of-use issue, however, arose because the district court "*fail[ed] to consider* [the insurer's] duty under" the policy's loss-of-use-of-tangible-property provision. *Id.* (emphasis added). That previously unaddressed dispute raised the same question—whether a loss of use occurred to tangible versus intangible property. The Court ultimately ruled that the complaint adequately alleged loss of use of tangible property such that the insurer had a duty to defend against that claim (in this case the broader duty to defend is not at issue; only the more restrictive duty to indemnify is plead by Target, which said duty the *Eyeblaster* court did not consider). The court analyzed this issue as follows: First, it concluded that "[t]he tangible property is [the claimant's] computer." *Id.* Next, the court stated that the claimant alleged that he lost the use of his existing computer for transferring client tax returns, and that he "therefore must reconstruct those records on a new computer." *Id.* The court found the claimant's argument about the existing computer's usability to be supported by the allegation seeking to recover its cost. *Id.* The court returned to the tangible versus intangible question, stating that the policy "did not include a definition of tangible property." *Id.* It continued further by stating that "[t]he plain meaning of tangible property includes computers, and the [] complaint alleges repeatedly the 'loss of use' of his computer." *Id.* The court completed its analysis with the citation to two cases, one applying Virginia law and one applying Oklahoma law, both as support for the proposition that a computer is tangible property. *Id.* (citations omitted).

In short, the *Eyeblaster* court addressed a completely different issue from the one presented here. By no possible reading of that case did the court "squarely address" the questions either of time-based loss-of-use damages or replacement costs as "damages because of loss of use." *Passmore*, 533 F.3d at 660 (stating that "when an issue is not squarely addressed in prior case law, we are not bound by precedent through *stare decisis*"). Indeed, that issue at the very most "lurk[ed] in the record" of *Eyeblaster* because the parties did not raise it as an issue, and the court therefore said literally nothing about, the question of what damages might be within coverage after remand. *Sanzone*, 954 F.3d at 1038-39 (stating that "[q]uestions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents"). *Eyeblaster* did not establish binding precedent on any issue presented in this case.

Target contends, however, that by "necessary implication" the *Eyeblaster* court must have decided that *some damage* would be covered (if proven on remand), and it seemingly contends that replacement costs are what the court "necessarily" found to be covered. (Target Resp. at 7-8). Target argues: "By finding a duty to defend the Eighth Circuit *necessarily concluded* that the underlying lawsuit against the insured did not "'fall[] outside coverage.'" (Target Resp. at 7) (emphasis added) (quoting *Eyeblaster*, 613 F.3d at 804). According to Target, "[t]his means that the Eighth Circuit could not have reached its decision [that the insurer had a duty to defend] without *holding* that the plaintiff in that case alleged a loss within the scope of coverage as a matter of law." (*Id.* at 8) (emphasis added) (original emphasis removed).

Nothing in those contentions is correct. First, courts do not decide, much less *necessarily* decide, issues not raised by the parties. *Streu*, 557 F.3d at 964 (stating that "we are generally not bound by a prior panel's implicit resolution of an issue that was neither raised by the parties nor discussed by the panel"). Nor do issues not raised become "holdings." *Fernandez*, 502 F.3d at 343 n.2 (stating that federal courts are "bound by holdings, not unwritten assumptions") (citation omitted). And for good reason: "The question actually before the court is investigated with care, and considered in its full extent. Other principles which may serve to illustrate it, are considered in their relation to the case decided, but their possible bearing on all other cases is seldom completely investigated". *See, e.g.*, *Carroll v. Carroll's Lessee*, 57 U.S. 275, 287 (1853). There is no such rule as a "lesser included issue" or a "lesser included holding." When parties do not contest a particular point, courts do not decide it anyway, and such non-decisions do not become precedential holdings. The *Eyeblaster* court decided the issues presented for review and "remand[ed] for further proceedings." 613 F.3d at 805. Target's argument describes the essence of what is *not* a holding.

Second, Target contends that the sole issue raised in *Eyeblaster* (the duty to defend) provides no distinction from the issue raised here (the duty to indemnity), (Target Resp. at 7), but the truncated quotation it provided to the Court on the duty to defend (recited directly above at p. 27) distorts the actual law, which fully states that an insurer may escape the duty to defend only when "*each claim* asserted in the lawsuit clearly falls outside the policy." *Eyeblaster*, 613 F.3d at 801 (emphasis added); *see also Metro. Prop & Cas. Ins. Co. v. Miller*, 589 N.W.2d 297, 299 (Minn. 1999) (stating that insurer must defend when

"*any part* of the claim against the insured is arguably within the scope" of coverage) (emphasis added). This means that *one* potentially covered claim—*any* such claim—triggers the duty to defend. *Id.* Target's argument that the *Eyeblaster* court *necessarily* ruled on the question of covered damages—even though the parties did not raise that question—not only is contrary to law, it goes a step beyond and tries to assume that the necessary ruling was on a damage item the court did not even *mention*—the cost of a *replacement* computer.

If a later court were actually required to decide what a previous court "necessarily" ruled, presumably that later court would rely on something the previous court actually discussed and that comports with controlling law. In *Eyeblaster*, for example, the claimant alleged that he lost the use of his existing computer, which he used to service clients. The court stated: "[Claimant] asserts that his computer has three years of client tax returns that he cannot transfer because he believes the spyware files would also be transferred." 363 F.3d at 802. Therefore, he had to commit his own professional time, or hire someone, to transfer the files manually: "[Claimant] asserts that . . . he therefore must reconstruct those records on a new computer." *Id.* These are the very kinds of time-based damages that triggered a duty to defend in *Concrete Units*, where the plaintiff lost the use of its grain elevator and thereby lost profits from its inability to dry corn, and incurred expenses from its need to rent other storage space. 363 N.W.2d at 756. The *Eyeblaster* court did not "necessarily reject" a hundred years of Minnesota Supreme Court precedent as to what it means to become "legally obligated to pay damages because of loss of use."

In sum, the Eighth Circuit's decision in *Eyeblaster* neither presents a roadblock to the application of Minnesota cases compelling summary judgment in ACE's favor nor supports Target's position on the merits.

### 4.    Target's other arguments are without merit

Finally, Target makes two additional arguments that provide no support for the outcome it seeks. First, Target cites a line of cases whose essential rule is that the loss of any *significant* use satisfies the policy's loss-of-use requirement. (Target Resp. at 22-23) (and cases cited). That rule is inapposite here because, as established above in section I A, the Card Claimants did not lose *any* use of the Payment Cards, significant or otherwise. The cards functioned exactly as intended and could continue to do so after the data breach.

Moreover, on the issue being discussed in this section—whether replacement costs are "damages because of loss of use"—the cases Target cites support ACE's position. In the first case, the claimant, a trucking company, incurred loss-of-use damages in the form of lost profits represented by its need to carry less cargo per truckload than the trailer manufacturer said its trailers could bear. *Liberty Mut. Ins. Co. v. Wheelwright Trucking Co., Inc.*, 851 So. 2d 466, 494-95 (Ala. 2002). *Wheelwright* involved lost profits; it did not involve a claim for trailer replacement costs. In the second case, the claimant experienced loss-of-use damages in the form of lower production because it could only *partially* use its boiler house due to the insured's defective cooling fans. *Hartzell Indus., Inc. v. Fed. Ins. Co.*, 168 F. Supp.2d 789, 795 (S.D. Ohio 2001). Once the claimant restored proper cooling capacity, of course, the loss-of-use damages would end. Such time-based damages reflect the rule long-followed in Minnesota, that commercial loss-of-use damages are measured

by "the reasonable value of the benefit which would have been derived from its use *during the period* it was undergoing repairs." *Hanson*, 202 Minn. at 387–88, 279 N.W. at 230–31 (emphasis added).

Second, Target criticizes ACE's use of a line of California cases, (cited in ACE Opening Mem. at 26-30), first on the ground that California is far away, and second on the ground that the cases are "old," "now-discarded" and "now-abandoned." (Target Resp. at 2 (stating that "ACE stretches 2,000 miles away to try to find support for its argument in a now-discarded line of older California cases"), Target Resp. at 25 (stating that "ACE cites a now-abandoned line of older California cases")). Target claims that a 2002 Ninth Circuit decision reflects "contemporary" California legal holdings, (Target Resp. at 25-26)— seemingly evidence that California has abandoned everything from before 2002—but ACE's actual California authority comes from 1994, 2004, 2006, 2010, and 2018.

Those cases are not old, too far away, or abandoned, and ACE stands by its contention that they are consistent with Minnesota law and add strong persuasive value to its position on this issue. *See Collin v. American Empire Ins. Co.*, 21 Cal. App. 4th 787, 818 (Cal. App. 2nd Dist. 1994) ( agreeing that "loss of use refers to rental or income value of property which has been damaged or rendered unusable"); *F&H Constr. v. ITT Hartford Ins. Co.*, 118 Cal. App. 4th 364, 377 (Cal. App. 4th Dist. 2004) (rejecting loss-of-use coverage because underlying plaintiff did "not seek damages for the rental value (or its equivalent) for the loss of the use . . . during the time period modifications were made"); *Atmel Corp. v. St. Paul Fire and Marine Ins. Co.*, 430 F. Supp. 2d 989, 992 (N.D. Cal. 2006) (rejecting insured's argument that loss-of-use coverage applies to "any and all

damages *related to* the failure of the [computer] chips in Seagate's [disk] drives, and [that it] does not require a nexus with Seagate's (or its customers') inability to *use* the drives" and adding that loss-of-use damages "may be determined by rental value or loss of profits") (emphasis original); *Advanced Network, Inc. v. Peerless Ins. Co.*, 190 Cal. App. 4th 1054, 1064 (Cal. App. 4th Dist. 2010) (stating that "[w]hile the 'loss of use' provision in Peerless's CGL policy is not modified by the term 'temporary,' the impermanent nature of 'loss of use' damages is implicit"); *THV Investments, LLC v. Certain Underwriters at Lloyds, London*, 2018 WL 2410812 at *6 (Cal. App. 4th Dist.) (ruling loss-of-use coverage inapplicable because "each of the categories of damages that THV sought in the Underlying Action were intended to permanently replace property, not to compensate for a temporary loss of use of property") (original emphasis deleted).

### C.     As a Matter of Law, the Replacement of Payment Cards was not "caused by an occurrence."

The ACE policy "applies to . . . 'property damage' only if . . . [t]he . . . 'property damage' is caused by an 'occurrence,'" which the policy defines as an accident. (Legatta Dec. Ex. A p. 12 of 230 § I.A.1. b(1)). Thus, even if the Payment Cards satisfied the policy's loss-of-use provision—which sections I A and B establish that they do not—coverage would apply only if the card replacement was caused by accident. As a matter of law and undisputed fact, the card replacement was not an accident. Therefore, coverage fails for this additional and alternative reason.

The controlling case for this issue is *Bright Wood v. Bankers Std. Ins. Co.*, 665 N.W.2d 544 (Minn. App. 2003). That case involved non-covered damages due to a

construction defect in the insured's own work and product, which said work and product was embedded in the non-defective work and product of others. *Id.* at 544. To remedy the non-covered harm (the insured's own defective work and product), it became necessary to cause harm (tear out and replacement) to that which would otherwise be a covered damage (the work and product of others). *Id.* The appellate court ruled that in such circumstances the otherwise covered damage was not caused by accident: "[T]he damage to other property occurred because the repair was deliberately undertaken. The resulting damage is not an accidental occurrence." *Id.* at 549.

The controlling rule in *Bright Wood* is that otherwise covered damage is not caused by accident when it occurs through deliberate actions purposefully undertaken to remedy harm that is *not* otherwise within policy coverage. *Id.* at 549. Target argues that *Bright Wood* does not control here, but in fact it is directly on point. The harm Target caused was allowing cyber thieves to compromise intangible data, by policy definition a harm that is beyond coverage.[17] To remedy that non-covered harm, the Card Claimants deliberately destroyed and replaced all tangible Payment Cards. Under the holding in *Bright Wood*, even if this activity involved "property damage," such damage did not occur by accident.

Target's reliance on case law and analogies where the *original* harm was a covered damage cannot overcome *Bright Wood*. For example, Target's hypothetical about a driver who suffers a severe leg injury in a car accident describes an *original* injury within policy coverage (*i.e.*, "bodily injury"). (Target Resp. at 33). The physician's decision to amputate

---

[17] *See* note 4, *supra*, at p. 5 (quoting policy provision stating that electronic data is not tangible property).

the leg simply results in a covered damage because of bodily injury. (*Id.*). The same distinction applies to the accident question raised in *American Family Ins. Co. v. Walser*, 628 N.W.2d 605 (Minn. 2001). The question there also arose in the context of an original injury within coverage (also "bodily injury"), not a *remedy* for non-covered harm.

In short, coverage in a *Bright Wood* scenario does not depend either on who decides the best course of remedial action or on who performs the remedial work. This is important because it shows why Target's focus on the actor's intent is misplaced. The outcome in *Bright Wood* would not change if the owner there had fired the contractor who performed the faulty work and hired someone else (*i.e.*, someone who is not the "insured") to remedy the defect. The second contractor's identical actions would not somehow create coverage just because the "insured's perspective" would be completely removed from the process. Nor would the *Bright Wood* outcome change if the owner hired an inspector to tell the original contractor (*i.e.*, the "insured") how best to remedy the defect (*i.e.*, by purposefully causing harm to others' work). Regardless of who makes the decision or who performs the remedial action, otherwise covered harm that is purposefully caused to remedy the insured's non-covered harm is not caused by accident. Therefore, Target's claim must also fail as a matter of law on this alternative ground.

## II.   This Court Can and Should Consider the Insuring Context When Interpreting the ACE Policy Language.

Target allocates more than five briefing pages, and makes seven discreet arguments, in an attempt to refute the irrefutable rule of insurance policy construction mandating consideration of context when interpreting an insurance policy.   Target's arguments miss

the mark, and continue its ubiquitous practice of mischaracterizing ACE's arguments. ACE does not suggest that the actual language in Target's cyber policies directly impact the court's interpretation of the ACE policy (such that the cyber policies must be placed into and relied upon as extrinsic evidence). Nor does ACE argue that the Court's analysis should not focus on the actual language in the ACE policy.  Rather, ACE simply asks the Court to consider the type of risk at issue here—and the fact that cyber insurance exists in the market for this type of risk—in its contextual analysis of *the ACE policy language*.

Minnesota courts routinely consider the insuring context when interpreting the meaning of policy terms. *Am. Commerce Ins. Brokers, Inc. v. Minnesota Mut. Fire & Cas. Co.*, 551 N.W.2d 224, 229 (Minn. 1996) (interpreting "series of related acts" in business insurance policy in context of embezzlement claim); *Mickman Bros. v. Farm Bureau Mut. Ins. Co.*, 639 N.W.2d 890, 894–95 (Minn. Ct. App. 2002) (interpreting "hired" in auto policy's hired vehicle exclusion in the context of an interstate trucking claim); *Acceptance Ins. Co. v. Canter*, 927 F.2d 1026, 1027–28 (8th Cir. (Minn.) 1991) (interpreting "in the business of" in the context of a liability policy issued to a trucker operating under a long-term lease agreement). Here, Target, failed to purchase a sufficient amount of cyber coverage to indemnify it for the full amount of its payouts, causing it to now improperly reach for its commercial general liability policies to cover its shortfall.

Further contrary to Target's arguments:

- A contextual analysis of the coverage at issue in the ACE policy is in no way influenced by the insured's *intent* in procuring coverage;

- The deletion by endorsement of the "electronic data" exclusion from Coverage A is a meaningless observation given that, by definition, "tangible property" does not include "electronic data," making the "electronic data" exclusion entirely superfluous to the issues at hand;

- *Eyeblaster, Inc. v. Fed. Ins. Co.*, 613 F.3d 797 (8th Cir. 2010) does not refute ACE's arguments concerning a contextual analysis because the *Eyeblaster* court did not consider the standards for insurance policy interpretation, much less address ACE's textual argument;

- *Interstate Fire & Cas. Co. v. Auto-Owners Ins. Co.*, 433 N.W.2d 82, 85-86 (Minn. 1988) and *U.S. Fire Ins. Co. v. Fireman's Fund Ins. Co.*, 461 N.W.2d 230, 234-35 (Minn. App. 1990) are not distinguishable because they involved coverage priority disputes, as they still announce the broad proposition that Minnesota courts recognize that context is informed by the type of risks at issue; and

- *Sony Computer Entertainment America Inc. v. American Home Assurance Co.*, 532 F.3d 1007, 1014 (9th Cir. 2008), cannot be distinguished on the grounds that it involved the interpretation of a specialized media liability policy, as this would improperly limit Minnesota law permitting a court's consideration of the context of a particular claim to only those cases involving specialized, but not general, insurance.

Target's arguments notwithstanding, Minnesota law tells us that it is entirely proper for this court to view the terms of the ACE general liability coverage in the context of Target's specialized cyber insurance, with the fact that Target failed to purchase a sufficient amount of the former being no reason to misinterpret the latter.

## CONCLUSION

For these reasons, and those set forth in its opening memorandum, Defendant respectfully requests that Plaintiff's motion be denied, and that summary judgment be

ordered in its favor, holding that Defendants owe Plaintiff no coverage for the matters at

issue in their complaint.

       Respectfully submitted,

Dated: August 13, 2020

                              */s/ Charles E. Spevacek*
                              Charles E. Spevacek (#126044)
                              William M. Hart (#150526)
                              **Meagher & Geer, P.L.L.P**
                              33 South Sixth Street, Suite 4400
                              Minneapolis, Minnesota 55402
                              (612) 338-0661
                              (612) 338-8384 Fax
                              cspevacek@meagher.com
                              whart@meagher.com

                              *Attorneys for ACE American*
                              *Insurance Company and ACE*
                              *Property & Casualty Insurance*
                              *Company*

13697293.1